```
 1                  IN THE UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF CALIFORNIA
 2         BEFORE THE HONORABLE DEBORAH BARNES, MAGISTRATE JUDGE

 3

     UNITED STATES OF AMERICA,
 4
                  Plaintiff,
 5   vs.                                  Sacramento, California
                                          No. 2:20-MJ-00096-DB
 6   TANG JUAN,                           Friday, July 31, 2020
                                          4:04 p.m.
 7                Defendant.
     _____/
 8

 9                                 --oOo--

10               REPORTER'S TRANSCRIPT OF PROCEEDINGS

11                   RE: MOTION FOR BAIL REVIEW

12           (Proceedings held via Zoom video conference.)

13                                 --oOo--

14   APPEARANCES:

15   For the Government:           UNITED STATES ATTORNEY'S OFFICE
                                   HEIKO COPPOLA
16                                 Assistant U.S. Attorney
                                   501 I Street, Suite 10-100
17                                 Sacramento, CA  95814

18   For the Defendant:            OFFICE OF THE FEDERAL DEFENDER
                                   ALEXANDRA NEGIN
19                                 Assistant Federal Defender
                                   801 I Street, Third Floor
20                                 Sacramento, CA  95814

21   Official Reporter:            KACY PARKER BARAJAS
                                   CSR No. 10915, RMR, CRR, CRC
22                                 UNITED STATES DISTRICT COURT
                                   501 I Street, Suite 4-200
23                                 Sacramento, CA  95814
                                   kbarajas.csr@gmail.com
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

1         SACRAMENTO, CALIFORNIA, FRIDAY, JULY 31, 2020, 4:04 PM
2                             --oOo--
3         THE CLERK: Calling magistrate case 20-0096-DB,
4    United States versus Tang Juan.
5         Your Honor, this matter is on calendar for defendant's
6    motion for bail review.
7         THE COURT: All right. I see -- I think we've got all
8    of our players here. Can the government state your appearance
9    for the record.
10        MR. COPPOLA: Good afternoon, your Honor.
11   Heiko Coppola on behalf of the United States. And on behalf of
12   the United States, we consent to this hearing being conducted
13   with Zoom.
14        THE COURT: Thank you. Good afternoon.
15        And for the defendant.
16        MS. NEGIN: Good afternoon, your Honor. Lexi Negin
17   from the Federal Defender's Office on behalf of Dr. Juan Tang.
18   My understanding is that Tang is her family name, so we would
19   call her that even though we write the name differently. But
20   we address her as Dr. Tang. She is present on Zoom, your
21   Honor. She consents to these proceedings by Zoom. She's using
22   a Mandarin interpreter, Mr. Shek. Mr. Shek is on the screen as
23   well. I can see that he is speaking into a telephone to
24   Dr. Tang. And if Dr. Tang can just wave her hand to let us
25   know that she can see and hear us, and then we can proceed by

1   Zoom.  And I assume Mr. Shek will let us know as well if she --
2   if there was any problems there.
3          THE COURT:  All right.
4          THE INTERPRETER:  And your Honor, for the record, this
5   is Richard Shek, previously sworn Mandarin interpreter.
6          THE COURT:  Good afternoon, Mr. Shek.
7          And I would like to thank you all for your patience
8   today.
9          Mr. Shek, are you in communication with Dr. Tang?
10  Sir, you're muted.  And Mr. Shek, I assume -- do I assume
11  correctly you are in communication with Dr. Tang?
12         THE INTERPRETER:  I am on the phone with her.  I don't
13  know if she -- I need her to indicate that she can hear me.
14         THE COURT:  Dr. Tang, go ahead, please.
15         THE DEFENDANT:  I can hear you.
16         THE COURT:  Thank you very much.
17         Dr. Tang, we're here today for your -- based on your
18  lawyer's motion for bail review.  And before we go over the
19  issue at hand, I want to review your rights with you.  You have
20  the right to an attorney.  And as Ms. Negin and the Federal
21  Defender's Office has been previously appointed to represent
22  you in the matter, I would suggest you let her speak for you or
23  you consult with her before you speak in open court.  That is
24  because you have the right to remain silent, and anything you
25  say in this proceeding can be used against you in a future

1  proceeding.

2  All right.  I would like to indicate for the record
3  that the Court is in receipt of the bail motion filed by
4  Ms. Negin.  I'm also in receipt of an opposition filed by
5  Mr. Coppola.  I am also in receipt of the Pretrial Services
6  report that was prepared by Steve Sheehan of Pretrial Services.

7  MS. NEGIN:  And your Honor, I filed a reply as well.

8  THE COURT:  Let me make sure I've seen that one.  When
9  did you file your reply, Ms. Negin?

10  MS. NEGIN:  About 7:00 p.m. last night.

11  THE COURT:  All right.

12  MS. NEGIN:  Maybe 8:00.

13  THE COURT:  Let me make sure I've seen it.

14  MS. NEGIN:  It should be the last filing on the
15  docket.

16  THE COURT:  Hold on.  Got it.  Just a moment, please.
17  For some reason I'm having difficulties accessing it.  Give me
18  just a moment and I will try again.

19  All right.  Here we go.  Give me just a second.

20  All right.  I've had a chance to briefly review the
21  defendant's reply to the government's opposition.  I would like
22  to assure everyone here today the Court is well aware of the
23  burden of proof and the presumption of innocence.

24  The Court is also well aware that this case is at the
25  complaint stage which is a relatively early stage in the

1  criminal process.  In the United States I will also note that
2  it is not unusual for the government to proffer information
3  during a detention hearing process as well, so I'd like to
4  continue on with our hearing, and I'd like to hear from the
5  parties before I make my decision.
6  　　　　　Mr. Coppola, have you been in receipt of the Pretrial
7  Services report?  And I assume given your opposition, you have
8  reviewed the defense's bail review motion and the reply to your
9  opposition; am I correct with those assumptions?
10 　　　　　MR. COPPOLA:  Yes, your Honor.  I have received the
11 Pretrial Services report, and I have received both of counsel's
12 filings.
13 　　　　　THE COURT:  All right.  And what is the government's
14 position on detention at this time?
15 　　　　　MR. COPPOLA:  Your Honor, the government's position on
16 detention, we would renew our motion for detention at this
17 time.  There are two matters, your Honor, before I proceed with
18 additional argument that I need to correct the record on
19 with related -- as they relate to my filing.
20 　　　　　THE COURT:  All right.
21 　　　　　MR. COPPOLA:  The first regards footnote number 2,
22 your Honor, in my opposition.  It should more correctly -- it
23 should more correctly read, "some of the items had been
24 deleted," as opposed to the blanket statement that perhaps left
25 the Court with the impression that all of the items on her

1    electronic devices had been deleted.

2              THE COURT:  All right.  Thank you.

3              MR. COPPOLA:  So and with that, your Honor, I will

4    just say that, to further clarify, a number of the photos of

5    her in military uniform have been deleted.  There were the

6    documents related to Dr. Tang's research related to antidotes

7    for biological agents was also among the deleted items.  The

8    video that I mentioned is not among the deleted items.

9    However, the application that I mentioned for Communist Party

10   benefits was either deleted or in the recycle bin, I can't

11   recall which.

12             The second area that I wanted to correct or at least

13   clarify for the record is the Court no doubt noted my comment

14   that the State Department had revoked Ms. -- or excuse me,

15   Dr. Tang's J-1 visa, and while that is correct, it is what

16   is -- I received some clarification earlier today that that

17   revocation is what's known as a prudential revocation.

18             THE COURT:  What kind of revocation?

19             MR. COPPOLA:  A prudential revocation, which means

20   that it will not be formally revoked until she is removed from

21   the United States.  So I wanted those -- I wanted to correct

22   the record with respect to those issues from the outset.

23             THE COURT:  All right.  Thank you.

24             All right.  Ms. Negin, you've been following this

25   discussion.  I know that you have received the government's

1  opposition.  Given your reply, I am going to assume you -- are
2  you in receipt of the Pretrial Services report as well?
3         MS. NEGIN:  Yes, your Honor, and I did want to make
4  some comments.
5         THE COURT:  All right.  You need to speak up just a
6  teeny bit.  I have to tell you the concern I have regarding
7  Dr. Tang is the lack of sureties and any -- all of her ties are
8  in China.  It's not unusual for an individual to seek
9  assistance from her consulate, their own consulate.  I don't
10 know how usual it is to live in a consulate for a month.  I
11 don't know how usual that is.
12        Nonetheless, the main concern I have is I just don't
13 see here sufficient conditions to overcome flight risk.  She
14 would have every reason to leave, and the fact she stayed at
15 the consulate and didn't leave until there's a doctor's
16 appointment also I thought was interesting.
17        MS. NEGIN:  Well, it wasn't an appointment -- sorry,
18 your Honor.
19        THE COURT:  It was not an appointment?  I thought it
20 was a medical appointment.  Am I wrong with that?
21        MS. NEGIN:  It wasn't an appointment.  I can address
22 that if the Court -- I don't want to interrupt the Court if you
23 had more.
24        THE COURT:  So was it -- what was it for then?
25        MS. NEGIN:  Well, my understanding of what occurred,

1  and this is me hearing it from different sources.  I wasn't
2  there obviously.  But my understanding of what occurred is that
3  the agents or law enforcement was at the consulate, informed
4  the consulate that there was actually a warrant in hand which
5  I'm not sure that that had been known by them until that time.
6  And the consulate's response -- and Mr. Coppola can correct me
7  if I'm wrong -- but the consulate's response was sort of like,
8  well, it's up to her, you know, to come out or not.  If she's
9  on property, you can't arrest her.  If she leaves, you know,
10 you can.  We're going to leave that up to her.
11         My understanding is that when the consulate then
12 informed her outside of the presence of law enforcement about
13 the warrant, she had a reaction that was emotional and physical
14 and that the consulate felt she needed medical help at that
15 moment.  And so the consulate took her off property in a car.
16 And she was well enough.  She wasn't unconscious or anything.
17 She was well enough to agree to go to medical.
18         My understanding is that the consulate advised that
19 she should be seen medically first to be cleared before she was
20 taken into custody and that she knew that was going to happen
21 and that she agreed with that plan and that they went to a
22 medical office which I don't know if it's a hospital -- maybe
23 Mr. Coppola knows better -- but a medical office and that the
24 agents of course saw the car leave and then went to the -- went
25 to the place.  And then once she was able -- once she was

1    medically cleared, they arrested her.  But it wasn't like a
2    prescheduled appointment.  I just wanted to --
3            THE COURT:  All right.  My mistake.  It was at least
4    medically related is my general understanding.
5            MS. NEGIN:  Right.  But your Honor, I have -- well, so
6    I just wanted to address a couple issues, and I think the Court
7    is exactly -- I understand the Court's concerns, and what I
8    think is I don't have a surety in the United States right now
9    for Dr. Tang.  I think that people are scared.  The Chinese
10   community is terrified about the news and about what they're
11   hearing, and many of the Chinese academics that Dr. Tang knows
12   are leaving the country right now because of this concern.  So
13   there is no surety.
14           However, when the Court is looking at the flight risk,
15   she has no ability to leave the country.  She does not have a
16   passport.  She has to fly to China.  It's not like Mexico where
17   you can drive across the border.  She has no ability to leave
18   as a matter of the passport.
19           In addition, we have a place, a secure place for her
20   to live, a stable place for her to live, and she could be put
21   on electronic monitoring.  That could be put on immediately.
22   And there's no reason for her to not have that on right away
23   and go to the residence and not leave the residence.  I mean,
24   she could basically be on home detention at this residence.
25   There's no problem with that at all.  And your Honor, if she

1  left the residence for any reason that wasn't cleared by
2  Pretrial Services, the Court, everyone would know about it
3  right away.
4        And there's absolutely -- Dr. Tang has every incentive
5  to stay in the United States to fight this case.  This case has
6  an impact on her for the rest of her life.  And I will say that
7  as of this moment, I don't have the discovery, but we are
8  contesting these allegations.  This uniform that the government
9  keeps calling a military uniform is also widely known as a
10 uniform that civilian contractors wear when they are working or
11 associated with the military.  So -- and that's readily also
12 available on Google that the FBI agents have been using to do
13 some research here.  And so the idea that this is a military
14 uniform is not exactly accurate.  There are contract civilians
15 that wear uniforms similar to, you know, contract employees
16 that work at Air Force bases or whatever.  She is seen in
17 photographs in a uniform.  It is not necessarily -- it doesn't
18 necessarily make this case.
19       The other thing too is about this deleted stuff.  I
20 mean, we don't know when it was deleted.  We don't know the
21 circumstances under which it was deleted, and we don't know
22 what this material is that is necessarily -- why would someone
23 delete some things and not other things that are -- if they
24 thought they were incriminating.
25       So your Honor, and importantly, Dr. Tang has never --

1  she did what she had a right to do, and I think the Court
2  already said you understand that people go to a consulate in
3  this circumstance and that's --
4           THE COURT: But they normally don't -- just in my
5  anecdotal information and understanding, I think it's somewhat
6  unusual to be at a consulate for 30 days.
7           MS. NEGIN: Well, the problem here is that she had
8  given up her apartment, and she did not know whether she should
9  stay or leave; and she didn't have identification anymore. She
10 didn't really have a way to know what to do, and that was part
11 of what she was seeking for help from the consulate.
12          THE COURT: I have to say, Counsel, I would -- another
13 assumption I might make, I could be wrong, but I would doubt
14 that the Chinese consulate would allow her to live at the
15 consulate for a month if they didn't have some assurance that
16 she was in fact who she said she was and that people often go
17 to consulates in countries that -- if they find themselves in a
18 foreign country, they'll go to their country of origin
19 consulate to get replacement ID, to get replacement passports,
20 et cetera, so --
21          MS. NEGIN: Well, and your Honor, she could have
22 gotten a replacement passport and left the country if she was
23 going to flee because she didn't know that there was a warrant.
24 And so -- and she didn't know there were charges. And if she
25 was trying to evade this -- I mean, she sent her daughter back

1    to China.

2            THE COURT:  I see that.

3            MS. NEGIN:  She sent her daughter back to China

4    because there was already an arrangement to leave the country

5    before the FBI even came to the apartment.  She had no notice

6    at all that the FBI was going to show up that day, and so your

7    Honor, what I think is important is we're looking -- the

8    statute requires the least restrictive conditions, and this is

9    not a presumption case.  And so the risk of flight can be

10   addressed.  We don't have dangerousness here.  I think

11   everybody agrees with that.  The risk of flight can be

12   addressed with this particular housing situation.  It could be

13   a home detention with electronic monitoring, and Pretrial

14   Services can monitor that and alert the Court and law

15   enforcement if there was any issues at all.  There's no

16   problems here.  Dr. Tang understands what's going on.  She

17   wishes to deal with this case.  I mean, there's a lot at

18   stake --

19           THE COURT:  Counsel, I hear what you're saying, and I

20   think -- and I thought you just -- I thought maybe you froze up

21   there for a moment.  Not you, but the Zoom connection.  I have

22   to say that does not address my concern that she has virtually

23   no ties here in the country.  She would have every reason to

24   attempt to try to go back to her country of origin.  People --

25   you can disagree with me and that's fine.  People do get on

1  airplanes.  People do slip through.  I'm just very concerned
2  about any -- all of her ties are in China.  Any financial
3  resources are in China.  There is nothing here for her.  And,
4  you know, if the situation were somewhat different, if there
5  was some resources here in the United States, maybe that would
6  make a difference.  I can't guarantee it would.  But everything
7  points to everything for her being in China.
8          And there are statements that are not my primary
9  concern, but there's some confusion as to whether she actually
10 left UC Davis lab, whether she was in the lab, not in the lab.
11 Those are not my primary concern, but they do give me pause.
12 I'm not -- it's really the flight risk and the lack of ties --
13         THE CLERK:  Judge, are you there?
14         THE COURT:  -- here in the United States is a flight
15 risk issue.
16         MS. NEGIN:  Your Honor, you froze for a little bit.  I
17 heard what you were saying, but you did stop there for a
18 second.
19         THE COURT:  Maybe my own wifi signal is getting tired.
20 In any event, I still have those concerns, Ms. Negin.  And I
21 don't disagree with the presumption of innocence, et cetera,
22 but I am concerned about the flight risk, and I just don't see
23 a combination of conditions here that address that issue.
24         MS. NEGIN:  Yes, your Honor.  We will seek -- we will
25 continue to seek surety, and if we get one, we'll come back to

1  the Court.
2          THE COURT:  All right.  I'm going to make a ruling at
3  this time, deny the bail motion at this time based on the
4  flight risk.  I don't have a combination of conditions that
5  ameliorate the flight risk here.  Again, that decision is made
6  without prejudice.
7          Ms. Negin, I know you know how to put this back on
8  calendar.  You've just got to give the Court something more.
9          MS. NEGIN:  I understand.
10         THE COURT:  Hopefully you can make that arrangement.
11 Again, no guarantees, but that is my primary concern.
12         MS. NEGIN:  Yes, your Honor.  I understand.
13         THE COURT:  All right.  I believe that takes care of
14 this case unless, Mr. Coppola, you have anything else to add.
15         MR. COPPOLA:  I don't, your Honor.
16         THE COURT:  All right.  Thank you both.
17         MS. NEGIN:  Thank you, your Honor.
18              (The proceedings adjourned at 4:24 p.m.)
19                             --oOo--
20 I certify that the foregoing is a correct transcript from the
21 record of proceedings in the above-entitled matter.
22                             /s/ Kacy Parker Barajas
                                _____
23                              KACY PARKER BARAJAS
                                CSR No. 10915, RMR, CRR, CRC
24
25