IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF CALIFORNIA


  UNITED STATES OF AMERICA,

                    PLAINTIFF,
                                            CASE NO. 2:20-CR-00134
              VS.

                                            SACRAMENTO, CALIFORNIA
  JUAN TANG,                                AUGUST 27, 2020
                                            2:00 P.M.
                    DEFENDANT.
  _____  /




                         MOTION FOR BAIL REVIEW
                  BEFORE THE HONORABLE KENDALL J. NEWMAN
                      UNITED STATES MAGISTRATE JUDGE



  APPEARANCES:
  (CONTINUED ON NEXT PAGE)



  FOR THE GOVERNMENT:            UNITED STATES ATTORNEY
                                 501 I STREET, SUITE 10-100
                                 SACRAMENTO, CALIFORNIA 95814
                                 BY:  HEIKO COPPOLA
                                      ASSISTANT U.S. ATTORNEY




  COURT REPORTER:                DIANE J. SHEPARD, CSR 6331, RPR
                                 OFFICIAL COURT REPORTER
                                 501 I STREET, RM 4-200
                                 SACRAMENTO, CALIFORNIA 95814
                                 (916) 538-5907


  PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
  PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

```
 1    APPEARANCES CONTINUED:

 2

 3    FOR THE DEFENDANT:          MALCOLM S. SEGAL
                                  SEGAL & ASSOCIATES, PC
 4                                400 CAPITOL MALL, SUITE 2550
                                  SACRAMENTO, CALIFORNIA 95814
 5

 6                                THOMAS A. JOHNSON
                                  LAW OFFICES OF THOMAS A. JOHNSON
 7                                400 CAPITOL MALL, SUITE 1620
                                  SACRAMENTO, CALIFORNIA 95814
 8

 9                                PATRICK WONG
                                  ATTORNEY AT LAW
10                                145 EL CAMINO REAL, UNIT B
                                  MENLO PARK, CALIFORNIA 94025
11

12
      ALSO PRESENT:               RICHARD SHEK
13                                FEDERAL CERTIFIED INTERPRETER

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  CALLING CRIMINAL CASE 20-134 JAM.  UNITED

2     STATES V TANG JUAN.  ON FOR DEFENDANT'S MOTION FOR PRETRIAL

3     RELEASE.

4          THE COURT:  GOOD AFTERNOON.  I AM JUDGE NEWMAN.  I

5     HOPE EVERYONE IS HEALTHY.  IF I COULD PLEASE HAVE APPEARANCES

6     FOR THE RECORD STARTING WITH GOVERNMENT'S COUNSEL.

7          MR. COPPOLA:  GOOD AFTERNOON, YOUR HONOR.  HEIKO

8     COPPOLA ON BEHALF OF THE UNITED STATES.

9          THE COURT:  MR. COPPOLA, GOOD AFTERNOON.  AND FOR THE

10    DEFENDANTS?

11         MR. SEGAL:  GOOD AFTERNOON, YOUR HONOR.  MALCOLM SEGAL

12    ON BEHALF OF THE DEFENDANT, DR. JUAN TANG.

13         THE COURT:  MR. SEGAL, GOOD AFTERNOON.  GOOD TO SEE

14    YOU, SIR.  WHO ELSE FOR THE DEFENDANTS?

15         MR. JOHNSON:  GOOD AFTERNOON, YOUR HONOR.  TOM JOHNSON

16    ON BEHALF OF DR. JUAN TANG ALSO.

17         THE COURT:  AND MR. JOHNSON, GOOD AFTERNOON TO YOU,

18    SIR.

19         MR. WONG:  GOOD AFTERNOON, YOUR HONOR.  PATRICK WONG

20    FOR DEFENDANT.

21         THE COURT:  AND MR. WONG, GOOD AFTERNOON.

22       AND DR. TANG, FIRST AM I REFERRING TO YOU CORRECTLY?  IS IT

23    DR. TANG?  IS THAT THE CORRECT WAY TO REFER TO YOU?

24         THE DEFENDANT:  YES, I AGREE.

25         THE COURT:  SO DR. TANG, AS YOU HEARD, AND I KNOW

1    YOU'VE HAD OTHER COURT APPEARANCES, BUT EVERYONE IS REMOTE TODAY

2    INCLUDING I'M NOT IN MY COURTROOM, NEITHER IS MY COURTROOM

3    DEPUTY.

4        AND BEFORE I EVEN TURN TO THAT, I APOLOGIZE.  I DIDN'T HAVE

5    PRESENCE ANNOUNCED BY THE COURT INTERPRETERS.  IF I COULD HAVE

6    THE COURT INTERPRETER ALSO STATE APPEARANCE FOR THE RECORD.

7            THE INTERPRETER:  YES.  THE INTERPRETER'S NAME IS

8    RICHARD SHEK, PREVIOUSLY SWORN MANDARIN INTERPRETER.

9            THE COURT:  I APOLOGIZE, MR. SHEK.  GOOD TO SEE YOU,

10   SIR.

11       DR. TANG, AS I MENTIONED, WE ARE ALL REMOTE IN LIGHT OF

12   COVID-19.  ARE YOU IN FACT AGREEABLE TO APPEARING TODAY VIA

13   ZOOM?

14           MR. COPPOLA:  YES, YOUR HONOR.  I AM AGREEABLE TO

15   APPEARING.

16           THE COURT:  MR. COPPOLA, I WASN'T CONCERNED ABOUT YOU.

17   I WAS ASKING DR. TANG.

18           MR. COPPOLA:  OH, SORRY.

19           THE COURT:  I'M SORRY, MR. SHEK.  YOU WERE ON AND NOW

20   YOU'VE MUTED.  IF YOU COULD DO THAT AGAIN?

21           THE INTERPRETER:  I'M SORRY.

22           THE DEFENDANT:  YES, I AGREE TO CONDUCT THIS THROUGH

23   ZOOM.

24           THE COURT:  THANK YOU.  THE OTHER THING I WANT TO

25   REMIND YOU BEFORE WE START IS YOU HAVE THE RIGHT TO REMAIN

1   SILENT.  YOU'RE NOT REQUIRED TO MAKE ANY STATEMENTS HERE TODAY,

2   AND I MUST CAUTION YOU IF YOU MAKE ANY STATEMENTS THEY COULD BE

3   USED AGAINST YOU NOT ONLY TODAY BUT IN FUTURE PROCEEDINGS IN

4   THIS MATTER.

5       WE ARE HERE FOR A BAIL REVIEW.  IN THAT REGARD, I HAVE

6   RECEIVED AND REVIEWED THE DEFENDANT'S MOTION, THE ACCOMPANYING

7   AFFIDAVIT FROM A PROPOSED THIRD PARTY CUSTODIAN, THE

8   GOVERNMENT'S OPPOSITION, THE DEFENDANT'S REPLY, THE PRETRIAL

9   SERVICES REPORTS INCLUDING THE AMENDED -- THE SUPPLEMENTAL

10  REPORT FROM TODAY.  AND I'VE BEEN BACK THROUGH THE DOCKET.  SO I

11  THINK I'VE LOOKED AT EVERYTHING.

12      IF THERE'S SOME CONCERN AMONGST ANY OF YOU, AS WE'RE

13  SPEAKING, THAT I'VE MISSED ANYTHING, PLEASE JUST SPEAK UP AND

14  LET ME KNOW THAT.  WE CAN MAKE SURE AND ADDRESS WHETHER OR NOT

15  I'VE LOOKED AT IT AND CONSIDERED IT.

16      LET ME START PRELIMINARILY CERTAIN COMMENTS, I WANT TO TELL

17  YOU A FEW THOUGHTS, THINGS THAT CONCERN ME, THINGS THAT DON'T

18  CONCERN ME.

19      I DON'T THINK IT IS A CONCERN THAT DR. TANG WENT TO THE

20  EMBASSY AFTER BEING QUESTIONED BY LAW ENFORCEMENT, HAVING HER

21  PASSPORT TAKEN.  I THINK IT'S A LITTLE BIT MORE OF A QUESTION

22  MARK ABOUT HER RESIDING AT THE EMBASSY FOR APPROXIMATELY THREE

23  WEEKS.  ALTHOUGH, CANDIDLY, I THINK AT THAT PLACE -- AT THAT

24  TIME MY UNDERSTANDING IS SHE HAD NO WHERE TO LIVE AT THAT POINT.

25  SO I REALLY -- I'M NOT PUTTING A GREAT DEAL OF WEIGHT INTO THE

1  ISSUE OF HER GOING TO THE EMBASSY.  I'M NOT REALLY GIVING IT ANY

2  WEIGHT.

3      AND THEN, CANDIDLY, IT'S NOT AS IF THEY GAVE HER ANOTHER

4  PASSPORT AND FLEW HER OUT IN THE DARK OF NIGHT.  SHE CAME OVER

5  TO THE EMBASSY AND WAS ULTIMATELY ARRESTED.  I DO FIND IT -- AT

6  ONE POINT -- I WANT TO CLARIFY FROM DEFENSE COUNSEL -- AM I

7  CORRECT THAT -- AND I THOUGHT I READ SOMEWHERE -- SHE WAS

8  ACCOMPANIED -- AFTER HER HUSBAND WENT BACK TO CHINA, SHE WAS

9  ACCOMPANIED BY HER MOTHER AND YOUNG DAUGHTER.  ALTHOUGH I DIDN'T

10 SEE WHAT THE AGE OF THE DAUGHTER WAS.  AND I THOUGHT IT SOMEWHAT

11 CURIOUS AND THERE WERE STATEMENTS THAT IN LIGHT OF COVID-19 AND

12 THE LAB NOT BEING OPEN, SHE PLANS TO GO BACK TO CHINA.

13      I DON'T UNDERSTAND WHY THEY WOULDN'T ALL TRAVEL TOGETHER.

14 AND, IN FACT, I THOUGHT I READ SOMEWHERE THAT THE CHILD WENT

15 BACK SEPARATELY FROM THE MOTHER, WHICH SEEMS JUST VERY CURIOUS

16 TO ME.

17      MR. SEGAL, DO YOU WANT TO ADDRESS THAT AND CLARIFY FOR ME?

18          MR. SEGAL:  I DO, YOUR HONOR.  DURING THAT PERIOD OF

19 TIME, AS YOUR HONOR MAY RECALL, THERE WAS A PROBLEM GETTING

20 FLIGHTS OUT OF THIS COUNTRY TO CHINA.

21      AND IN THE BEGINNING OF APRIL, I BELIEVE IT WAS APRIL 3RD,

22 ALL THREE OF THEM PURCHASED TICKETS TO TRAVEL TO CHINA TOGETHER,

23 AND IT LOOKED LIKE THAT FLIGHT WOULD GET OUT.  AND THEN THEY

24 COULD NOT GET A FLIGHT OUT BECAUSE FLIGHTS WERE STOPPED.

25      AND SO THEY WERE TRYING TO GET BACK HOME TO CHINA, IN VIEW

1    OF THE VIRUS, AS BEST THEY COULD.  THE MOTHER WAS ABLE TO

2    CONFIRM A TICKET, AND SHE FLEW.  THE DAUGHTER WAS ABLE TO

3    CONFIRM A TICKET, AND SHE FLEW TO CHINA.  BUT THE DEFENDANT HAD

4    NOT YET BEEN ABLE TO SECURE A FINAL TRAVEL TICKET TO CHINA AT

5    THAT TIME.  AND THAT'S WHAT THE DELAY WAS.

6            THE COURT:  AND HOW OLD WAS THE DAUGHTER?

7            MR. SEGAL:  THE DAUGHTER, I BELIEVE, IS 8.

8            THE COURT:  AND THEN THE MOTHER AND THE DAUGHTER DID

9    NOT FLY BACK TOGETHER?

10           MR. SEGAL:  NO.  I BELIEVE THEY FLEW SEPARATELY.

11           THE COURT:  OKAY.

12           MR. COPPOLA:  YOUR HONOR, I COULD CHIME IN HERE.  THE

13   DAUGHTER FLEW FIRST.  IF MY RECOLLECTION IS CORRECT, IT WAS THE

14   DAY FOLLOWING THE SERVICE OF THE SEARCH WARRANTS AT THE

15   DEFENDANT'S RESIDENCE.  AND THEN THE MOTHER FLEW APPROXIMATELY A

16   WEEK LATER.

17           THE COURT:  OKAY.  THE OTHER THING, OBVIOUSLY, IN THIS

18   CASE, IS THERE ARE STRONG IMPLICATIONS, IF NOT EXPRESSED BY THE

19   GOVERNMENT, THAT DR. TANG WAS INVOLVED IN ESPIONAGE.  HOWEVER,

20   SHE'S NOT CHARGED WITH ESPIONAGE.  SHE'S CHARGED WITH FALSE

21   STATEMENTS AND A FALSE VISA APPLICATION.

22       AND I AM NOT GOING TO CONSIDER THE INFORMATION THE

23   GOVERNMENT'S PUTTING FORTH ABOUT OTHER CHINESE SCIENTISTS WHO

24   WERE ARRESTED IN OTHER LOCATIONS OF WHICH I KNOW NOTHING ABOUT,

25   AND THERE IS NO ALLEGATION IN THIS CASE THAT THERE WAS A GRAND

1   CONSPIRACY.

2       LET ME ASK, MR. COPPOLA, BECAUSE LOOKING AT THE INDICTMENT,

3   THE TWO COUNTS, ONE HAS A MAXIMUM SENTENCE OF UP TO 10 YEARS,

4   THE OTHER HAS A MAXIMUM SENTENCE OF UP TO 5 YEARS, BUT THERE'S

5   ALSO BEEN A REPRESENTATION BY DEFENSE COUNSEL THAT UNDER THE

6   GUIDELINES WHAT DR. TANG WOULD REALISTICALLY BE LOOKING AT WOULD

7   BE GUIDELINES OF 0 TO 6 MONTHS.  AGREE?  DISAGREE?  POSITION?

8           MR. COPPOLA:  I THINK THAT'S AN OPEN QUESTION, YOUR

9   HONOR.  AND I THINK IT DEPENDS LARGELY ON HOW SOME OF THE

10  FACTORS -- HOW SOME OF THE FACTORS PAN OUT WHETHER OR NOT

11  GROUPING ACTUALLY APPLIES.

12      SO IF THE COURT WILL INDULGE ME FOR JUST A MOMENT.  IN

13  LOOKING AT THAT PARTICULAR ISSUE, I DON'T KNOW THAT I

14  NECESSARILY AGREE THAT SHE -- THE MOST SHE WOULD FACE IS 6

15  MONTHS AT THIS POINT.  I THINK SHE COULD FACE, YOU KNOW,

16  DEPENDING ON -- DEPENDING ON WHAT FACTORS ARE -- WHAT FACTORS

17  COME INTO PLAY, SHE COULD BE 0 TO 6 MONTHS, BUT SHE COULD ALSO

18  BE 10 TO 16 MONTHS, BUT SHE COULD ALSO BE 6 TO 12 MONTHS.  IT

19  JUST REALLY DEPENDS IN TERMS OF -- ON HOW ALL THAT WORKS OUT.  I

20  DON'T THINK IT'S NEARLY AS CLEAR AS DEFENSE COUNSEL WOULD LIKE

21  IT TO BE.

22          THE COURT:  THE OTHER CONSIDERATION THAT I'M GIVING,

23  BECAUSE I THINK I HAVE TO, IS WE CAN'T PRETEND THAT THESE ARE

24  NORMAL TIMES.  NO CASES RIGHT NOW ARE GOING TO TRIAL.

25          AND THIS IS NOT AS A JUDGE.  THIS IS JUST FROM READING THE

1 | NEWS, ET CETERA.  BUT OFTENTIMES BEFORE THIS YOU WOULD HEAR
2 | SOMEONE SUSPECTED OF ESPIONAGE IN OUR COUNTRY, AND THEY WOULD BE
3 | ESCORTED OUT OF THE COUNTRY, OR, OUR PEOPLE, YOU KNOW, IN
4 | ANOTHER COUNTRY WHO ARE SUSPECTED OF ESPIONAGE ARE THEN KICKED
5 | OUT OF THAT COUNTRY.  BUT WE'RE NOT DEALING WITH THIS SITUATION.
6 | WE'RE DEALING WITH SOMEONE WHO WAS SEEKING TO LEAVE BUT GOT
7 | ARRESTED.
8 |      BUT THERE IS OBVIOUSLY A GREAT CONCERN IF EVEN IF CONVICTED
9 | DR. TANG IS LOOKING AT, YOU KNOW, A MAXIMUM OF 6 MONTHS, OR, YOU
10 | KNOW, LIKELY AT THAT POINT IT WOULD BE TIME SERVED.  AND THERE'S
11 | A GREAT CONCERN THAT I COULD BE KEEPING HER IN JAIL FOR YEARS
12 | BEFORE THIS THING EVER WOULD GET TO TRIAL FOR THAT KIND OF A
13 | MAXIMUM PENALTY.
14 |      HERE'S WHAT MAKES TODAY LESS COMPLICATED.  HERE'S WHAT I
15 | THOUGHT WOULD HAVE MADE IT VERY COMPLICATED.  I WAS VERY
16 | INTERESTED TO SEE THE DECLARATION FROM THE PROPOSED THIRD-PARTY
17 | CUSTODIAN.  AND, CANDIDLY, WHEN I READ THROUGH IT THE FIRST
18 | TIME, I MISREAD A CRUCIAL COMPONENT.  BECAUSE IT DOES TALK ABOUT
19 | HOW MUCH EQUITY THAT PERSON HAS IN THEIR HOME.
20 |      AND I THOUGHT, WELL, THIS IS REALLY INTERESTING.  WE HAVE A
21 | PERSON WHO IS INVOLVED IN THE CHINESE AMERICAN CULTURE AND
22 | COUNTRY.  I'M NOT SURE WHY, BUT IT WOULD BE -- IT WILL BE A
23 | TOUGH CALL FOR ME IF THAT PERSON IS WILLING TO PUT UP HALF A
24 | MILLION DOLLARS OR A MILLION DOLLARS OF EQUITY IN THEIR HOME AS
25 | WELL AS BEING A THIRD-PARTY CUSTODIAN BECAUSE, CANDIDLY, I DON'T

1    THINK THERE IS A LOT THAT WOULD BE KEEPING DR. TANG HERE.

2        HER HUSBAND AND CHILD AND FAMILY ARE IN CHINA.  AND SO IF

3    SHE WAS OUT, I DON'T KNOW WHAT WOULD POSSIBLY INTEREST HER IN

4    STAYING HERE.  YOU KNOW, MAYBE CLEARING UP HER NAME OR

5    REPUTATION.  BUT IT LOOKS LIKE SHE WOULDN'T BE GRANTED A VISA

6    ANYWAY EVEN IF ACQUITTED.  IT LOOKS LIKE SHE WOULD PROBABLY BE

7    OUT OF THE COUNTRY.

8        SO ONE OF THE REASONS I INITIALLY SAID, BOY, I WOULD LIKE TO

9    HAVE THAT THIRD-PARTY CUSTODIAN ON THE LINE IS I WANT TO FIND

10   OUT WHY ARE YOU WILLING TO RISK YOUR HOME FOR THIS PERSON ONLY

11   TO THEN FIND OUT THEY'RE NOT WILLING TO RISK THEIR HOME.

12   THEY'RE WILLING TO HAVE DR. TANG LIVE WITH THEM, BUT THEY'RE NOT

13   WILLING TO PUT UP THEIR HOME AT RISK.

14       AND IT ALSO, I THINK, COMES BACK TO WHY MR. SHEEHAN FROM

15   PRETRIAL IS SAYING THERE'S NO SURETY PROPOSED HERE.  IT'S A

16   THIRD-PARTY CUSTODIAN WHO REALLY DOESN'T KNOW HER.  THAT'S NICE

17   THAT THAT PERSON IS WILLING TO HAVE HER LIVE WITH THEM, BUT, YOU

18   KNOW, NORMALLY A BOND AND A FAMILY MEMBER IS BECAUSE A PERSON

19   REALIZES IF THEY TAKE OFF, FOR LACK OF A BETTER WORD, THEY'RE

20   SCREWING OVER A FAMILY MEMBER FOR -- POTENTIALLY FOREVER.  THERE

21   IS NO BIND BEING PROPOSED HERE.

22       SO MR. SEGAL, WHY DOESN'T THAT MAKE IT A MUCH EASIER

23   QUESTION FOR ME THAN IT MIGHT OTHERWISE BE IF YOU WERE OFFERING

24   A SIGNIFICANT BOND AS WELL AS A THIRD-PARTY CUSTODIAN?

25             MR. SEGAL:  I HAVE GOOD NEWS FOR THE COURT.

1          THE COURT:  OKAY.

2          MR. SEGAL:  WE HAVE SPOKEN TO THE PROPOSED THIRD-PARTY

3   CUSTODIAN TODAY AND CONFIRMED THAT THE THIRD-PARTY CUSTODIAN IS

4   WILLING TO ACCEPT HER INTO HIS RESIDENCE, HIS WIFE IS WILLING TO

5   ACCEPT HER INTO THEIR RESIDENCE, AND THEY ARE PROPOSING TO POST

6   THE EQUITY -- SOME OF THE EQUITY IN THEIR HOME TO THE SUM OF

7   $500,000, HALF A MILLION DOLLARS, TO SECURE A BOND FOR THE

8   DEFENDANT.

9          THE COURT:  AND MR. COPPOLA, UNDOUBTEDLY I'LL GIVE YOU

10  AN OPPORTUNITY TO JUMP IN HERE IN A MINUTE.

11     AND WE HAVE MR. C.  I'LL REFER TO HIM AS -- BY A LETTER.

12  MR. C IS AVAILABLE AND WITH US RIGHT NOW, IS THAT CORRECT?

13         MR. SEGAL:  YES, YOUR HONOR.  AND I WOULD PROPOSE THAT

14  ONCE WE DISCUSS WHAT YOUR HONOR WISHES TO RAISE, I WOULD LIKE TO

15  ASK MR. C SOME QUESTIONS ABOUT HIS SERVICE AS A THIRD-PARTY

16  CUSTODIAN, HIS FAMILY'S WILLINGNESS TO POST A SECURED BOND, AND

17  ASK HIM THE QUESTION OF WHY HE'S WILLING TO DO THAT.

18         THE COURT:  WELL, THAT'S EXACTLY WHAT I WANT TO ASK

19  HIM.

20     SO ALEX, DO WE HAVE MR. C VISIBLE WITH US OR JUST BY PHONE

21  SO -- BECAUSE OF MAINTAINING HIS CONFIDENTIALITY RIGHT NOW?

22  WHAT IS HIS STATUS?

23         THE CLERK:  YOUR HONOR, HE IS VISIBLE, AND HE IS

24  AVAILABLE.  HE'S ON ZOOM.  WE DO HAVE THE PUBLIC AS WELL ON THE

25  CALL.  BUT HE, ACTUALLY, HAS JUST SHOWN UP RIGHT NOW.

1          THE COURT:  OKAY.  SO MR. C, AS I'M CALLING YOU --

2          MR. C:  THANK YOU VERY --

3          MR. COPPOLA:  YOUR HONOR, JUST TO BE CLEAR, THE COURT

4    IS NOT CLOSING THE HEARING FOR THIS PORTION, ARE THEY?

5          THE COURT:  CORRECT.

6          MR. COPPOLA:  OKAY.  SO THIS IS -- THIS PORTION OF THE

7    HEARING IS STILL OPEN TO THE PUBLIC?

8          THE COURT:  CORRECT.  BUT THE DECLARATION IS UNDER

9    SEAL, AND MY UNDERSTANDING HIS WHOLE NAME DOES NOT SHOW UP ON

10   THE VIDEO SCREEN.

11         MR. C:  YOUR HONOR, MAY I ASK, SO MY -- OUR IMAGE

12   WON'T BE AVAILABLE TO THE PUBLIC IMMEDIATELY, RIGHT?

13         THE COURT:  I'M SORRY.  YOUR WHAT?

14         MR. C:  OUR IMAGE?  THEY CAN ONLY HEAR OUR SONG.  THEY

15   CANNOT SEE US.

16         THE CLERK:  THE PUBLIC IS ONLY ON THE TELEPHONE, YOUR

17   HONOR.

18         THE COURT:  RIGHT.  SO THEY CANNOT SEE YOU.

19         MR. C:  THANK YOU.

20         THE COURT:  THEY CANNOT SEE YOU.

21      SO, SIR, YOU CAN UNDERSTAND WHILE I APPRECIATE YOUR WHOLE

22   LEGAL HISTORY, WHAT ALL YOU HAVE ACCOMPLISHED, AND I APPRECIATE

23   YOU COMING FORWARD FOR A PERSON IN LEGAL DIFFICULTY, CANDIDLY

24   I'M SOMEWHAT BAFFLED IF NOT ASTOUNDED WHY IT IS YOU AND YOUR

25   WIFE AT THIS STAGE WOULD RISK YOUR HOME FOR A PERSON THAT YOU

1  DON'T KNOW, WHO, CANDIDLY, THERE IS NOT A HUGE REASON FOR HER TO

2  STAY IN THIS COUNTRY.

3      IF SHE GETS OUT OF JAIL, SHE COULD BE GONE, GO BACK TO BE

4  WITH HER HUSBAND AND DAUGHTER.  WHY WOULD YOU WANT TO RISK YOUR

5  HOME FOR SOMEONE YOU DON'T KNOW?

6          MR. C:  THANK YOU, YOUR HONOR.  I WILL TRY TO EXPLAIN

7  THIS GLADLY TO YOU IF YOU ALLOW ME.  THE DECISION -- THE

8  DECISION TO MAKE REGARDING THE EQUITY IS CONSISTENT WITH OUR

9  REASON TO COME FORWARD TO BEGIN WITH.

10      JUST AS CITIZEN, YOU KNOW, MAY BE EDUCATED IN THE LAW, SO

11  KIND OF UNDERSTAND, LIKE YOU WOULD SAY, SOMEBODY WHO -- BETTER

12  THAN THE COMMON PUBLIC.  AND WE REALLY HAVE THE STRONG FAITH IN

13  THE SYSTEM.  AND WE FEEL LIKE STRONGLY SOMEBODY TO BE FAIRLY

14  TREATED.

15      A MOMENT.  I WASN'T PREPARED FOR THIS.

16      BUT THEN WHEN IT COMES TO THE -- YOU KNOW WHEN I TALK TO

17  MR. SHEEHAN THE OTHER DAY, I TOLD HIM THAT THE BOND, THE SURETY

18  THING HAD NEVER BEEN DISCUSSED WITH ME.  SO WE WEREN'T AWARE OF

19  THAT.  HE DIDN'T EVEN TALK TO MY WIFE ABOUT THAT, THE MONEY.  SO

20  WE'RE, LIKE YOU SAID, WE'RE WILLING TO PROVIDE A PLACE FOR HER,

21  TO MONITOR HER, ET CETERA.

22      BUT THEN WHEN YOU COME TO THIS, WE REALIZE THAT -- SO I TOLD

23  MY ANSWER TO MR. SHEEHAN THAT WE DON'T KNOW AT THE TIME BECAUSE

24  WE HAVE NO INFORMATION ABOUT WHAT WE ARE -- WHAT WAS THE INTEL,

25  WHAT WE ARE GOING TOWARD, WHAT'S THE CONSEQUENCE, ET CETERA.

1 AND THEN AFTER THE ATTORNEY COUNSEL EXPLAINED THIS THING TO

2 US, AND WE REALIZE THAT DEALING THE CIRCUMSTANCES, DEALING THE

3 CHARGE, YOU KNOW, SHE'S FACING AND THEN THE POTENTIAL PENALTY

4 AND ALSO, YOU KNOW, JUST ALL THE CIRCUMSTANCES, WE DON'T REALLY

5 FEEL, YOU KNOW, THE RISK IS THAT HIGH TO BE HONEST.  ESPECIALLY

6 KNOWING THAT MOST LIKELY SHE'LL WEAR SOME KIND OF DEVICE TO, YOU

7 KNOW, LIMIT HER ABILITY TO MOVE, TO EVEN GO OUT OF THE HOUSE.

8 SO WE FEEL THAT IF THE COURT TRULY TO BE -- THE MONEY NEED

9 TO BE TIED TO THIS, AND THAT'S WHY WE FEEL WE ARE WILLING TO,

10 YOU KNOW, HELP IN THAT REGARD.  SO, YEAH.

11 THE COURT:  AND I'M NOT TRYING TO TALK YOU OUT OF

12 THAT.  I'M JUST TRYING TO MAKE SURE IF I GO ALONG WITH THAT, YOU

13 ARE GOING WITH TOTALLY EYES WIDE OPEN.

14 AND SO, YEAH, I ALWAYS -- I BELIEVE IN AND HOPE THAT

15 EVERYONE GETS A FAIR OPPORTUNITY IN OUR JUSTICE SYSTEM.  BUT

16 THERE ARE REASONS WHY A PERSON MAY SAY EVEN IF THEY THINK THEY

17 COULD GET A FAIR HEARING, THEY MAY NOT WANT TO STAY FOR THAT

18 HEARING.

19 AND YOU HAVE A PERSON -- PART OF WHAT I WAS JUST TALKING

20 ABOUT BEFORE -- THERE IS A LONG TIME UNTIL TRIAL, UNFORTUNATELY,

21 THESE DAYS, AND EVEN LONGER BECAUSE OF COVID-19, AND YOU HAVE

22 SOMEONE WHO HAS AN 8-YEAR-OLD DAUGHTER IN CHINA, AND A HUSBAND

23 IN CHINA.  THEY MAY SAY I DON'T WANT TO STAY AND WAIT A COUPLE

24 YEARS BEFORE I CAN SEE THEM.

25 ESPECIALLY IF THE ISSUE, AS I WAS SAYING -- UNLESS SOMETHING

1   CHANGES -- THE ISSUE IS NOT WHETHER OR NOT DR. TANG WAS A SPY.

2   IT'S WHETHER OR NOT SHE MADE FALSE STATEMENTS OR LIED ON VISA

3   APPLICATIONS.  SO IT COULD BE -- AND, AGAIN, I DON'T KNOW.  I

4   HAVEN'T GOTTEN ALL THE FACTS.  BUT IT COULD BE SHE'S ULTIMATELY

5   FOUND GUILTY OF THAT AND THEN FACING PRISON TIME AS A RESULT AS

6   WELL.

7       AND SO WHEN -- IF IT WAS YOUR DAUGHTER, FOR EXAMPLE, SOMEONE

8   MAY SAY, WELL, I'M NOT GOING TO MESS UP MY PARENTS' FINANCIAL

9   LIFE FOREVER OR FOR THEIR RETIREMENT FOR YEARS TO COME.  I'M NOT

10  GOING TO TAKE OFF.  NO OFFENSE.  AS I UNDERSTAND IT, DR. TANG

11  DOESN'T KNOW YOU.  YOU DON'T KNOW HER.  SO SHE MAY SAY, HEY, I'M

12  OUT OF HERE.  YOU KNOW, I'LL SEND YOU SOME MONEY IF I CAN BUT

13  THANKS SO MUCH.

14      WHAT MAKES YOU THINK, NOT KNOWING THIS WOMAN, THAT SHE'S

15  POSSIBLY GOING TO STAY?  AND OUR ELECTRONIC MONITORING, BY THE

16  WAY, IS NOT AS GOOD AS YOU WOULD LIKE TO SEE IN MOVIES, AND IT'S

17  NOT AS IF SHE STEPS OUT YOUR FRONT DOOR AND ALARMS GO OFF AND

18  OFFICERS ARE THERE IN 30 SECONDS.

19      WHAT MAKES YOU THINK THAT YOU'RE GOING TO BE ABLE TO CONTROL

20  HER AND SHE'S NOT GOING TO JUST TAKE OFF?

21          MR. C:  YES.  SO THANK YOU FOR THOSE REASONS, THOSE

22  CONCERNS.  THOSE ARE THE CONCERNS THAT WE HAVE, YOU KNOW,

23  THROUGH OUR MIND.  WE HAVE TALKED ABOUT IT.

24      AND, AS YOU SAID, WE KNOW NOTHING ABOUT HER.  WE HAVE ZERO

25  CONTACT TO HER.  THIS IS THE FIRST TIME I SEE HER FACE OTHER

1  THAN ON MEDIA.  SO I CAN'T REALLY SAY ANYTHING ABOUT WHAT'S IN

2  HER MIND AND HER RELATIONSHIP WITH THE FAMILY, WHAT'S INCENTIVE

3  FOR HER TO LEAVE.

4       AND THE ONLY THING I CAN OBSERVE, I CAN SEE, OR, LIKE I

5  SAID, TRUST IN THE SYSTEM AND TRUST THE CIRCUMSTANCES NOW IS

6  THAT THERE ARE PHYSICAL BARRIERS, IF YOU WILL, NOT ONLY THE

7  DEVICE BUT KNOWING -- BECAUSE MY -- I HAVE TO SAY -- I CAN TELL

8  YOU MY PARENTS ARE 85 YEARS OLD.  MY MOM IN VERY BAD CONDITION

9  IN CHINA.  I WANTED TO GO BACK TO VISIT THEM FROM DAY ONE, BUT

10 WE CANNOT.  EVEN THOUGH, YOU KNOW, DIFFERENCE IS THAT I'M A U.S.

11 CITIZEN.  THAT CAN BE LITTLE DIFFICULTY.

12      BUT, YOU KNOW, SO MANY PEOPLE STUCK IN THIS COUNTRY.  EVEN

13 IF THEY WANT TO, JUST PRACTICALLY IT'S VERY HARD, VERY

14 DIFFICULT.  SO THAT AND ALSO, LIKE I SAID, THE DEVICE.  NOT ONLY

15 THE DEVICE TECHNOLOGY BUT ALSO THE FACT THAT MY WIFE AND I COULD

16 BE HOME.  AND I'M WORKING FROM HOME BECAUSE OF PART OF --

17 BECAUSE OF THE COVID-19.  SO WE'LL BE HERE.  WE'LL KIND OF SEE

18 THAT PART OF THE THING.  WE'LL MONITOR HER.

19      IF SHE STEP OUT -- AND ALSO I UNDERSTAND OUR OBLIGATION TO

20 THE COURT -- WE WILL REPORT.  WE'LL HELP THE COURT TO LIMIT HER

21 ABILITY.  OF COURSE, THE OTHER THING ALSO I WANT TO SAY THAT,

22 YOU KNOW, BY COMMUNICATING WITH HER -- YOU KNOW, IN A WAY IT'S

23 LIKE WE'RE TRYING TO HELP HER TO UNDERSTAND THE SYSTEM AS WELL,

24 THE CONSEQUENCE OF HER BEHAVIOR.  HER SEEING, YOU KNOW, THAT

25 MAYBE WE'LL -- HOPEFULLY WE CAN BUILD THE TRUST AND CONVINCE HER

1    THAT THAT'S A STUPID THING TO DO IF SHE WANT TO.

2          THE COURT:  AND HAS ANYONE OFFERED, SUGGESTED OR

3    OTHERWISE THAT IF SHE DOES TAKE OFF, SOMEONE WOULD TAKE CARE OF

4    REIMBURSING YOU?

5          MR. C:  NO.

6          THE COURT:  OKAY.  I JUST WANT TO MAKE SURE OF THAT.

7       BEFORE I ASK MR. COPPOLA'S RESPONSE, MR. SEGAL WAS THERE

8    ANYTHING ELSE YOU WANTED TO ASK MR. C TO ADDRESS THIS?

9          MR. SEGAL:  I WAS JUST GOING TO ASK, YOUR HONOR,

10   WHETHER THERE'S ANYTHING ABOUT MR. C'S BACKGROUND, OR HIS LAW

11   PRACTICE, OR HIS BELIEF SYSTEM THAT CAUSES HIM TO WANT TO TAKE

12   THIS IMPORTANT STEP ON BEHALF OF DR. TANG?

13         THE COURT:  MR. C, DO YOU UNDERSTAND MR. SEGAL'S

14   QUESTION FOR YOU?

15         MR. C:  OH, I THOUGHT THAT YOU -- SORRY.  COULD YOU

16   REPEAT?  I THOUGHT YOU WERE ASKING THE HONORABLE JUDGE.

17         MR. SEGAL:  I'LL ASK AGAIN.

18      I WANTED YOU TO TELL THE JUDGE IF THERE'S ANYTHING ABOUT

19   YOUR PERSONAL BACKGROUND, YOUR LAW PRACTICE, YOUR LIFE WHICH HAS

20   CAUSED YOU TO STEP UP THIS WAY TO ASSIST DR. TANG?

21         MR. C:  YES.  SO PARDON ME FOR MY ENGLISH.  YOU CAN

22   TELL THAT WE ARE FIRST-GENERATION IMMIGRANT.  WE CAME TO THIS

23   COUNTRY ABOUT 30 YEARS AGO AND BECAME U.S. CITIZEN ABOUT

24   20 YEARS AGO.  AND SO WE LIVE IN THE -- MOST TIME IN THE BAY

25   AREA AND THE MIDWEST.

1    SO WE ENCOUNTERED AND EXPERIENCED SOME SITUATIONS WHERE WE

2  FEEL THAT WE WERE HOPING TO HAVE SOME HELP FROM THE COMMUNITY.

3  YOU KNOW, WE FEEL -- SORRY.  WHENEVER I SAY THAT, I BECOME

4  EMOTIONAL.

5    AND THEN WE FEEL LIKE AT THIS STAGE OF MY CAREER OR OUR

6  LIFE, OUR KIDS, YOU KNOW, ONE IS 30 AND THE OTHER 24.  THEY ARE

7  OUT.  ONE IS IN NEW YORK CITY.  THE OTHER CHICAGO.  WE TAUGHT

8  THEM TO, YOU KNOW, HELP PEOPLE.  AND SO WE HAVE A STRONG FAITH

9  AND WE FEEL THAT THIS IS A CHANCE THAT WE CAN DO SOMETHING TO

10  SET AS EXAMPLE FOR THEM AND ALSO TO HELP SOMEONE WE TRULY FEEL

11  LIKE VERY VULNERABLE IN CURRENT SITUATION.

12    I'M NOT SECOND GUESSING WHETHER SHE'S GUILTY OR NOT.  I JUST

13  FEEL LIKE SHE -- YOU KNOW, I JUST WANT TO HELP HER TO GET

14  JUSTICE.

15        THE COURT:  MR. SEGAL, ANYTHING ELSE?

16        MR. SEGAL:  NO, YOUR HONOR.  THANK YOU.

17        THE COURT:  MR. COPPOLA, THIS OBVIOUSLY CHANGES THE

18  PLAYING FIELD SOMEWHAT.  YOUR RESPONSE?

19        MR. COPPOLA:  IT DOES NOT CHANGE THE GOVERNMENT'S

20  POSITION ONE IOTA, YOUR HONOR.  AND THE REASON FOR THAT IS, AS

21  THIS COURT INDICATED AT THE OUTSET, WHILE I APPRECIATE MR. C AND

22  HIS WIFE'S DESIRE TO BE HELPFUL IN THIS CASE AND BE GOOD

23  SAMARITANS, THE FACT OF THE MATTER IS THEY HAVE NOT ONCE TALKED

24  TO DR. TANG.  THEY ARE SEEING HER FOR THE FIRST TIME TODAY.

25        WHILE I AM CERTAIN THAT THEY ARE SOLID -- BASED ON WHAT I'VE

1    READ IN THE DECLARATION, IT DOES NOT APPEAR -- IT APPEARS THAT

2    THEY ARE SOLID CITIZENS.  THIS IS NOT A PARTICULARLY USUAL CASE.

3        THERE IS ABSOLUTELY -- AS THE GOVERNMENT HAS ARGUED FROM THE

4    FIRST HEARING TO NOW, THERE IS ABSOLUTELY NOTHING TO STOP

5    MS. TANG FROM WALKING AWAY AND ONCE AGAIN RETREATING TO THE

6    CHINESE CONSULATE AND FINDING HER WAY BACK TO CHINA IF THIS IS

7    -- IF THIS COURT RELEASES HER.

8        THE BOTTOM LINE HERE, YOUR HONOR, IS SHE HAS ZERO TIES IN

9    THE UNITED STATES.  AS THE COURT HAS POINTED OUT, HER DAUGHTER

10   IS GONE, HER MOTHER IS GONE, HER HUSBAND IS GONE.  AND WITH ALL

11   DUE RESPECT TO MR. C AND HIS FAMILY, THAT IS SIMPLY A -- IT'S

12   SIMPLY TOO BIG OF A GAMBLE AND A RISK AT THIS POINT TO TAKE FOR

13   SOMEONE WHO HAS ALREADY DEMONSTRATED, IN THE GOVERNMENT'S

14   VIEW -- WHILE THE COURT MAY NOT FIND THAT SIGNIFICANT, THE

15   GOVERNMENT FINDS IT INCREDIBLY SIGNIFICANT -- ESPECIALLY IN

16   LIGHT OF HER RESIDENCE AT THE CONSULATE AND OTHER INDIVIDUALS

17   WHO WERE ARRESTED IN SIMILAR CIRCUMSTANCES THROUGHOUT THIS

18   TIMEFRAME.  THE GOVERNMENT FINDS THAT NOT MERELY COINCIDENTAL.

19       IN THIS CASE, GIVEN THE LACK OF TIES, GIVEN THE LACK OF ANY

20   RELATIONSHIP WHATSOEVER BETWEEN THE C FAMILY AND DR. TANG, THE

21   GOVERNMENT STRONGLY OPPOSES WHAT IS BEING SUGGESTED AND REQUESTS

22   THAT THIS COURT CONTINUE TO KEEP DR. TANG DETAINED.

23            THE COURT:  I ALSO WANT TO MAKE SURE I DIDN'T MISSPEAK

24   EARLIER.  DO YOU KNOW, IF YOU KNOW, IF DR. TANG IS ACQUITTED,

25   WOULD DR. TANG THEN BE ABLE TO STAY IN THE COUNTRY OR NOT OR

1    UNKNOWN OR WOULD HAVE TO APPLY FOR NEW VISA?

2          MR. COPPOLA:  I EXPECT, YOUR HONOR, THAT SHE WOULD NOT

3    BE ALLOWED TO REMAIN IN THE COUNTRY.

4       HOWEVER, I WILL SAY THIS -- AND IMMIGRATION LAW IS NOT MY

5    FORTE.  I WILL BE CANDID WITH THE COURT UP FRONT.  MY

6    UNDERSTANDING, AND I BRIEFED THIS EARLIER IN OUR EARLIER PAPERS,

7    IS THAT DR. TANG'S VISA -- HER J-1 VISA HAS BEEN REVOKED BY THE

8    STATE DEPARTMENT.  HOWEVER, THAT IS WHAT'S CALLED A PRUDENTIAL

9    REVOCATION.

10          THE COURT:  I READ THAT IN THE PREVIOUS ORDER, RIGHT.

11          MR. COPPOLA:  RIGHT.  WHICH ESSENTIALLY MEANS THAT IT

12   IS -- THAT IT IS THEN -- IT WOULD BE REVOKED UPON HER EXIT FROM

13   THE UNITED STATES, ESSENTIALLY.

14       SO, AGAIN, I WOULD HAVE TO -- I WOULD HAVE TO DISCUSS THE

15   MATTER WITH IMMIGRATION COUNSEL FROM CUSTOMS AND IMMIGRATION

16   ENFORCEMENT TO GIVE THE COURT ANY REAL -- ANY REAL SOLID ANSWERS

17   HERE.

18       BUT I BELIEVE, AGAIN, THAT SHE WOULD LIKELY -- THAT ICE

19   WOULD LIKELY STILL SEEK TO REMOVE HER EVEN IF SHE WERE -- IF SHE

20   WERE IN FACT ACQUITTED.

21          THE COURT:  SO MR. SEGAL, HELP ME UNDERSTAND, WHAT IS

22   YOUR CLIENT'S POSSIBLE MOTIVATION TO STAY?

23          MR. SEGAL:  HER MOTIVATION, YOUR HONOR, IS VERY

24   STRAIGHT FORWARD.  SHE WANTS TO BE VINDICATED OF THESE CHARGES.

25   SHE INTENDS TO ASSERT THAT SHE IS NOT GUILTY OF THESE CHARGES.

1      SHE HAS NO DESIRE TO BE CLASSIFIED AS AN INTERNATIONAL

2   FUGITIVE.  SHE'S A SCIENTIST WHOSE PAPERS HAVE BEEN PUBLISHED IN

3   THE SCIENTIFIC COMMUNITY.  SHE'S BEEN THE AUTHOR OF MANY PAPERS

4   AND THE SECOND PH.D. OR SCIENTIST ON OTHER PAPERS.  SHE HAS A

5   REPUTATION TO UPHOLD.

6      HER ABILITY TO FUNCTION AS A SCIENTIST, TO PUBLISH AS A

7   SCIENTIST, TO PRACTICE HER PROFESSION ALL DEPENDS ON WHAT IS

8   PERCEIVED TO BE HER INTEGRITY AS A SCIENTIST.

9      AND HER DECISION TO SURRENDER HERSELF TO THE FBI BY LEAVING

10   THE CONSULATE, I THINK, PLAYS AN IMPORTANT ROLE IN THE

11   DETERMINATION HERE.  SHE COULD --

12          THE COURT:  HELP ME UNDERSTAND THAT.  BECAUSE I WANT

13   TO UNDERSTAND, AND I WANT TO UNDERSTAND FROM MR. COPPOLA AS

14   WELL.  MY UNDERSTANDING WAS NOT -- YOU CAN HELP CLARIFY FOR THIS

15   ME, AND I'LL ASK MR. COPPOLA.

16      MY UNDERSTANDING WAS NOT THAT, OH, I'M AWARE THAT THERE IS

17   AN ARREST WARRANT OUT FOR ME.  I'M GOING TO THE FBI OFFICE OR

18   THE MARSHALS TO TURN MYSELF IN.  IT WAS, WELL, THERE MAY BE AN

19   ARREST WARRANT.  I'M GOING TO A DOCTOR'S APPOINTMENT.  AND THEY,

20   UPON KEEPING AN EYE OUT FOR HER, THEN PICKED HER UP.  I

21   UNDERSTAND SHE DIDN'T NECESSARILY FLEE.

22      BUT THAT SEEMS TO ME -- THAT'S DIFFERENT THAN HER

23   VOLUNTARILY GETTING HERSELF TO THE FBI FIELD OFFICE AFTER

24   TURNING HERSELF IN.

25      AM I MISUNDERSTANDING SOMETHING, MR. SEGAL?

1             MR. SEGAL:  I THINK YOU ARE.

2             MR. COPPOLA:  I DON'T THINK --

3             THE COURT:  MR. COPPOLA, I'LL GIVE YOU A CHANCE.  LET

4    ME GET MR. SEGAL, AND I'LL GIVE YOU A CHANCE TO RESPOND.  GO

5    AHEAD, MR. SEGAL.

6             MR. SEGAL:  NO ONE TOLD THE DEFENDANT THAT THERE WAS

7    AN ARREST WARRANT OUT FOR HER.  WHEN THE FBI CAME AND SEIZED HER

8    COMPUTER, AND HER PHONE, AND INTERROGATED HER, THEY DIDN'T TELL

9    HER THERE WAS AN ARREST WARRANT BECAUSE THERE WASN'T AN ARREST

10   WARRANT.

11            THE COURT:  RIGHT.

12            MR. SEGAL:  IT WASN'T UNDER SEAL.

13       SHE WENT TO THE CONSULATE.  SHE STAYED AT THE CONSULATE.

14   SHE WAS IN A STATE OF ABSOLUTE SHOCK AND DISTRESS.  SHE STAYED

15   THERE AND WAS TALKING TO THE CONSULATE AUTHORITIES ABOUT SEEKING

16   THEIR HELP.

17       WHEN THE FBI WENT TO THE CONSULATE, AS I UNDERSTAND IT, AND

18   ADVISED THE CONSULATE THAT THEY HAD AN ARREST WARRANT FOR HER,

19   THE CONSULATE OFFICERS TALKED TO HER, AND SHE AGREED TO LEAVE

20   THE CONSULATE, KNOWING SHE WOULD BE ARRESTED ON THE WARRANT.

21   BUT EXPLAINING TO EVERYBODY THAT SHE WAS SO STRESSED AND UPSET

22   THAT SHE WAS IN A STATE WHERE SHE FELT UNCOMFORTABLE

23   SURRENDERING WITHOUT SEEING A DOCTOR.

24       THE FBI WAS AWARE OF THAT.  THEY -- SHE WENT TO THE DOCTOR.

25   IMMEDIATELY AFTER THE DOCTOR SAW HER AND SAID THAT SHE WOULD BE

1  OKAY, SHE SURRENDERED TO THE FBI AND THEY ARRESTED HER.

2     THIS WAS NOT A SITUATION WHERE THE FBI HAD TO CHASE HER DOWN

3  OR THE FBI HAD TO OVERCOME ANY RESISTANCE ON THEIR PART.  THEY

4  SIMPLY HAD TO TELL THE CONSULATE YOU HAVE THE CITIZEN OF CHINA

5  THERE, AND WE WOULD LIKE TO ARREST HER ON OUR WARRANT.

6          THE COURT:  AGAIN, I MAY BE MISTAKEN.  I THOUGHT I

7  ALSO READ THE DOCTOR SHE SAW WAS A DERMATOLOGIST.

8          MR. SEGAL:  I HAVE NO IDEA WHAT THE SPECIALTY WAS.  I

9  KNOW IT WAS A MEDICAL DOCTOR.  AND THAT SHE WAS UNDER STRESS,

10  AND THAT SHE WAS DISORIENTED.  AND THE PEOPLE AT THE CONSULATE

11  COULD SEE THAT, THAT SHE WAS -- THAT SHE WAS STUNNED AT WHAT WAS

12  GOING ON.

13          THE COURT:  AND THE CONSULATE -- I DON'T KNOW IF WE

14  HAVE TO GET INTO THAT.  I'M SURPRISED THE CONSULATE COULDN'T

15  PROVIDE HER WITH MEDICAL ATTENTION.  THAT WAS THE --

16          MR. SEGAL:  NOT ONLY -- IF I MAY SAY ONE MORE THING,

17  YOUR HONOR?

18          THE COURT:  SURE.

19          MR. SEGAL:  THE CONSULATE DID NOT PROVIDE HER WITH A

20  NEW PASSPORT SO SHE COULD LEAVE THE COUNTRY.  THE CONSULATE DID

21  NOT SPIRIT HER OUT OF THE COUNTRY.  THE CONSULATE DID NOT TAKE

22  HER TO THE BORDER.  THE CONSULATE JUST SAID WE'LL GIVE YOU

23  ADVICE, AND WE THINK YOU SHOULD SURRENDER TO THE FBI.  AND AS I

24  UNDERSTAND IT, THE CONSULATE CAME TO VISIT HER WHILE SHE'S BEEN

25  IN CUSTODY JUST TO SEE THAT SHE WAS OKAY, WHICH IS WHAT

1    CONSULATE OFFICES DO.

2        BUT SHE AGREED TO SURRENDER TO THE FBI.  I SUPPOSE SHE COULD

3    HAVE PUT UP AN ARGUMENT AND INSISTED ON STAYING AT THE CONSULATE

4    BUT CHOSE TO LEAVE KNOWING WHAT WAS AHEAD OF HER.

5              THE COURT:  MR. COPPOLA.

6              MR. COPPOLA:  I THINK WE'RE TAKING A LITTLE BIT MORE

7    WITH A -- WE HAVE TO TAKE SOME OF WHAT MR. SEGAL SAYS WITH THE

8    GRAIN OF SALT HERE AT LEAST IN TERMS OF MS. TANG'S ACTIONS.

9        SO THE WAY THIS WENT DOWN WAS THE FBI WENT AND MET WITH

10   CONSULATE OFFICIALS AWAY FROM THE CONSULATE, ADVISED THEM THAT

11   THERE -- THAT THERE WAS A WARRANT -- RATHER RE-ADVISED THEM

12   BECAUSE EARLIER IN THE WEEK THAT SHE WAS ARRESTED A WARRANT -- A

13   COPY -- RATHER NOTIFICATION HAD BEEN DELIVERED TO THE CONSULATE

14   INDICATING THAT MS. TANG HAD A WARRANT BASED ON A COMPLAINT.

15       THE THURSDAY NIGHT SHE WAS ARRESTED, THE FBI ATTEMPTED TO

16   NEGOTIATE HER SURRENDER WITH THE CONSULATE.  THE CONSULATE --

17   THEY WERE UNSUCCESSFUL IN THAT.  MS. TANG WAS SURVEILLED IN A

18   CONSULATE VEHICLE LEAVING THE CONSULATE AND BEING DRIVEN TO A

19   HOSPITAL LATE IN THE EVENING.

20       SHE WAS SEEN BY A DOCTOR.  I DON'T KNOW WHAT TYPE OF DOCTOR.

21   AND THEN SHE WAS -- WHEN SHE WAS DISCHARGED FROM THE HOSPITAL,

22   THE FBI EFFECTED THE ARREST.

23       I DON'T THINK COUNSEL'S CHARACTERIZATIONS WITH RESPECT TO

24   HER PEACEFULLY SURRENDERING AND, YOU KNOW, AND GIVING HERSELF UP

25   TO THE FBI ARE NECESSARILY HOW YOU KNOW -- ARE NECESSARILY THE

1   LENS THAT WE OUGHT TO LOOK AT HOW THIS WENT DOWN.  SHE DIDN'T GO

2   TO THE FBI FIELD OFFICE.  SHE DIDN'T CALL THE FBI AND SAY, HEY,

3   COME PICK ME UP.  SHE DID NONE OF THOSE THINGS.

4       NOW AT THE TIME OF THE INITIAL FBI CONTACT, AT THE TIME OF

5   THE SEARCH WARRANT THERE WAS NO ARREST WARRANT FOR HER.  THE

6   CRIMINAL COMPLAINT AND THE ARREST WARRANT WERE SWORN OUT, I

7   BELIEVE, 6 OR 7 DAYS AFTERWARDS, AND IT WAS UNDER SEAL.

8       SO TO THAT EXTENT, YOUR HONOR, NOBODY MADE THIS EASY FOR THE

9   FBI AS MR. SEGAL WOULD LIKE -- WOULD LIKE FOR EVERYONE TO

10  BELIEVE.  THE FBI, AS I INDICATED, DID WHAT THEY COULD, BUT

11  MS. TANG DID NOT SURRENDER AS SUGGESTED.

12          THE COURT:  THE OTHER QUESTION I WANTED TO ASK OF YOU,

13  MR. COPPOLA -- AND I'M NOT SURE HOW MUCH IT WEIGHS IN THIS

14  DECISION TODAY -- BUT TO THE EXTENT YOU THINK IT DOES -- IS

15  THERE ANYTHING ELSE YOU WANT TO PROFFER WITH REGARD TO WHAT

16  YOU'VE BEEN LEARNING AS TO INFORMATION THAT WAS DELETED FROM

17  MS. TANG'S COMPUTERS, PHONE, ET CETERA, AND HOW THAT AFFECTS THE

18  WEIGHT OF THE EVIDENCE, UNDERLYING FACTS, ET CETERA?

19          MR. COPPOLA:  YOUR HONOR, I THINK I PUT SOME OF THAT

20  IN THE GOVERNMENT'S RESPONSE -- OR, EXCUSE ME, IN THE

21  GOVERNMENT'S OPPOSITION TO THE BAIL REVIEW.

22      WHAT I CAN TELL THE COURT IS THAT THERE IS A BROAD RANGE AT

23  LEAST IN TERMS OF -- A BROAD RANGE OF DATES, AS THE COURT KNOWS,

24  IN TERMS OF DATA THAT WAS DELETED.

25      HOWEVER, WHAT WE HAVE BEEN ABLE TO FIND ON DR. TANG'S --

1    WE'LL JUST SAY ELECTRONIC MEDIA BECAUSE THERE ARE -- I BELIEVE

2    THERE ARE 6 DEVICES IN TOTAL THAT WE'RE TALKING ABOUT HERE --

3    WHAT WE HAVE BEEN ABLE TO FIND ARE DOCUMENTS THAT INDICATE THAT

4    SHE WAS IN FACT IN THE MILITARY, PHOTOGRAPHS THAT INDICATE THAT

5    SHE WAS IN THE MILITARY, RANK INSIGNIA -- OR, EXCUSE ME, RIBBONS

6    THAT SHE'S WEARING IN THOSE PHOTOGRAPHS THAT INDICATE YEARS OF

7    SERVICE.

8         I THINK, AS I POINTED OUT IN MY MOST RECENT MOVING PAPERS,

9    WE WERE ABLE TO FIND THE DATA FOR ENLISTMENT IN THESE DOCUMENTS.

10   WE WERE ABLE TO FIND INDICATIONS THAT SHE HAD REQUESTED TO --

11   THAT, AS I INDICATED IN MY MOST RECENT MOVING PAPERS, THAT SHE

12   WAS -- HAD INDICATED THAT SHE HAD CONCLUDED HER RESEARCH EARLY

13   TO BOTH THE CHINA SCHOLARSHIP COUNCIL AND THE CONSULATE

14   GENERAL'S OFFICE AND ASKED TO RETURN HOME SO SHE COULD COMPLETE

15   HER MILITARY DUTIES.

16        SO, I MEAN, THOSE ARE SOME -- THOSE ARE JUST, YOU KNOW,

17   AGAIN, BROAD, BROAD CATEGORIES OF ITEMS THAT WE'RE SEEING IN THE

18   -- AND THOSE ARE SOME SPECIFIC DOCUMENTS AND PHOTOGRAPHS AND

19   THOSE SORTS OF THINGS THAT WE'RE SEEING IN TERMS OF DR. TANG.

20        AND, YOU KNOW, WHAT WE ALLEGE NOT ONLY BY WAY OF THE

21   CRIMINAL COMPLAINT BUT ALSO THE INDICTMENT IS THAT SHE, YOU

22   KNOW, THAT SHE IN FACT WAS NOT HONEST WHEN SHE INDICATED THAT

23   SHE HAD NO MILITARY SERVICE.

24        SO, YOU KNOW, TO THE EXTENT -- YOU KNOW, TO THE EXTENT THAT

25   THE EVIDENCE IS -- YOU KNOW, OUR VIEW OF THE EVIDENCE IS THAT IT

1   IS STRONG.  I UNDERSTAND MR. SEGAL'S, YOU KNOW, CONCERNS AT

2   LEAST IN TERMS OF WANTING TO, YOU KNOW, GET MS. TANG OUT OF

3   CUSTODY.  HOWEVER, THIS IS REALLY A CASE LIKE NO OTHER IN TERMS

4   OF -- AS I'VE INDICATED BEFORE, IN TERMS OF HER LACK OF -- HER

5   LACK OF TIES TO THE COMMUNITY.  NOTWITHSTANDING, YOU KNOW, MR. C

6   AND HIS FAMILY AND THEIR OFFERS AT THIS POINT.

7            THE COURT:  SO HERE IS WHAT MY -- CANDIDLY, I WANTED

8   NOT ONLY FOR ME TO HEAR SOME OF THAT, BUT I WANTED MR. AND

9   MRS. C TO HEAR THAT.

10    HERE IS WHAT MY STRONG INCLINATION IS.  AND I WILL GIVE YOU

11   EACH A BRIEF OPPORTUNITY TO RESPOND TO THAT.  MY STRONG

12   INCLINATION IS TO TELL YOU WHAT I'M INCLINED TO DO AND TO THEN

13   HAVE THIS CONTINUED TO TOMORROW.

14    BECAUSE MY INCLINATION IS TO ALLOW DR. TANG TO BE RELEASED

15   ON A $750,000 SECURED BOND.  SECURED.  NOT THE OLD UNSECURED BUT

16   THERE'S PROPERTY.  ACTUALLY POSTING THE PROPERTY BY MR. AND

17   MRS. C.  AND WITH THIRD-PARTY CUSTODIAN AND HER RESIDING AT

18   THEIR HOUSE WITH ESSENTIALLY A 24-HOUR-A-DAY CURFEW AND

19   ELECTRONIC MONITORING.

20    BUT, THE REASON I WANT TO HAVE IT BACK BEFORE THE COURT

21   TOMORROW IS I WANT TO MAKE SURE THAT MR. AND MRS. C HAVE THOUGHT

22   MORE AND TALKED ABOUT IT.  WHILE I FIND IT INCREDIBLY HONORABLE

23   BY THE TWO OF YOU TO BE WILLING TO DO THIS, I'M A FEDERAL JUDGE

24   WHO BELIEVES IN OUR SYSTEM, AND I GOT TO TELL YOU I WOULDN'T DO

25   THIS FOR SOMEBODY I WOULDN'T KNOW.  I WOULDN'T RISK PUTTING UP

1  MY WIFE'S HOUSE AND MINE.  SO I THINK THAT'S NICE.  AND I'M A

2  LITTLE CONCERNED THAT THIS FIRST GOT BROUGHT UP TO YOU AT THE

3  BEGINNING OF THIS HEARING.  SO I WANT TO MAKE SURE THAT YOU HAVE

4  THIS EVENING AND TIME TO TALK ABOUT IT AND THINK ABOUT IT.

5       I WANT MR. SHEEHAN TO BE ABLE TO NOW TALK TO YOU FURTHER AND

6  TO LOOK INTO THIS.  I WANT MR. COPPOLA, AS WELL, TO HAVE A

7  FURTHER OPPORTUNITY BECAUSE I THINK HE LOOKED AT YOU BEFORE AS A

8  THIRD-PARTY CUSTODIAN.  OKAY.  YOU'RE A RESPECTED MEMBER OF THE

9  BAR.  NOW IT'S DIFFERENT.

10      AND, CANDIDLY, THEY MIGHT REQUIRE AND I'M GOING TO REQUIRE

11 THAT YOU SHARE WITH THEM A MUCH GREATER SNAPSHOT OF YOUR

12 FINANCIAL SITUATION.  AND I DON'T MEAN YOU HAVE TO FILL OUT

13 HUGE, HUGE FORMS.  BUT I WANT THEM TO HAVE SOME IDEA OF ARE YOU

14 ESSENTIALLY PUTTING YOUR MAIN ASSET AT RISK HERE?  OR DO YOU OWN

15 17 HOUSES AROUND THE COUNTRY, YOU KNOW -- AND I KNOW -- BUT

16 THAT'S WHAT I'M SAYING.  BECAUSE IT MAKES A BIG DIFFERENCE IF

17 YOU'RE PUTTING UP THIS AMOUNT, OR YOUR HOME, OR BILL GATES WAS.

18 THOSE ARE TWO VERY DIFFERENT THINGS.

19      SO I WANT TO GIVE MR. SHEEHAN AND MR. COPPOLA AN OPPORTUNITY

20 AS WELL, AND I WANT YOU TO HAVE AN OPPORTUNITY TO THINK ABOUT

21 IT.

22      BUT, THE OTHER THING IS THERE WOULD BE SOME TIME -- AND I

23 WANT DR. TANG TO KNOW THIS -- BEFORE THERE WOULD BE A RELEASE

24 BECAUSE, A, THE PROPERTY WOULD ACTUALLY HAVE TO GET POSTED

25 FIRST, AND, B, ELECTRONIC MONITORING WOULD HAVE TO BE IN PLACE.

1    AND THIS ACCOMPLISHES A THIRD GOAL WHICH IS MR. COPPOLA MAY VERY

2    WELL WANT TO TAKE UP MY ORDER BEFORE JUDGE MENDEZ.  AND THERE'S

3    THAT TIME OPPORTUNITY TO DO SO WHILE THE PROPERTY IS GETTING

4    POSTED AND ET CETERA.  BUT THAT'S MY STRONG INCLINATION IN

5    MAKING SURE THAT THIS IS WHAT PEOPLE WANT TO DO.

6         LET ME ASK FIRST, MR. SEGAL?

7              MR. SEGAL:  YOUR HONOR, GIVEN YOUR STRONG INCLINATION,

8    I THINK WE'VE MOVED GIANT STEPS TOWARDS THE RELEASE OF THE

9    DEFENDANT FROM CUSTODY, AND I THINK IT'S IMPORTANT THAT WE MOVE

10   AS QUICKLY AS WE CAN SO I APPRECIATE THE HEARING TOMORROW.  I

11   WOULD ASK THAT THE COURT CONSIDER THE AMOUNT OF THE SECURED

12   BAIL.  I THINK $500,000 --

13             THE COURT:  I'M NOT GOING TO.  FOR EXACTLY THAT

14   REASON.  AND, CANDIDLY, WHEN I FIRST READ THE DECLARATION, I WAS

15   THINKING THE FULL MILLION DOLLARS.  AND I'M SAYING, OKAY, I'LL

16   MEET YOU AND MR. AND MRS. C PART WAY.  AND THAT MAY GET

17   REVISITED TOMORROW DEPENDING ON WHAT ELSE INFORMATION THERE IS

18   AS TO ALL OTHER ASSETS.

19        BUT, NO, I WANT TO MAKE SURE THAT THEY REALIZE AND DR. TANG

20   REALIZES IF SHE WAS TO TAKE OFF -- AGAIN, THERE IS NO BETTER

21   LEGAL TERM THAN THEY'RE SCREWED.  THEY'RE GOING TO LOSE THEIR

22   HOME.

23        AND SO IT'S NOT LIGHTLY THAT I THINK ABOUT THIS AMOUNT.

24   IT'S JUST TO MAKE SURE THAT THEY REALIZE WHAT THEY'RE PUTTING AT

25   RISK, AND DR. TANG REALIZES WHAT SHE'S DOING TO THESE PEOPLE WHO

1   HAVE COME FORWARD.  WHAT ELSE, MR. SEGAL?

2          MR. SEGAL:  THE OTHER THING I WANTED TO ASK WAS, DO I

3   UNDERSTAND CORRECTLY THAT YOU WOULD LIKE MR. AND MRS. C TO SHARE

4   WITH PRETRIAL SERVICES, UNDER THE SEAL OF THAT REPORT, SOME

5   GENERAL INFORMATION ABOUT THEIR PROPERTY HOLDINGS AND FINANCIAL

6   STATUS?

7          THE COURT:  CORRECT.

8          MR. SEGAL:  BUT NOT SHARE THAT WITH THE GENERAL PUBLIC

9   OR --

10          THE COURT:  CORRECT.  ABSOLUTELY.  ABSOLUTELY.  I JUST

11   WANT TO MAKE SURE THAT PRETRIAL, GOVERNED MYSELF, HAS SOME IDEA

12   JUST THE EXTENT OF THE FINANCIAL HURT THERE WOULD BE IF DR. TANG

13   WAS TO TAKE OFF VERSUS, OH, OKAY -- LIKE I SAID, NOT TRYING TO

14   BE TOO GLIB -- BUT, OKAY, WE LOST ONE HOUSE, BUT WE STILL HAVE

15   16 OTHERS.  THAT'S A VERY DIFFERENT SITUATION.  YEAH.

16          MR. SEGAL:  I THINK THAT'S ENOUGH GRAINS OF SALT FROM

17   THE DEFENSE.  AND SO MR. COPPOLA --

18          THE COURT:  MR. COPPOLA.

19          MR. COPPOLA:  YES, YOUR HONOR.  I'M FINE WITH THE

20   CONTINUANCE UNTIL TOMORROW.  I UNDERSTAND THAT THIS IS THE

21   COURT'S INCLINATION.  IT IS NOT YET THE COURT'S RULING.  SO FROM

22   THAT PERSPECTIVE, AGAIN, I DON'T OBJECT TO CONTINUING THE

23   HEARING UNTIL TOMORROW.

24          THE COURT:  AND LET ME JUST REITERATE SOMETHING I SAID

25   EARLIER SO YOU EACH KNOW -- SO YOU ALL KNOW WHERE I'M COMING

1   FROM.

2       I CAN'T HELP BUT HAVE A FACTOR IN THIS STRONG INCLINATION TO

3   BE THE SITUATION WE'RE IN RIGHT NOW AS WELL AS THE LIKELY

4   PENALTIES DR. TANG IS LOOKING AT.

5       SO MR. COPPOLA, YOU MAY ALSO WANT TO SCRAMBLE BETWEEN TODAY

6   AND TOMORROW.  IF YOU COME BACK AND SAY NO, NO, NO, WE'RE

7   ENVISIONING A SUPERSEDING WHERE IT IS A GRAND CONSPIRACY.  SHE'S

8   LOOKING AT, YOU KNOW, A 20-YEAR MINIMUM.  WELL, THAT WOULD BE

9   DIFFERENT.

10      BUT IN THIS DAY AND AGE, IT'S HARD FOR ME TO KEEP A PERSON

11  WHO'S IN JAIL IN THERE FOR A COUPLE YEARS WHERE AT THE END OF

12  THAT EVEN IF CONVICTED IS LOOKING AT, YOU KNOW, MAYBE 0 TO

13  6 MONTHS, 6 TO 10.  AND WE ALL KNOW IT'S GOING TO BE LONGER THAN

14  THAT BEFORE SOMEONE EVER GETS TO TRIAL WHEN WE NOW HAVE -- SO

15  THAT WOULD BE ONE THING -- BUT WE NOW HAVE SOMEONE WHO KINDLY

16  HAS COME FORWARD TO SAY WE'LL RISK OUR ENTIRE FINANCIAL

17  WELLBEING AS WELL AS WE'RE WORKING FROM HOME SO WE CAN KEEP AN

18  EYE ON THIS PERSON.

19      IT'S NOT AN IDEAL SITUATION, BUT IT HAS CERTAINLY -- IT'S

20  CERTAINLY HEAVILY TIPPING THE SCALES FOR ME.  BUT WE'LL TAKE A

21  LOOK AT THAT TOMORROW.  MR. COPPOLA, ANYTHING ELSE?

22          MR. COPPOLA:  NO, YOUR HONOR.  I UNDERSTAND THE

23  COURT'S POSITION.  THANK YOU.

24          THE COURT:  OKAY.

25          MS. RILEY-PORTAL:  YOUR HONOR?

1              THE COURT:  YES.

2              MS. RILEY-PORTAL:  I'M SORRY.  I WOULD LIKE TO CONFER

3      WITH THE INTERPRETER TO MAKE SURE THAT HE IS AVAILABLE FOR

4      TOMORROW?

5              THE COURT:  PLEASE DO.

6              THE CLERK:  JUDGE, IT LOOKS LIKE MR. SHEEHAN HAS LEFT

7      THE ZOOM.

8              MR. SHEK:  THE INTERPRETER IS AVAILABLE TOMORROW

9      AFTERNOON.

10             MS. RILEY-PORTAL:  THE INTERPRETER IS AVAILABLE?

11     OKAY.  THANK YOU.

12             THE COURT:  EVEN IF WE LOST MR. SHEEHAN, I THINK HE

13     HEARD THE GIST OF IT.  I THINK WE'LL BE OKAY.  SO 2:00 TOMORROW.

14         ALL RIGHT.  I DON'T KNOW IF THERE'S ANYTHING ELSE?

15         MR. C, QUESTIONS AT THIS POINT?  YOU'RE GOING TO BE TALKING

16     FURTHER TO PRETRIAL AND MR. COPPOLA, BUT ANY QUESTIONS FOR ME AT

17     THIS POINT?

18             MR. COPPOLA:  NO, YOUR HONOR.

19             MR. SEGAL:  NO, YOUR HONOR.

20             THE COURT:  BEFORE YOU EXIT OUT.  MR. AND MRS. C, I

21     WAS JUST ASKING IF THEY HAVE ANYTHING WHILE I'VE GOT THEM HERE?

22             MR. C:  YOUR HONOR, I THINK YOU WERE BREAKING UP.

23     COULD YOU REPEAT THE QUESTION?

24             THE COURT:  YOU'LL PROBABLY BE TALKING TO MR. SHEEHAN

25     FROM PRETRIAL AND MAYBE MR. COPPOLA AGAIN BEFORE TOMORROW, BUT

1   DO YOU HAVE ANY QUESTIONS FOR ME BEFORE WE END THIS HEARING

2   TODAY?

3           MR. C:  NO.  NO.  I REALLY APPRECIATE YOUR INFORMATION

4   AND, YOU KNOW, SCENARIO ABOUT THIS.  THANK YOU, REALLY, YOUR

5   HONOR.

6           THE COURT:  OKAY.  MR. JOHNSON, IT'S VERY RARE TO HAVE

7   YOU THIS QUIET.  ANYTHING YOU WANT TO SAY WHILE YOU'RE ON THE

8   RECORD?

9           MR. JOHNSON:  NO, YOUR HONOR.  THANK YOU FOR THE

10  CONSIDERATION YOU'RE GIVING OUR CLIENT.

11          THE COURT:  ALL RIGHT.  EVERYONE, PLEASE STAY HEALTHY.

12  THANK YOU VERY MUCH FOR THE TIME.  MR. WONG, SAME FOR YOU.  I

13  KNOW YOU DIDN'T SAY MUCH THERE.  BUT I WILL SEE MOST OF YOU IF

14  NOT ALL OF YOU TOMORROW AT 2:00 P.M.  THANK YOU VERY MUCH.

15      (COURT ADJOURNED.  2:49 P.M.)

16

17                          CERTIFICATION

18

19      I, DIANE J. SHEPARD, CERTIFY THAT THE FOREGOING IS A CORRECT

20  TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED

21  MATTER.

22                          /S/ DIANE J. SHEPARD
                            DIANE J. SHEPARD, CSR #6331, RPR
23                          OFFICIAL COURT REPORTER
                            UNITED STATES DISTRICT COURT
24

25