Malcolm Segal, SBN 075481
Emily E. Doringer, SBN 208727
**SEGAL & ASSOCIATES, PC**
400 Capitol Mall, Suite 2550
Sacramento, CA 95814
Telephone: (916) 441-0886
Facsimile: (916) 475-1231
msegal@segal-pc.com

Thomas A. Johnson, SBN 119203
**Law Office of Thomas A. Johnson**
400 Capitol Mall, Suite 2560
Sacramento, CA 95814
Telephone: (916) 442-4022
taj@tomjohnsonlaw.com

Patrick Wong, SBN 241740
**Patrick Wong, Esq.**
145 El Camino Real
Menlo Park, CA 94025-5234
Telephone: (650) 391-5366
Facsimile: (650) 352-3562
patrick@wong.law

Attorneys for Defendant
JUAN TANG

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>v.<br><br>TANG JUAN,<br>aka Juan Tang,<br><br>  Defendant. | Case No: 2:20-CR-00134 JAM<br><br>**DEFENDANT JUAN TANG'S REPLY TO GOVERNMENT OPPOSITION RE MOTION TO MODIFY CONDITIONS OF PRETRIAL RELEASE**<br><br>Date: November 6, 2020<br>Time: 2:00 p.m.<br>Crtrm: 25, 8th Floor<br>Judge: Hon. Kendall J. Newman |

-1-

Defendant Juan Tang's Reply to Government Opposition

## I.   Introduction

The government has contended since commencing this case that the defendant should be detained as a flight risk, and that she is connected to defendants charged in other judicial districts, although none were ever charged with conspiratorial conduct.  This Court rejected that position and found that there were conditions of release which met the statutory standards.  The government persisted, appealing this Court's determination by seeking a stay and revocation of the Release Order.  District Court Judge John A. Mendez rejected the government's arguments and denied both the stay and the motion to revoke. As required by this Court's Order, the defendant's release was secured in the amount of $750,000, against the equity in the Third-Party Custodian's home. Prior to her release, the property bond documents were scrutinized by the government, and the Defendant's release was withheld until the physical presentation of a recorded deed to the Clerk of the Court.  The government argued against the sealing of information which would reveal the physical location of the property and the identity of the Third-Party Custodian, who was generally referred to as Mr. C during the hearings, but ultimately conceded that the street address of the property could be redacted in public filings.

    The government continues to claim that the defendant is a substantial flight risk, notwithstanding the fact that her conduct since her release two months ago has been exemplary.  It also opposes a reasonable modification of the conditions of release requiring the defendant's residence in the Third-Party Custodian's home, even in the face of new and substantial information which demonstrate that his and the defendant's safety are at risk.

## II.   The Government Incorrectly Downplays Serious Threats.

The government is comfortable speculating that Dr. Tang would flee if permitted by this Court to reside in an apartment a short distance from the Third-Party Custodian's home, but ignores the fact that after two months, she has not

fled through the front door on those occasions when he was not home. The opposition is similarly willing to speculate that the Third-Party Custodian has suggested the new terms because he no longer wants to fulfill his responsibilities, despite the fact that he has again avowed his commitment to them by sworn declaration, and has performed his duties in a manner entirely satisfactory to the Pretrial Services supervising officers.  The government has embraced such speculation on one hand, but then objects to the Third-Party Custodian's and the defendant's concerns -- that repeated, sustained threats of violence stated in writing and disseminated in the online public sphere should be taken seriously -- characterizing them only as speculative and even worse.

The demonstrable record is contrary to the government's arguments and contains examples of public statements circulated within the past month on Twitter, a worldwide online social media platform, following the defendant's release to the Third-Party Custodian's residence.  The government states that it is unwilling to speculate that the threatening statements present a substantial change in circumstances and mischaracterizes the threats as merely the "opinions" of the authors.  Similarly, it dismisses as speculative the notion that threats to take hostages as a response to this very case and others reported in the national press has any bearing on whether the defendant's conditions of release should be modified.

That response is particularly unexpected because, contrary to the prosecution's argument here, it has often previously stated that threats disseminated online and in social media should be taken very seriously and that they are a federal crime.  In fact, the United States Attorney's Office for the Eastern District of California has prosecuted cases where social and other public media were used to convey such threats.  Such indictments have been filed under Title 18 of the United States Code Section 875(c), which provides:  "Whoever transmits in interstate or foreign commerce any communication containing any

threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both."

The government nonetheless minimizes the threats here by declaring: "Nor is it surprising, given the nature of the allegations, that people use social media to express opinions about Tang, her alleged conduct, and the fact that she remains out of custody pursuant to the Court's release order." Govt. Opp. at 3:11-15 (emphasis added). Similarly, although the threats to the Custodian were clearly not invited or welcomed, the prosecution also surmises that because of the Third-Party Custodian's "voluntary insertion of himself in this matter" these threatening comments should be expected. Id. Aside from the fact that the government's argument blames the victim of the threats for having offered his assistance to achieve a measure of fairness for the defendant, it is particularly shocking because the statements on social media in question here are not "opinions." They are threats and incitement to kill the Third-Party Custodian and others, and to cause property damage.

Regardless of the government's shifting position, the threats are real, and the concerns are palpable. The threats are quite clear as to who should be harmed, where the potential victims can be located, and what should be done by way of physical violence and property destruction. In pertinent part, and translated, they say:

- "She is enjoying the (good) life in that lawyer c's house. ...go…"
- "You can kill ... ( the) guarantor for Tang Juan, the Chinese lawyer, you have a way to kill one, I will reward you with a million"
- "The lawyers who defended Tang Juan (are) obviously gangsters. (You go) to smash their home."

It is significant that the threats refer to the Third-Party Custodian as Mr. C, as he was called in this Court, and that they were not made to an insular group of just a few friends, who might choose to discount them, as has the prosecution. The

Twitter accounts from which the above threats emanated have a substantial following.  One has over 21,000 followers, another has 147 followers.  The account whose user suggested that that the Third-Party Custodian be killed in return for a stated reward has 309 followers.  Those recent statements were made since the defendant's release and can still be seen online where they permanently reside. While the government suggests that in the face of those threats the Third-Party Custodian's safety, and presumably others in the residence, will not be enhanced by permitting the defendant to live separately nearby, the opposition does not take into account that the threats reference the Third-Party Custodian and tell people to go to his residence, a known and specific location.

     Individuals who make threats of the kind and nature of those posted against the Third-Party Custodian in public media and on social media have been prosecuted by indictment in this District.  In one case, remarkably similar as to the nature of the threatening language made in the tweets to the Third-Party Custodian, the defendant posted several statements on a news website saying: "The management of (a company working on matters with which he disagreed) should be taken by force and killed in the streets today.  Kill (the company's employees.)  I'll pay you for it."  He identified the target of his threats by name and wrote "I'll pay ten grand to whomever beats me to [the target]."  The then-acting United States Attorney Phillip Talbert did not accept those statements as a mere opinion or without risk to the victims.  Instead he told the public in a press release that: "(The defendant) made explicit, public statements expressing his intent to kill the victim.  His conduct caused the victim to fear for her life and the lives of her family members and colleagues. The sentence imposed by the court recognizes the seriousness of his offense and should act as a deterrent to similar conduct."[1]

---

[1] United States Attorney Press Release dated Tuesday, October 4, 2016, in *United States v. Orton* 2:15-cr-233-JAM.

Similarly, in a case where the defendant believed he had been unfairly treated in what was apparently an online combat game, this United States Attorney's Office described the facts in a press release stating: that the defendant "transmitted messages over the internet to [the company]," that he threatened to come to company headquarters "with an AK47 amongst some other 'fun' tools," and that he "might be inclined to cause a disturbance at [company] headquarters" while armed.  The defendant was prosecuted under 18 USC §875(c), to which he plead guilty and was sentenced to a period of incarceration.[2]  The government certainly did not find the language in those prior similar cases to be "speculative" or a mere expression of an "opinion" as to the inequity of the company's treatment of his complaints.

Nor should one offering to serve this Court in any capacity be subjected to threats to their life and property, whether made on social media or elsewhere, or suffer the risk of physical violence or harm to property.  The threat can be substantially reduced here by having the defendant live within a prescribed and reasonable distance from the Third-Party Custodian, while he maintains an appropriate level of supervision.  The government's argument that electronic monitoring is unsatisfactory to supplement his supervision lacks merit.  While such monitoring may not be a perfect supervision tool, the present Order does not require the Third-Party Custodian to be continuously present at the home, it requires the defendant to remain at the residence, with her presence reviewed by electronic monitoring.  If the defendant intended to flee, she could have, but of course, she has not done so.  Moreover, such flight would be virtually impossible without a passport, a driver's license, or another form of identification of which the defendant has none.  Indeed, it took the Third-Party Custodian's personal efforts over the course of several days simply to find a place that would test the defendant for Covid-19 without any form of identification.  That personal effort on

---

[2] United States Attorney Press Release dated Thursday, July 21, 2016, in *United States v. Cebula*, 2:16-cr-00136 KJM.

his part demonstrates his conviction to fulfill his responsibilities; and highlights the defendant's inability to travel or otherwise leave the jurisdiction while on pretrial release. The defendant has no intention to flee and the well justified safety concerns of the Third-Party Custodian and the defendant as to the publicly stated threats can be ameliorated by her residing reasonably close to the residence.

### III.     The Modification Request is Not Unreasonable or Unprecedented.

The Court previously determined that the defendant's appearance for future proceedings can be assured with an appropriate combination of conditions. The present request is based on reasonable grounds and is consistent with the legal framework underlying the Bail Reform Act. "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 754 (1987). Courts have long noted "that '[b]y its very language the Bail Reform Act demonstrates its favorable inclination toward pretrial release of federal criminal defendants.'…Therefore, the general expectation of the Bail Reform Act is that a defendant shall be released on his own recognizance or unsecured bond." *United States v. Karper*, 847 F. Supp. 2d 350, 354 (ND NY 2011).

The request is also consistent with the purposes of a Third-Party Custodian, who traditionally exists in that role as a means of further assurance of the defendant's continued compliance and required appearance. Contrary to the government's opposition, a Third-Party Custodian's role is not eviscerated if the defendant does not reside at the same precise location. As the Supreme Court has noted, although such sureties may be akin to "a jailer of [a defendant's] choosing," such relationship does not require "constant imprisonment" of the defendant by his surety. *Reese v. United States*, 76 U.S. 13, 21 (1869).

The defendant and the Third-Party Custodian have made this request in response to changed circumstances, supported by a record of full, complete compliance with the Special Conditions of Release. Requests to modify release

conditions are not uncommon and are often granted as a case evolves and the defendant shows compliance. A clear example of that progression is shown by a case in the Northern District often cited by government's opposing papers in this case. There the Court reduced the level of supervision, over time and commensurate with the defendant's compliance. *United States v. Chen Song*, 3:20-mj-70968 (ND CA). In that case, the defendant was released to home confinement in mid-July and by the end of that month, the Court modified the initial release conditions by eliminating the requirement of home confinement in favor of a curfew requiring her to remain at her residence between the hours of 8:00 PM to 6:00 AM. The Court recently modified the release conditions again to terminate electronic monitoring entirely. Of course, every case is different and release terms must be fashioned to suit the individual being supervised, but the point is clear that a reasonable modification can and should be made to suit the circumstances.

## IV.    Conclusion

The change in the conditions of release permitting a residence nearby that of the Third-Party Custodian may not, as the government has argued, fully guarantee the safety of the Third-Party Custodian or the defendant from those who want to threaten them or call on others to harm them, but it is a measured step to that reasonable end. Whatever inspired the threats, they are not a statement of "opinion" as the government urges. The United States Attorney said it best in the context of one of its previous cases referenced above. "Terrorizing others through threats of violence, whether communicated in person or through media websites, is cruel, dangerous and disruptive, and is also a federal crime … As (the defendant) now knows, those who seek to terrorize others online will be identified and prosecuted."[3] The prosecution here should not disregard that view

---

[3] United States Attorney Press Release dated Tuesday, April 19, 2016, in *United States v. Orton* 2:15-cr-233-JAM.

simply because it continues to disagree with this Court's finding that the defendant should not be detained.

Since the defendant's residency in the Third-Party Custodian's home appears to be the genesis of the terrorist threats, they can be ameliorated by permitting her to live in reasonable proximity to the residence, under the other substantial conditions of release. Even were the threats not to have been made, the defendant's history of compliance merit the modification. For that reason, the defendant requests that her conditions of release be modified as requested.

Dated: November 2, 2020  **SEGAL & ASSOCIATES, PC**

By: /s/ Malcolm Segal
MALCOLM SEGAL
EMILY E. DORINGER
Counsel for Defendant

**LAW OFFICE of THOMAS A. JOHNSON**

By: /s/ Thomas A. Johnson
THOMAS A. JOHNSON
Counsel for Defendant