1
2

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BEFORE THE HONORABLE KENDALL J. NEWMAN, MAGISTRATE JUDGE

3

UNITED STATES OF AMERICA,

4

           Plaintiff,

5

vs.
                     Sacramento, California
                       No. 2:20-CR-00134-JAM

6

TANG JUAN
                     Friday, November 6, 2020
(a.k.a. Juan Tang),
                     3:07 p.m.

7

           Defendant.

8

_____/

9

                     --oOo--

10

          REPORTER'S TRANSCRIPT OF PROCEEDINGS

11

   RE: DEFENDANT'S MOTION TO MODIFY CONDITIONS OF RELEASE
        *(Proceedings held via Zoom video conference.)*

12

                    --oOo--

13

APPEARANCES:

14

For the Government:        UNITED STATES ATTORNEY'S OFFICE

15

                     HEIKO COPPOLA
                     Assistant U.S. Attorney

16

                     501 I Street, Suite 10-100
                     Sacramento, CA  95814

17

For the Defendant:         SEGAL & ASSOCIATES, PC

18

                     MALCOLM S. SEGAL
                     Attorney at Law

19

                     400 Capitol Mall, Suite 2550
                     Sacramento, CA  95814

20

(Appearances continued on page 2.)

21

Official Reporter:         KACY PARKER BARAJAS

22

                     CSR No. 10915, RMR, CRR, CRC
                     UNITED STATES DISTRICT COURT

23

                     501 I Street, Suite 4-200
                     Sacramento, CA  95814

24

                     kbarajas.csr@gmail.com

25

*Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.*

1   APPEARANCES (Continued):

2   For the Defendant:          LAW OFFICE OF THOMAS A. JOHNSON
                                THOMAS A. JOHNSON
3                               Attorney at Law
                                400 Capitol Mall, Suite 1620
4                               Sacramento, CA  95814

5                               PATRICK WONG
                                Attorney at Law
6                               145 El Camino Real, Unit B
                                Menlo Park, CA  94025
7
    Also present:               Steven X. Cui
8

9                           --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        SACRAMENTO, CALIFORNIA, FRIDAY, NOVEMBER 6, 2020, 3:07 PM

2                      --oOo--

3        THE CLERK:  I'm just checking if our interpreter,

4  Mr. Shek, needs to get in touch with Ms. Juan.

5        THE INTERPRETER:  Yes.  Please allow time for the

6  interpreter to call her.

7        Yes, she's ready.

8        THE CLERK:  And calling criminal case 20-134-JAM,

9  United States versus Tang Juan, on for defendant's motion to

10  modify conditions of release.

11        THE COURT:  And good afternoon.  I am Judge Newman.

12  If I could please have appearances for the record starting with

13  government's counsel.

14        MR. COPPOLA:  Good afternoon, your Honor.

15  Heiko Coppola on behalf of the United States.  We consent to

16  proceeding by Zoom today.

17        THE COURT:  Thank you.  Good afternoon, Mr. Coppola.

18  Good to see you.

19        And for defendant?

20        MR. SEGAL:  Good afternoon, your Honor.  Malcolm Segal

21  on behalf of the defendant who consents to appear by Zoom.

22        THE COURT:  Mr. Segal, good afternoon.

23        And also for the defendant?

24        MR. JOHNSON:  Good afternoon, your Honor,

25  Tom Johnson.

1    MR. WONG:  Good afternoon, your Honor, Patrick Wong.

2    THE COURT:  And good afternoon.

3    And anyone else for the defendants?

4    And do we also have, if I'm pronouncing it correctly,

5    Mr. Cui, on the Zoom with us?

6    MR. CUI:  Hi, your Honor.  I'm here.

7    THE COURT:  Okay.  And good afternoon.  Thank you all

8    for being here.

9    THE INTERPRETER:  Your Honor, Richard Shek, previously

10   sworn Mandarin interpreter.

11   THE COURT:  Thank you, Mr. Shek.  I apologize about

12   that.

13   Thank you all for being here.  We are here on

14   defendant's motion to modify conditions of release.

15   First off, I want to make sure we're all on the same

16   page about one thing which is defendants filed their motion

17   with accompanying declarations and documents and request to

18   seal, which I granted temporarily, and I haven't even had

19   Mr. Coppola weigh in.  And I granted until today because I

20   wanted to get things before the Court.

21   And then government's counsel filed their opposition

22   to sealing which was also filed under seal since they were

23   addressing some of that.

24   But then I thereafter received from defense counsel a

25   subsequent filing not under seal that essentially said we're

1   concerned that the Court may unseal it on November 6th.  We

2   don't want that to happen, so here is an unsealed version which

3   we really think still addresses the concerns and agreeable to

4   having the Court not address the previously filed sealed

5   documents.  Just leave those sealed and somewhat moot the

6   issue.

7           Mr. Segal, this can be for any of you, but I will just

8   do it shorthand and say Mr. Segal, and if you can address it.

9   Is that an accurate statement of what brings us here now?

10          MR. SEGAL:  That is, your Honor.

11          THE COURT:  Okay.  And Mr. Coppola, you're agreeable

12  with that as well?

13          MR. COPPOLA:  I'm agreeable, your Honor, to the

14  substitution of the documents that counsel indicated.  I think

15  the court rule provides that if the Court isn't going to

16  seal -- if the Court decides not to seal something, then the

17  parties get their documents back.  So we can certainly talk

18  about that if we need to.

19          THE COURT:  Rather than leaving a sealed thing on the

20  record which has no force and effect, is it more appropriate to

21  simply have the previously filed documents returned to the

22  parties is the point; is that correct, Mr. Coppola?

23          MR. COPPOLA:  Yeah.  That's kind of what I'm saying.

24  If Mr. Segal doesn't want the items -- if Mr. Segal doesn't

25  want to go -- to utilize the items that are sealed, it doesn't

1    seem to me to matter.  It doesn't seem to me that we

2    necessarily need to leave them on the docket and sealed.  I

3    think the Court, under its own rule, could simply return those

4    documents to Mr. Segal and certainly and could, you know,

5    return my filing as well.

6              THE COURT:  Mr. Segal.

7              MR. SEGAL:  I'm happy to receive them, your Honor.

8              THE COURT:  Okay.  That's what the Court will order.

9              So let me tell you I have reviewed the defendant's

10   motion, the supporting documents, the government's opposition,

11   as well as the supplemental pretrial report.  A preliminary

12   comment I want to make for -- oh, by the way, even before I

13   make that preliminary comment, if I haven't already done this

14   for Ms. Juan, I do want to remind you you have the right to

15   remain silent.  You are not required to make any statements

16   here today, and I must caution you, if you make any statements,

17   they can be used against you not only today but in future

18   proceedings in this matter.

19             But addressing the motion, I do not want any of my

20   comments to be construed as unsympathetic at all.  There are

21   some serious concerns and allegations in there.  It is

22   unfortunate circumstances, a lot of what goes on in the world

23   these days and a lot of what people post and do, but I'm not

24   really clear on how the motion addresses much of what has been

25   raised in the defendant's motion.

1          Let me ask first has there been -- well, let me ask

2     first, I want to make sure I'm correct, is it Mr. Cui?  How do

3     I correctly pronounce your last name, sir?

4          MR. CUI:  That's good enough.  That's close enough.

5          THE COURT:  Well, I'm trying to get better than just

6     close enough.  Has there been any actual picketing or

7     demonstrations at Mr. Cui's home?

8          MR. CUI:  Do I answer that or the attorney for --

9          THE COURT:  Well, the attorneys -- unless I direct

10    something directly to you, I will have the attorneys answer it,

11    and they may at times ask you to address it.  But Mr. Segal?

12         MR. SEGAL:  There has not been picketing, as far as we

13    know, at Mr. Cui's home.

14         THE COURT:  So what I don't understand from the

15    filings is there have been filings that unfortunately

16    Ms. Juan's case is getting wrapped up with other ones but

17    much of -- and political and -- but much of that doesn't

18    involve Mr. Cui.  There's talk about, well, the Chinese

19    government may seize American scientists over there.

20    Unfortunate if it happened but again that doesn't impact

21    Mr. Cui.

22         But also there have been some various postings

23    threatening Mr. Cui, but a lot of that goes to because of his

24    role as a third-party custodian.  I'm not sure -- here he would

25    still be proposed being a third-party custodian except Ms. Juan

1   would be living somewhere else.  Maybe that lessens the threat,

2   but it doesn't seem to necessarily.

3          So help me understand why.  I understand it might

4   lower Mr. Cui's blood pressure somewhat, but why is this really

5   necessary or appropriate especially, as we all know, this was a

6   very close call with a lot of concerns, Mr. Segal?

7          MR. SEGAL:  First, your Honor, I want to start by

8   saying that I don't mean this to be critical in any way, but we

9   believe that the threats are very real.  They were made online.

10   They were explicitly made, and they were made in the Chinese

11   language and intended to reach a certain readership.  I don't

12   think we have to wait for someone to physically attempt to harm

13   Mr. Cui or Dr. Tang or persons in the home to make a

14   determination as to whether or not there is a substantial risk

15   at the home to people who are a resident there.

16          To the contrary, the threats that were made here in

17   these tweets within the last several weeks were very specific

18   in inciting people to go to that home and cause harm to

19   Dr. Tang and to Mr. Cui.  It was intended not just to picket

20   but to cause physical harm including killing somebody.  Under

21   those circumstances, I think that there's a very real and

22   present danger.

23          From my perspective, I might say when I read these

24   tweets, one of the tweets said we should go and trash or cause

25   damage to the gangster lawyers' homes.  Though that doesn't

1   bear on the issue before the Court directly, I reacted to that

2   very strongly.  I've never had a case where someone has

3   threatened to come to my home and damage my home because I was

4   representing an individual.  So these are very serious physical

5   threats, and they apply to a specific location.

6          As you will recall, there was a substantial argument

7   between the parties at our hearing with respect to release as

8   to whether or not some identifying data as to Mr. Cui's home

9   would be in the Court file, the public file.  We ultimately --

10  we agreed to modify that to eliminate the specific address, but

11  of course it gave a city.  It was pretty clear who he was from

12  the proceedings, and all someone had to do was to look up and

13  find the address.

14         That would not apply to a circumstance where you

15  permitted the defendant to reside in an apartment totally apart

16  from the residence.  Her apartment address would not need to be

17  in the public file of the court because the Court has the

18  authority, if it should appear in any place, to redact that

19  information and to seal it from the public.

20         There is a significant threat here to the defendant's

21  safety which is what brings me to court.  It's the defendant's

22  application and a significant threat to Mr. Cui's safety and

23  those in his home's safety from people coming there to

24  physically cause harm to him.  And the person who tweeted this

25  has a huge following and offered to pay a very substantial

1   amount of money to anyone who would kill Mr. Cui.

2           THE COURT:  Wait, let me interrupt a moment, and then

3   I've got a number of questions and comments.

4           MR. SEGAL:  Yes.

5           THE COURT:  Number one is the proposed apartment, is

6   it a standalone?  Is it a part of an apartment building?  Is it

7   a -- what is it?

8           MR. SEGAL:  It's part of a housing complex.  It's

9   already been rented.  It's already been reviewed by Pretrial

10  Services, and Pretrial Services, as I understand it, is

11  comfortable with the apartment in and of itself.

12          THE COURT:  My question, when you say it's part of a

13  housing complex, is it a duplex?  Is it part of an apartment

14  building?  What is it?

15          MR. SEGAL:  Perhaps --

16          MR. WONG:  It is a duplex.  There are a couple of

17  duplexes.  It is in one of the duplexes there.  There are four,

18  I think four apartments who are in one building, and then there

19  are a couple of other buildings; and it's a pretty big

20  complex.

21          THE COURT:  So here's some of my questions and

22  concerns.  And again, I don't want anyone to think I'm trying

23  to make anyone be, you know, subject to threats they shouldn't

24  be subject to, but again, having read through all the comments,

25  there was at least one comment that said, well, Dr. Tang is

1    getting to live in the luxury of this lawyer's home.  But other

2    than that, a lot of the comments, as you just admitted

3    yourself, Mr. Segal, has to do with the fact of threats against

4    you because you're willing to represent her.  Threats against

5    Mr. Cui because he's willing to be a third-party custodian, as

6    long as he's still the custodian, I don't see how that threat

7    is gone.

8           Plus, I'm just wondering, you know, sometimes maybe

9    this is more for marshals or law enforcement or whatever, I'm

10   wondering if there's less of a threat certainly to Dr. Tang if

11   she's living in a home where there are other people present as

12   opposed to her being in an apartment where it could be easier

13   for someone to get to her.  And I'm not sure how that's fair to

14   everyone else in an apartment complex where we go, well, let's

15   put her where other people may be at risk.  And I know that,

16   Mr. Cui, you certainly didn't agree to put yourself and your

17   family at risk, but we certainly talked about the fact to

18   agreeing to be a third-party custodian is certainly -- you're

19   undertaking a lot here.

20          So again, I don't understand why this is -- you may

21   say, well, it helps a little bit, but we also talked previously

22   about the fact that, Mr. Cui, you have grown children and, you

23   know, gosh what if family wants to come home or something, and

24   we talked about those concerns.  Sir, no one will fault you at

25   some point if you say this is not what I bargained for.  I

1   believe in our system, but this is not at all what I bargained

2   for.  And if you want to reconsider Dr. Tang living with you or

3   posting a surety, then you have an absolute, absolute right to

4   do so, and then I will take it from there.

5          But as I've said, my comfort level -- this was unheard

6   of in many ways, but my comfort level was to have Dr. Tang in

7   the home with a third-party custodian keeping an eye on her and

8   a curfew, and having her in a separate apartment doesn't do

9   that.  And I'm not trying to be unfeeling about Mr. Cui and his

10  family, but I am not comfortable about saying, hey, because

11  this case is getting profiled and maybe even online threats,

12  that the solution is to still have Mr. Cui be a third-party

13  custodian but to move Dr. Tang to an apartment.  I don't think

14  that's the answer or solution.

15         MR. SEGAL:  Well, let me -- may I respond, your Honor?

16         THE COURT:  Yes, please, absolutely.

17         MR. SEGAL:  So first of all, the plan would be for

18  Dr. Tang to go into the apartment, close the door, and not come

19  out unless she was going to some kind of a court appearance or

20  something which is mandatory.  She would stay in the house.

21  She would have her ankle bracelet on in the house.

22         Mr. Cui would check on her as many times a day

23  physically or on the phone as is necessary, and that provides

24  security for her in the sense that she's not in his home.

25  People will know.  Because this is a public record, people will

1    know she's no longer in his home.  They will not know where she

2    is, and she will be in safety.  She won't be putting anybody

3    else in danger.  She will be in that home -- in that apartment

4    locked in essentially.  It's effectively home confinement.  So

5    I think that alleviates -- should alleviate some of the

6    concerns.

7            As far as the concern about flight risk, first of all,

8    she's been an exemplary person over for the last -- over two

9    months.  She could have walked out of Mr. Cui's home at any

10   time and didn't.  She's been totally complying with Pretrial

11   Services.  There are other -- there are certain methods that

12   Pretrial Services uses to check on her by calling her.  Mr. Cui

13   can go over there as many times a day as Pretrial Services

14   wants.  And I would note that Pretrial Services, who was

15   originally a proponent of detention, is no longer a proponent

16   of detention.  They now say, while they would prefer that she

17   live at Mr. Cui's home, they are concerned and want to leave

18   that concern to the Court about the defendant's safety.

19           So again, I think it's -- I think going on to

20   something else you said, I think it's really unfair.  I don't

21   mean the Court's unfair.  But generally, it's unfair

22   objectively to ask Mr. Cui to make what is effectively Sophie's

23   choice.  We're saying to Mr. Cui that he has had someone in his

24   home as a guest who's been an exemplary guest.

25           There's not a single complaint about her.  There's not

1    a single complaint about him.  We're now saying to Mr. Cui,

2    Mr. Cui, which would you prefer?  Would you prefer to take the

3    risk that you personally or a member of your family or Dr. Tang

4    may be killed by some crazy person who bears a grudge against

5    you whether because you are her third-party custodian or

6    because the Chinese government has taken Americans hostage or

7    threatened to take Americans hostage?  Are you prepared,

8    Mr. Cui, to take the risk that you will be killed, or would you

9    be better off having Dr. Tang taken from your home and confined

10   to the Sacramento County Jail?  That's not a fair choice to ask

11   a human being, particularly someone who volunteered to assist,

12   a lawyer who came forward volunteering to assist not just

13   Dr. Tang but the Court.

14          And he's serving in a public role in alleviating a

15   concern that the Court has about unreasonably detaining

16   somebody under the Bail Reform Act, and he's assisting Dr. Tang

17   by not having her confined in the Sacramento County Jail at a

18   high risk of COVID-19 infection or some risk of COVID-19

19   infection.

20          So again, I don't think that Dr. Cui should be

21   required to make the determination as to whether or not he

22   throws her out of his house and sends her back to jail or make

23   the choice that he wants to risk his life or that of his

24   family.  It's just unreasonable to do that.

25          And I say this, part of the issue here is the

1    juxtaposition of a first class newspaper like The Wall Street

2    Journal and the New York Times specifically writing a detailed,

3    fact-based story about the threat of hostage taking in the

4    context of people making threats against Dr. Cui and Dr. Tang

5    based upon the relationship to the Chinese government.

6         I might say that the Wall Street Journal reporter

7    asked me if I was working for the Chinese government, if the

8    Chinese government was paying for me.  None of that is true.

9    But it's again the inquisitive nature of the press was based

10   upon factual reporting.

11        So one other thing I would like to address in

12   response, and that is, you know, the government was critical of

13   Dr. Cui for coming forward to assist Dr. Tang and the Court.

14   The government said that he was effectively a volunteer.  So as

15   I said, they blame the victim here because Mr. Cui is a victim

16   of these threats, just as Dr. Tang is a victim of these

17   threats.

18        But what I didn't hear from them is really important,

19   and I'd ask the Court to consider this in evaluating the

20   government's opposition to her remaining in an apartment rather

21   than Mr. Cui's residence.  What you didn't hear from the

22   government is that we're investigating the threats.  Nothing in

23   their opposition said they're even investigating those threats,

24   notwithstanding the fact that they have prosecuted people in

25   this district and sent them to jail for making similar threats,

1    and we cited two cases right on point.

2         The second thing we've not heard from the government

3    is that they've attempted to identify the people who have made

4    these threats and done a risk assessment as to whether or not

5    they are seriously in a position to kill Mr. Cui or have the

6    ability to enlist others to do so.  They've done nothing in

7    that regard.

8         And finally, they haven't even said to you that

9    they've talked to their partners in law enforcement to find out

10   what they know locally about possible threats, what they know

11   about the residence itself.  I know things about the residence,

12   which I don't want to share on the public line, but no one has

13   done a risk assessment.

14        So here we have the Federal Bureau of Investigation,

15   the National Security Division of the Department of Justice,

16   the local law enforcement, the Secret Service, all of those

17   available to the government.  The government has not told you

18   whether they've even done a risk assessment under the

19   circumstances where someone has made a threat to kill the

20   third-party custodian who is effectively an officer of the

21   Court.

22        THE COURT:  Mr. Coppola.

23        MR. COPPOLA:  Thank you, your Honor.  The question

24   that I would pose right back to Mr. Segal about that is, if all

25   of these threats are at least to unfold, and that's something

1   that I pointed out in my briefing, I'm wondering why it is if

2   they're truly concerned about the nature of these threats and

3   everything else, why they didn't bother to report them to law

4   enforcement themselves and now in this hearing attempts to cast

5   aspersions on the government for what Mr. Segal thinks is, you

6   know, the government's failure to somehow protect, you know,

7   the third-party custodian.

8        But that's neither here nor there your Honor.  When we

9   get down to the brass tacks of this particular issue, it's as

10  the Court has pointed out.  And that is simply this.  How is it

11  that this modification helps alleviate the concerns and fears,

12  and I still haven't heard that from the defense in this case.

13  I understand their concerns.

14       I'm sympathetic to their concerns, but the whole point

15  of the Court's incredibly unusual release order was exactly as

16  the Court pointed out.  It wanted somebody to stay in close

17  personal contact with the defendant and to monitor her.

18       The fact that she's done well under supervision is

19  neither here nor there because at this juncture she really has

20  no choice but to comply with the conditions of not only this

21  Court's order but also with making sure that she follows the

22  rules that Mr. Cui sets.

23       So I don't know that we can necessarily look to that

24  as an indicator that she will necessarily perform well if we

25  suddenly allow her to be in a situation where she is

1    effectively unmonitored.

2             So at this juncture too, you know, overall, as the

3    Court has pointed out, this solution does not alleviate any of

4    the problems.  It's not going to stop these alleged threats.

5    People are going to say what they're going to say.  But, you

6    know, at this juncture -- you know, as the Court pointed out as

7    well, how does this make her safer as well if we put her

8    suddenly in a place where she's not as well monitored?  So --

9             THE COURT:  Let me address because honestly hearing

10   anything more today isn't going to change things.

11            First off, I want to address the overall concern which

12   I started with which is Mr. Cui, and for that matter Dr. Tang

13   and defense counsel, I do not mean to minimize how the threats

14   or how messed up we are in a world where Mr. Cui is trying to

15   show people belief in our system, and people are trying to

16   prevent that.  But I do think and I agree with Mr. Coppola, if

17   you feel these threats are serious and credible, I think you

18   should contact law enforcement and FBI, and I think you should

19   also coordinate with Mr. Coppola about doing that because you

20   want to figure out how much of this is our, for lack of a

21   better word, whack jobs posting things on, you know, the

22   internet, or are they really credible threats?  And I think

23   that's one of the things that you want to make sure you've

24   brought to law enforcement.

25            And Mr. Cui, I don't know how much you've already

 1    notified your local law enforcement, if you want to or not, to

 2    notify them what's going on with your home, and there have been

 3    threats.  And that means sometimes you can have, whether it's

 4    local police or sheriffs doing, you know, more rounds, but I

 5    also agree that while it may alleviate Mr. Cui's mind a little

 6    bit or family members, moving Dr. Tang out of the house and

 7    into an apartment doesn't address a lot of what was put forth

 8    in front of me.  It doesn't address whether or not the Chinese

 9    government is going to seize American scientists or whether

10    other people are going to be taken hostage.

11         Also, as I said as read it, many of the threats

12    against Mr. Cui unfortunately are based on his being a

13    third-party custodian.  And if he's still being a third-party

14    custodian, many people may feel, well, we're going to threaten

15    him or unfortunately take action.

16         Also I don't want to act like I've watched too many

17    spy movies, but if Dr. Tang is moved to an apartment and

18    Mr. Cui is going over there regularly, it probably wouldn't be

19    that difficult for someone to follow him to figure out where

20    Dr. Tang is living.

21         But I also had great, great concerns in setting up

22    this condition is I wanted Dr. Tang not where someone's

23    checking in on her periodically but in a home where there's a

24    curfew and she's not going anywhere without Mr. Cui and his

25    wife being aware of that, keeping an eye on that.  There's also

1   prohibitions on other people visiting her, her going to the

2   embassy, and all of those are suddenly gone when she's on her

3   own in an apartment.  We all know minds start doing different

4   things when you're alone in an apartment and there's not

5   somebody right there.  So I am not willing to modify this.

6        I do not mean to give -- Mr. Cui, look, I don't want

7   you in danger.  I don't want your family in danger.  I don't

8   mean to give you a very difficult Sophie's choice.  But again,

9   sir, if you are really concerned at a certain point and say

10  this isn't what we signed up for, I do not want to put my wife

11  family members at risk, I understand that, sir.  And then you

12  always have the right to opt out of being a third-party

13  custodian or a surety, and then I will address it from there.

14  But I'm not going to modify the conditions being presented to

15  me at this point.

16        MR. SEGAL:  I --

17        THE COURT:  Yes, Mr. Segal?

18        MR. SEGAL:  Just for the record, your Honor?

19        THE COURT:  Yes.

20        MR. SEGAL:  And I appreciate your Honor's

21  thoughtfulness here.

22        THE COURT:  Yes.

23        MR. SEGAL:  First, I do think that having her in an

24  apartment does alleviate one concern.  The public will know

25  she's no longer at Mr. Cui's residence.  She will be separate

1    from him at a reasonable distance in an apartment.  She will be

2    wearing an ankle bracelet which this Court over many years has

3    found satisfactory to secure the presence of defendants charged

4    with far greater offenses serving far more time to make sure

5    that they would stay in the location the Court has assigned

6    them to.

7          Second, we -- I understand that in the beginning of

8    the case the Court thought those terms were necessary, but time

9    has passed.  And some of the things the Court learns over the

10   passage of time is that defendants can be compliant.

11   Defendants can show their compliance, and she has shown her

12   compliance.

13         And I purposely cited to another case which the

14   government has offered up in every appeal and every motion it's

15   made, and of course the case was rejected by Judge Mendez as an

16   example of spying or some other allegation the government made.

17   But I still think it's interesting to look at that case because

18   in that case over the same period of time as this one given a

19   defendant similarly situated charged with the same offenses in

20   San Francisco having had hearings in front of judges of the

21   court there who gave careful consideration to the situation,

22   allowed the defendant to evolve over time, and slowly but

23   surely diminished the conditions of release knowing that the

24   case might take some time to litigate and knowing that the

25   defendant was facing, if anything, but a brief sentence.  We've

1  talked about this before.  The defendant is facing a likely

2  presumptive sentence of zero to six months.  She's already

3  served two months in the Sacramento County Jail.

4       So in that case, what the court did was, as we cited

5  in our papers, had conditions of release, reduced the

6  conditions of release, had the defendant on home confinement,

7  had a curfew, and slowly but surely alleviated all those

8  conditions of release.

9       And so now, as of last week, the defendant is

10  essentially in home confinement on bail free to travel around

11  the city of San Francisco, do whatever she wants, and she is

12  similarly situated to the defendant.  The government has her

13  passport.  The government has her driver's license.  Where is

14  Dr. Tang going to go without those documents?

15       THE COURT:  Let me -- if I could, let me address a

16  couple points you brought up.  Number one of which is many,

17  many, many cases I address modifying conditions based on a

18  person's track record, absolutely.  Also that and, as you,

19  yourself, just alluded to, often that same gradual step-by-step

20  here's what we're asking for.

21       What is before me today is not some gradual.  It's we

22  want to have her move out to a separate apartment.  That's what

23  I'm saying no to.  As she develops a track record, if there are

24  other lesser things that you want to come back to the Court to

25  talk about, again I'm always open to doing that the longer that

1  Dr. Tang has a track record of showing she is compliant with

2  all of the conditions that are set.  So that's one point.

3          The other point is, again, I totally believe in

4  freedom of the press.  I think this is an unfortunate comment

5  to even make here, but I sometimes think whether this approach

6  by the defense is the best idea because then when you put this

7  before the Court, what it does is it gets additional press

8  attention.  And then while you say it alleviates it because she

9  will have moved into an apartment, you just wonder if it will

10  stir the pot again where we'll be saying at an unknown

11  apartment, and will again people be speculating trying to

12  figure out, trying to follow Mr. Cui.

13          And again, that shouldn't be prohibiting you all from

14  coming to court.  I'm just saying we're in an unfortunate

15  situation where that's sometimes the reality.

16          But again, I just am concerned that moving her to an

17  apartment you think or hope might lessen it, but candidly

18  that's all it is is you're hoping.  But I would hate to be the

19  one inviting Mr. Cui, hey, you're good to go now, she's not in

20  your house anymore.  You would still have huge concerns.

21          MR. SEGAL:  Your Honor, we have to do what we can to

22  prevent the damage to Mr. Cui and Dr. Tang, and the concern

23  that I have is that we did make a complaint to law enforcement.

24  We did tell law enforcement about these tweets.  We did tell

25  law enforcement there was a threat to kill Dr. Cui and come and

1  harm Dr. Tang.  We told them that two weeks ago when we filed

2  this motion.  And what they have done since then is nothing.

3  So the government's claim you didn't make the complaint to law

4  enforcement is simply, you know, a red herring.

5        The reality here is we've done -- and we asked the

6  government if they would stipulate.  What we're doing here by

7  filing this motion is trying to prevent the one in a thousand,

8  the one in a hundred, the one in 21,000 recipients possibility

9  that someone will go to that residence which is in the public

10  record of this court and kill Dr. Tang or kill Steven Cui.

11  That's why we made this application.

12        And I understand there's a concern that the Court is

13  weighing.  And under the -- and the Court knows.  You've

14  handled hundreds, if not thousands, of bail applications.  The

15  Court is required to provide the least onerous conditions of

16  release which serve to ensure the defense return for trial in

17  the case.  But also the Court has an obligation in my view to

18  protect the defendant and the third-party custodian and to do

19  what he can.

20        And I realize, as I sit here and I make this argument,

21  I'm going to lose.  But having said that, I really would like

22  the Court to reconsider its position and at least give some

23  additional thought to this and perhaps take the matter under

24  advisement, give it some additional consideration before

25  ruling, because I think the arguments here are cogent.  They're

1  serious.  They're not made for the mere convenience of the

2  parties.  They're in the interest of public safety.  So if the

3  Court would be willing to accept one additional application

4  from me, and that is please take this matter under

5  consideration and not rule today.

6       THE COURT:  Let me just tell you -- and I don't mean

7  to be saying that you're not a very articulate advocate.  But

8  one definite advantage I had here is that this was filed

9  sometime ago, so I obviously have had quite a bit of time to be

10  able to think about it.  I will even tell you -- I don't know

11  if I should be admitting this, but I will tell you then and

12  more recently I went back and read the sealed documents because

13  I know there's an agreement not to address them, but I wanted

14  to make clear that I wasn't glossing over something that, boy,

15  if I had considered this, this would totally change the

16  landscape.  And the fact is, in my mind it did not.

17       So I appreciate it, Mr. Segal, but delaying the

18  decision isn't going to change the decision.  I really think

19  that given everything we've addressed multiple, multiple times

20  before, I have put all of the liberality I can in terms of

21  Dr. Tang's current release package to allow her to be released,

22  not be in jail, but take into account all the other concerns

23  that the Court has that the government has raised, and so I am

24  going to deny this request for a bail modification.

25       While I have you all here, in case it hasn't already

1   been done, under the Due Process Protections Act, I want to

2   advise the government that under Rule 5(f), counsel for the

3   United States is ordered to comply with its disclosure

4   obligations under *Brady versus Maryland* and its progeny.

5   Failure to do so may result in the dismissal of charges,

6   exclusion of evidence, adverse jury instructions, contempt

7   proceedings, and sanctions.

8           And a final comment, if Mr. Cui is still there, as I

9   said, I'm not trying to discourage you from being a third-party

10  custodian, but I also understand; and I don't want you to put

11  your family at risk.  If at a certain point after talking to

12  your wife or family members you feel like this just isn't

13  working, you can contact the pretrial services officer, or you

14  can contact the Court.  But again, I very much appreciate what

15  you've been willing to do today, sir.  So thank you.

16          Mr. Coppola, anything further?

17          MR. COPPOLA:  No, your Honor.  Thank you.

18          THE COURT:  Mr. Segal, anything further?

19          MR. SEGAL:  No.  Thank you, your Honor.

20          THE COURT:  Any other defense counsel?  Mr. Wong, I

21  don't mean to shorthand you.  I think we lost Mr. Johnson, but

22  anything else from anyone?

23          MR. WONG:  No.  Thank you, your Honor.

24          THE COURT:  Thank you everyone.  Mr. Shek, thank you

25  very much.

1          THE COURT:  Dr. Tang, good luck to you.

2          THE DEFENDANT:  Thank you, your Honor.

3          THE CLERK:  Thank you.  Court is adjourned.

4          (The proceedings adjourned at 3:45 p.m.)

5                          --oOo--

6    I certify that the foregoing is a correct transcript from the

7    record of proceedings in the above-entitled matter.

8                              /s/ Kacy Parker Barajas

                               _____
9                              KACY PARKER BARAJAS
                               CSR No. 10915, RMR, CRR, CRC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25