Malcolm Segal, SBN 075481
Emily E. Doringer, SBN 208727
**SEGAL & ASSOCIATES, PC**
400 Capitol Mall, Suite 2550
Sacramento, CA 95814
Telephone: (916) 441-0886
Facsimile: (916) 475-1231
msegal@segal-pc.com

Thomas A. Johnson, SBN 119203
**Law Office of Thomas A. Johnson**
400 Capitol Mall, Suite 2560
Sacramento, CA 95814
Telephone: (916) 442-4022
taj@tomjohnsonlaw.com

Patrick Wong, SBN 241740
**Patrick Wong, Esq.**
145 El Camino Real
Menlo Park, CA 94025-5234
Telephone: (650) 391-5366
Facsimile: (650) 352-3562
patrick@wong.law

Attorneys for Defendant
JUAN TANG

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TANG JUAN,<br>aka Juan Tang,<br><br>Defendant. | Case No: 2:20-CR-00134 JAM<br><br>**DEFENDANT JUAN TANG'S APPEAL FOR REVIEW OF ORDER DENYING MOTION TO MODIFY PRETRIAL RELEASE CONDITIONS**<br><br>Date:    TBD<br>Time:    TBD<br>Crtrm:   6, 14th Floor<br>Judge:  Hon. John A. Mendez |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT the defendant, through her undersigned counsel of record, respectfully submits this Appeal for Review of Order Denying Motion to Modify Pretrial Release Conditions.  This appeal for review is made pursuant to 18 USC §3145(c).

Dated: November 10, 2020.          **SEGAL & ASSOCIATES, PC**

By:    /s/ Malcolm Segal
        MALCOLM SEGAL
        EMILY E. DORINGER
        Counsel for Defendant

**LAW OFFICE of THOMAS A. JOHNSON**

By:    /s/ Thomas A. Johnson
        THOMAS A. JOHNSON
        Counsel for Defendant

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANT JUAN TANG'S APPEAL FOR REVIEW OF ORDER
DENYING MOTION TO MODIFY PRETRIAL RELEASE CONDITIONS**

Dr. Juan Tang, by and through undersigned counsel, respectfully appeals to this Court for review of the Magistrate's order denying her Motion to Modify Pretrial Release Conditions. This appeal is made pursuant to 18 USC §3145(c).

## I.    Procedural Background

A Complaint, filed June 26, 2020, charged the defendant with an alleged violation of 18 USC 1546(a), involving fraud or misuse of a visa document. DKT #1; DKT #4. An arrest warrant was executed on July 23, 2020, and she was arraigned on July 27, 2020. At that time, the Magistrate Judge Court ordered her detained without prejudice and pending continued detention proceedings. DKT #6. On August 6, 2020, an Indictment was returned charging visa fraud and making false statements to the investigating agents concerning the same allegedly false information in the visa application; no additional charges or facts have since been alleged. DKT #18. Based on the facts and charges alleged, a preliminary analysis indicates a likely guideline sentence ranging between probation and eight months if the defendant is convicted. USSG §2L2.1. Any such sentence would be reduced by credit for time served during the period in which she was detained in the Sacramento County Jail.

Following a renewed motion for release based on the availability of a well-qualified Third-Party Custodian, an attorney who had no prior connection to the defendant and none to the case, and the Custodian's expressed willingness to post a $750,000 surety bond secured by his home, the defendant was ordered released. DKT #61. Other conditions of release were imposed, including electronic monitoring, regular reporting to Pretrial Services and Defendant's residence in the Custodian's home. The government argued for continued detention and sought a stay of defendant's release and revocation of the Order

from this Court.  Both were separately denied.  Upon the posting and proof of recording of the security for the $750,000 bond, the defendant was released two months ago, on September 10, 2020.  Since that time, Dr. Tang has been fully cooperative and compliant with Pretrial Services, the Custodian, her attorneys, and the Court's Orders.  She remained quarantined for the required period and was confirmed as negative for the Covid-19 virus.  She has fulfilled all ordered contact with Pretrial Services and is in regular contact with her attorneys and actively engaged in assisting in her defense.

There has been a steady interest in this case in the local and national press in the United States, and the reporting has often focused on the identity and role of the Third-Party Custodian.  There has also been regular reporting about the case in the Chinese language media in the United States, most often negative, and frequently very hostile toward Dr. Tang and the Third-Party Custodian.  Of greater concern is that since the defendant's release, widely circulated Chinese language social media posts concerning the case have contained explicitly violent threats, inciting others to kill the Third-Party Custodian because of the defendant's living in his home under this Court's orders, and to cause physical harm and property damage.  The name of the Custodian and the location of his residence has clearly been ascertained by those making the threats, even though some of the information was partially redacted in the Court's records over the government's initial objections.  As a result of these stories and attacks, there is a significant objective concern for the safety of people residing in the Third-Party Custodian's home, including the Custodian himself, the defendant, and others who may be in the home and who have no connection to the case.  The Third-Party Custodian is personally concerned that he and others in the residence may be physically harmed if the Defendant remains in the home because the touchstone for the threats has been her residence there.

/ / /

Defendant Juan Tang's Appeal for Review Order Denying Motion Modify Pretrial Release Conditions

1    Because of these specific threats and ongoing threats and the increasing

2    concerns about personal safety of those in the home, the defendant filed a Motion

3    to Modify the Conditions of Pretrial Release.  The proposed modification to the

4    conditions of release would permit her to reside in a leased apartment a short

5    distance from the Third-Party Custodian's home, while remaining subject to all

6    other conditions, including the Custodian's frequent and personal supervision,

7    electronic monitoring, regular reporting to Pretrial Services, and the posting of the

8    $750,000 equity in the home as security for the bond.  DKT #72.  The motion was

9    supported by documentary evidence of the explicit threats to the Custodian and

10   the Defendant and the resulting safety concerns.  *See* Exh. A and B.

11   The defendant's motion was heard on November 6, 2020, and the

12   Magistrate Judge denied the motion, essentially stating his belief that while he

13   was concerned about the safety of those impacted, having the defendant live

14   separately from the residence did not entirely eliminate the risk of harm, that no

15   physical acts of violence had occurred, and that he felt that her residence in the

16   home was an essential part of his previous release order.  Upon those

17   considerations, the Motion to Modify Pretrial Release Conditions was denied.

18   DKT #87.

19   Because the threats of physical violence and property destruction have

20   specified the targets and the known location of the residence for that violence and

21   destruction, and because the Third-Party Custodian, an attorney well-respected in

22   the professional and business community, has become more and more

23   concerned about the safety of those persons living or visiting his residence, there

24   are sufficient grounds to justify the proposed modification to the release

25   conditions, while maintaining a combination of other substantial conditions that

26   provide ample assurance for the defendant's continued compliance with all Court

27   orders and her appearance at future proceedings.  18 USC §3142(c)(1)(B).

28   / / /

## II.    This Court Should Order the Requested
## Modifications to Pretrial Release Conditions.

The defendant appeals to this Court for a review of the Order denying her request to modify release conditions.  The relevant Bail Reform Act provisions permit appeal from the Magistrate Judge's decision and requires its "prompt" determination.  18 USC §3145(c).  In considering an appeal from a Magistrate's decision on pretrial release matters, the District Court applies a *de novo* standard of review.  *United States v. Moore*, 607 F. Supp. 489, 500 (N.D. CA 1985); *United States v. Smith*, 87 F.R.D. 693, 699 (E.D. CA 1980) [*aff'd* 734 F.2d 22 (9th Cir.)].

The requested modifications, and this appeal from their denial, are based on the presence of ongoing, repeated and explicitly violent threats against the personal safety of the Third-Party Custodian and the defendant.  *See* Exh. A, Exh. B.  These threats have been made on social media to a substantial audience; they are real, and the parties concerns are palpable.  In pertinent part (translated) they say:

- "She is enjoying the (good) life in that lawyer c's house. ...go…"
- "You can kill ... ( the) guarantor for Tang Juan, the Chinese lawyer, you have a way to kill one, I will reward you with a million"
- "The lawyers who defended Tang Juan (are) obviously gangsters. (You go) to smash their home."

The persons who made the threats have a substantial following:  Three of the Twitter accounts from which the threats emanated have a large following. One has over 21,000 followers and another has 147 followers.  The account whose user suggested that that the Third-Party Custodian be killed in return for a stated reward has 309 followers.  Whether the threats will be carried out aside, they are unnerving and it is significant to note that individuals who make threats of the nature of those posted against the Third-Party Custodian are subject to criminal prosecution.  Individuals who have made such threats in recent years

have been prosecuted in this District pursuant to Title 18, Section 875(c) and received sentences which included incarceration.

The threats here are specific as to who should be harmed and what should be done by way of physical violence and property destruction. There is no question that the authors of the threats have followed this case through public access to the proceedings. It is significant that the threats refer to the Third-Party Custodian as "Mr. C," as he was called at the hearings before the Magistrate Judge, that the writers have been able to discern the location of his residence because the address was never fully redacted or sealed, and that they were not made to an insular group of just a few friends, who might choose to discount them. Instead they were widely broadcast. The threats were expressly motivated by the fact that the Custodian is assisting the Defendant in his role as a Court-appointed Third-Party Custodian and that she is a resident in his home. The threats are personally directed at the Custodian and his assistance to the defendant in providing a place for her to reside, although these proceedings have made it clear the Custodian is motivated exclusively by his own belief in a fair process for all parties involved and that permitting the Defendant to reside in his home was at the direction of the Magistrate Judge and initially volunteered.

This Court previously determined that the defendant's appearance for future proceedings can be assured with an appropriate combination of conditions. The present request is based on reasonable grounds, will serve the goal of ameliorating the threat to those involved arising from the Defendant's residence in the Third-Party Custodian's home, and reducing the fear caused by the tweets and is consistent with the legal framework underlying the Bail Reform Act. Requests to modify release conditions are not uncommon and are often granted after a period wherein the defendant shows compliance. Here, notwithstanding the government's initial and ongoing arguments that the defendant should be detained, the defendant has fully complied with the Release Order during the two

months she has been out of the Sacramento County Jail.

The change is not a dramatic one because the Release Order itself <u>does not</u> require the Third-Party Custodian to be present in the home for all or even part of the day, only that he "supervise" the defendant and that she remain in the residence unless she receives permission from Pretrial Services to go somewhere with a purpose and on notice to her supervising officer. She has fully complied with those terms. That same level of supervision can be maintained while the defendant resides a short distance from the residence under electronic surveillance and supervision of the Custodian. Moreover, allowing such supervision to occur and continue would directly mitigate the negative perception that appears to motivate the threats against the Custodian. The Third-Party Custodian's role entails a continuing responsibility for ensuring the Court's Orders are followed. This is true regardless of the circumstances of the living arrangements in any given case. Permitting the defendant to reside nearby would have no effect on the Custodian's legal obligations; however, to the extent the others may find the defendant's residence in his home repugnant, it may reduce further unwarranted threats, or worse, retribution, and allow the Custodian to perform the duties expected of him.

The defendant has no intention to flee. That fact is quite clear, considering her absolute compliance — even during the initial 14-day quarantine period ordered by the Court, during which she was successfully supervised by the Custodian <u>without</u> electronic monitoring. The Third-Party Custodian should not be forced into a position where he must choose between his own personal safety and the safety of his family and friends versus the defendant's right to pretrial release on reasonable conditions. Nor should he and others in his home be required to live in fear that others may harm him and other residents. The issue and the fear caused by the threats can be largely eliminated or at the least can be ameliorated by her residing elsewhere but close to the residence. The Bail

Reform Act permits a wide array of combined conditions to ensure appearance; the proposed modification will maintain all other conditions of release while ensuring future court appearances. 18 USC §3142(c)(1)(B).

### III.    Conclusion

The defendant's residency in the Third-Party Custodian's home is the basis and genesis for terrorist threats to kill the Third-Party Custodian and harm others. If nothing else, the risk and fear can be reduced by permitting her to live in reasonable proximity to the residence, while the other substantial conditions of her release remain in place.  Even absent the presence of such threats and the concerns they have caused, the defendant's history of full compliance merits the modification.  Based on the foregoing, the defendant respectfully requests that the Court resolve this appeal by an Order modifying the release conditions as requested.

Dated: November 10, 2020.          **SEGAL & ASSOCIATES, PC**

By:    /s/ Malcolm Segal
MALCOLM SEGAL
EMILY E. DORINGER
Counsel for Defendant

**LAW OFFICE of THOMAS A. JOHNSON**

By:    /s/ Thomas A. Johnson
THOMAS A. JOHNSON
Counsel for Defendant

**EXHIBIT A**



长江边 @uSukgXLRwBpecU5 · Oct 5
Replying to @KevinHu66985610

郭文贵就是一个流氓骗子，你有眼无珠，你从2017年往后看他的视频，他撒谎超过一万个，在美国的中共狗腿子多的很，你去干掉两个试试，比如：起诉美国总统的微信封禁令的微信联盟的那五位华裔律师，为唐娟做担保，那位华裔律师，你有种去干掉一个，老子奖你一百万。

Original Content (Oct 5, 2020):

郭文贵就是一个流氓骗子，你有眼无珠，你从 2017 年往后看他的视频，他撒谎超过一万个，在美国的中共狗腿子多的很，你去干掉两个试试，比如：起诉美国总统的微信封禁令的微信联盟的那五位华裔律师，为唐娟做担保，那位华裔律师，你有种去干掉一个，老子奖你一百万

Google Translate:

Guo Wengui is a rogue liar. You have no eyes. You watched his videos from 2017 onwards. He lied more than 10,000. There are so many doglegs in the CCP in the United States. You can kill two of them, such as: suing the President of the United States. The five Chinese lawyers of the WeChat Alliance who banned the micro-envelope guarantor for Tang Juan, the Chinese lawyer, you have a way to kill one, I will reward you with a million

Google Translate with assistance of Counsel:

Guo Wengui is a rogue liar. You have no eyes. You watched his videos from 2017 onwards. He lied more than 10,000 [times]. There are so many doglegs in the CCP in the United States. You can kill two of them, such as: [t]he five Chinese lawyers of the WeChat Alliance suing the President of the United States[,] who banned [WeChat], [or] [the] guarantor for Tang Juan, the Chinese lawyer, you have a way to kill one, I will reward you with a million



**青山兰** @qingshanlan · Oct 5

我觉得好奇怪。如果要说反共 打倒中共的特务 还有比那个唐娟更符合"中共特务"这个称号的吗？ 名副其实啊。大家怎么没人去抗议呢？ 也没人去喊口号呢？ 她在那个c律师家里享福呢。

有种 就去!

○ 5　　　⟲ 3　　　♡ 19

Original Content (October 5, 2020):

我觉得好奇怪。如果要说反共 打倒中共的特务 还有比那个唐娟更符合"中共特务"这个称号的吗？ 名副其实啊。大家怎么没人去抗议呢？ 也没人去喊口号呢？ 她在那个 c 律师家里享福呢。 有种 就去！

Google Translate:

I find it strange. If you want to talk about anti-Communist agents and bring down the CCP's spies, is there someone who is more in line with the title of "CCP spies" than Tang Juan? Well worthy of the name. Why is nobody protesting? No one chanted slogans? She is enjoying the good fortune in that lawyer c's house.

If there is a kind, go!

Google Translate with assistance of Counsel:

I find it strange. If you want to talk about anti-Communist agents and bring down the CCP's spies, is there someone who is more in line with the title of "CCP spies" than Tang Juan? Well worthy of the name. Why is nobody protesting? No one chanted slogans? She is enjoying the good [life] in that lawyer c's house. [If you have balls,] go!



**冰山来客** @europa665 · Sep 24

Replying to @gun_guo

大傻逼，有种去华尔街日报前抗议啊！他们被蓝金黄最厉害了还骂教主和搬弄几次了！给唐娟辩护的律师们是明显匪共走狗，去砸了他们家，你爷爷我佩服你！

♡ 1　　　　ↄↄ　　　　♡ 1　　　　↥

Original Content (September 24, 2020):

大傻逼，有种去华尔街日报前抗议啊！他们被蓝金黄最厉害了还骂教主和搬弄几次了！给唐娟辩护的律师们是明显匪共走狗，去砸了他们家，你爷爷我佩服你！

Google Translate:

Damn it, there is a kind of protest in front of the Wall Street Journal! They have been scolded and tricked the leader several times! The lawyers who defended Tang Juan were obviously gangsters who went to smash their home. Your grandpa, I admire you!

Google Translate with assistance of Counsel:

Damn it, [if you have balls], [go to] protest in front of the Wall Street Journal! They have been [subjugated] by Blue [referring to CCP surveillance], Gold [referring to CCP money bribes], Yellow [referring to CCP sex bribes and exhortation], and [have] scolded and tricked the leader several times! The lawyers who defended Tang Juan [are] obviously gangsters, [you go] to smash their home[s], Your grandpa [referring to oneself as a superior person], I admire you!

**EXHIBIT B**

Malcolm Segal, SBN 075481
Emily E. Doringer, SBN 208727
**SEGAL & ASSOCIATES, PC**
400 Capitol Mall, Suite 2550
Sacramento, CA 95814
Telephone: (916) 441-0886
Facsimile: (916) 475-1231
msegal@segal-pc.com

Thomas A. Johnson, SBN 119203
**Law Office of Thomas A. Johnson**
400 Capitol Mall, Suite 2560
Sacramento, CA 95814
Telephone: (916) 442-4022
taj@tomjohnsonlaw.com

Patrick Wong, SBN 241740
**Patrick Wong, Esq.**
145 El Camino Real
Menlo Park, CA 94025-5234
Telephone: (650) 391-5366
Facsimile: (650) 352-3562
patrick@wong.law

Attorneys for Defendant
JUAN TANG

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No: 2:20-CR-00134 JAM |
| Plaintiff, | **DECLARATION OF DR. STEVEN XUAN CUI** |
| v. | |
| TANG JUAN, aka Juan Tang, | |
| Defendant. | |

I, Dr. Steven Xuan Cui, make this declaration under the penalty of perjury.

1.  I am familiar with the case of *United States v. Tang* 2:20-cr-00134 JAM, Eastern District of California, in which I am serving as the Third-Party Custodian for the defendant, Dr. Juan Tang, and as her surety by the posting of my home as security for her release.  When I agreed to serve in that capacity, I made it clear to the Court and the parties that I had no legal, business, or personal relationship with any of the attorneys in this case and no legal, business, or personal relationship with Dr. Tang, her employer, or the government of China.  That has not changed except that pursuant to the terms of the defendant's release, she has resided in my home and established a cordial relationship with those in the home, and the attorneys have visited the residence to meet with their client, or discussed logistics with me as anticipated by the rules governing Dr. Tang's release.

2.  I wish to reiterate that I originally learned about the case as a member of the Chinese American Lawyers of the Bay Area professional forum and took the personal initiative to reach out to Dr. Tang's counsel to see if I could assist her in gaining her release from detention.  I did so out of a personal sense of fairness for someone who was unfamiliar with our country, and as a way to give back to the American community which had been so good to me after I immigrated to the United States, became a citizen, gained an education, and became an attorney.

3.   I am an attorney licensed to practice law in California and have been since 1998.  I have lived in the United States for more than 30 years.  In 1985, I received a B.S. in Cell Biology at the University of Science and Technology of China in Hefei, Anhui Province, China.  I left China solely for academic purposes, and in 1995, I received a PhD in Neuroscience from the University of Illinois.  In 1998, I received a Juris Doctor from Stanford University.

4.  I have long worked as an attorney for national and international law firms, focusing on life science and patent law.  I remain active in the legal and broader community and have been involved in both for the past 20 years.

Declaration of Steven Xuan Cui

5. My offer of assistance to the Defendant and the Court initially included offering to become Dr. Tang's Third-Party Custodian. The Court accepted that public service by Order dated August 28, 2010. Although I did not originally contemplate more, I ultimately agreed to offer my home as security for a bond in the amount of $750,000 to permit Dr. Tang to be released. I also agreed to give Dr. Tang a place in my home so she would have a place to stay when released. All of that was included in the combination of conditions imposed by the Court.

6. Upon the official recording of the security in my home, Dr. Tang was released from the Sacramento County Jail on September 10, 2020. I waited outside the jail, along with attorneys representing her in this case, and brought her to my home where she has since resided there. Dr. Tang has fully cooperated with me and others there, been an excellent guest, and has obeyed all Orders of this Court, including completing a period of quarantine, having an ankle security bracelet attached, and always reporting to her Pretrial Services Officer as required.

7. As her Third-Party Custodian, and as a licensed attorney, I take my responsibility to this Court very seriously and have done everything I can to personally assist Dr. Tang and all officers of the Court, including translating for her and transporting her when necessary.

8. I knew when I agreed to serve that my role came with substantial responsibilities and financial risk, and the presiding Magistrate Judge made that very clear to me. While Dr. Tang has been fully compliant and done nothing whatsoever to add to those responsibilities or burden, my efforts to assist her have been challenging, for which I can offer at least a partial resolution.

9. Since the time Dr. Tang was arrested, the Chinese language media both in the United States and internationally have taken an extraordinary interest in the case. There is a strong, steady, and loud element of negative press, hostile toward Dr. Tang, and toward me personally and my appointment as Third-Party

Declaration of Steven Xuan Cui

Custodian.  These public attacks have been persistent and unsettling.  I have been accused of working with and for the Chinese government.  <u>While that is not true</u>, the press has been unrelenting.  When Dr. Tang first came to my home after her initial release, it was necessary to notify local law enforcement of the situation, as a precaution against the potential for personal attacks against her or against my family at our home.  Since that time, the hostile press coverage has only intensified, with unfortunate results.

10.  Recent national press coverage and stories in Chinese language newspapers, widely read by the Chinese American community, have raised grave concerns for the safety of anyone in my home.  On Monday of this past week, the *New York Times* and *Wall Street Journal*, as well as other print and on-line news outlets of record, reported that the individual prosecutions of Chinese citizen/scientists in the United States have increased political tensions domestically and even more so with China.  The stories have alluded to the substantial possibility that China would react to the closing of its Consulate in Houston, Texas, and expulsion of its employees, and to the continued prosecution and detention of its citizens here in the United States working on scientific studies, by incarcerating or holding similarly situated American citizens in China.  The stories mention that China had done so in the past with Canadian citizens working in China when a similar dispute arose.  The *Wall Street Journal* describes these present tensions as "hostage diplomacy" that may "carry significant risk for both sides."

11.  The *Wall Street Journal* story specifically referred to Dr. Tang and required one of her attorneys to respond to the reporters' inquiries by phone and email by saying that the government of China was not involved in her case or defense.  Nothing I or the attorneys can say can quell the speculation of hostage taking.  Instead, the stories have caused the general public and members of the Chinese American community, having political views vehemently contrary to the

Declaration of Steven Xuan Cui

Chinese government, to believe that I am working for that government or in its interests.  That is not true, and I am a proud citizen of this country.

12.  Notwithstanding the latter, this heightened national exposure and the personal and political tensions it reflects, have created significant problems for me.  Tweets and online public statements from the Chinese American and Chinese speaking communities have expressed threats of physical violence against me and the legal team assisting Dr. Tang.  Those comments on social media have included references to me and/or Dr. Tang's legal team as "gangsters."  There have been multiple explicit suggestions that protest -- including even violent action -- should be taken against me personally, and against my home.  Those comments translated with the assistance of Google Translate and by assistance of counsel familiar with the Chinese language are attached for the Court's review, as are the recent stories in the *Wall Street Journal* and the *New York Times*.

13.  I am concerned that the continuing negative press within our community creates a dangerous situation in my home.  I cannot in good conscience invite people into my home when they are at physical risk.

14.  I feel similarly about Dr. Tang because my residence location is now known.  Additionally, the Indictment on public file in this case claims that Dr. Tang has served in the Chinese military, and photographs of her in attire claimed to be a military uniform have been published online and in print media.  I have no idea of her background and her relationship – if any – to the Chinese government or military, and I have not asked her about that issue or discussed the case with her. However, the fact is that some people may believe that hostages will be taken by the Chinese government because of these claims in the pleadings in this case, and I fear they may choose to retaliate during her residency in my home.

15.  There is a solution to this problem.  Dr. Tang is not at fault here, but I would feel more secure if she is permitted to continue her release status in my

Declaration of Steven Xuan Cui

third-party custody but be permitted to reside in an apartment in my immediate community.  An apartment has been located just a few minutes away from my residence by car.  I am willing to visit her daily to assist with her needs, including having her food and other needs met, and to make on site check-ins, while maintaining documentation of those contacts.  I can continue to help her in her calls to Pretrial Services, transport her when necessary, and facilitate her visits with her attorneys.  I will continue to make my duties as Third-Party Custodian a constant, daily focus of my intentions and efforts.  All other conditions of her release would remain in effect.

16.  I am fully committed to my role in serving as Third-Party Custodian, and specifically, my role to ensure that Dr. Tang remains compliant with all orders of the Court.  I am comfortable that she will honor the terms of her release and remain fully cooperative and compliant with any direction from the Court.  I am so certain of Dr. Tang's integrity that I remain willing to maintain the substantially secured bond against my residence to support her release, even though she would reside in a separate apartment.  I firmly believe that there is no additional risk in her release status were she to live nearby under my custodial supervision and were she to do so, the physical risk would be greatly reduced.  I continue to understand and appreciate the obligations of a Third-Party Custodian and surety and I agree to follow any directive of the Court or the Pretrial Services Office in discharging those obligations.

I declare under the penalty of perjury that the foregoing is true and correct.

DATED: October 29, 2020          /s/ Steven Xuan Cui

Steven Xuan Cui

Declaration of Steven Xuan Cui