Malcolm Segal, SBN 075481
Emily E. Doringer, SBN 208727
**SEGAL & ASSOCIATES, PC**
400 Capitol Mall, Suite 2550
Sacramento, CA  95814
Telephone: (916) 441-0886
msegal@segal-pc.com

Thomas A. Johnson, SBN 119203
**Law Office of Thomas A. Johnson**
400 Capitol Mall, Suite 2560
Sacramento, CA 95814
Telephone: (916) 442-4022
taj@tomjohnsonlaw.com

Patrick Wong, SBN 241740
**Patrick Wong, Esq.**
145 El Camino Real
Menlo Park, CA 94025-5234
Telephone: (650) 391-5366
patrick@wong.law

Attorneys for Defendant
JUAN TANG

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TANG JUAN,<br>aka Juan Tang,<br><br>Defendant. | Case No:  2:20-CR-0134 JAM<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO SUPRESS DEFENDANT'S STATEMENTS, *MIRANDA V. ARIZONA***<br><br>Date:     TBD<br>Time:    TBD<br>Crtrm:   6, 14th Floor<br>Judge:   Hon. Judge John A. Mendez |

1

2

# TABLE OF CONTENTS

Page(s)

3

4

I.      Introduction ............................................................................................1

5

II.     Factual Background ...............................................................................2

6

        A.      The Filing of the Complaint ........................................................2

7

        B.      The Interrogation and Violation of *Miranda v. Arizona* ...................2

8

III.    Argument .................................................................................................6

9

10

        A.      All Statements Made by Dr. Tang During the "Interview"
                Must Be Suppressed for Violation of *Miranda v.*

11
                *Arizona* ........................................................................................6

12
                1.      Dr. Tang's Apartment Was Police Dominated.....................9

13
                2.      Dr. Tang Was Restrained.................................................. 10

14
                3.      Dr. Tang Was Effectively Isolated ..................................... 12

15
                4.      Dr. Tang Was Never Informed That She Was Free to

16
                        Leave or End the Interview................................................. 13

17
                5.      The Totality of the Circumstances Supports a Finding

18
                        Dr. Tang Was Subjected to a Custodial Interrogation....... 14

19
        B.      An Evidentiary Hearing is Necessary to Resolve any

20
                Factual Disputes Presented by This Motion, Unless the
                Government Concedes the Facts................................................ 16

21

22
        C.      All Evidence Derived from the Statements Made by the
                Defendant Must Also be Determined and Suppressed .............. 17

23

IV.     Conclusion............................................................................................. 17

24

25

26

27

28

1

# **TABLE OF AUTHORITIES**

2

**Cases**                                                                                    Page(s)

*Brown v. Illinois*, 422 U.S. 590 (1975) ............................................................. 17

*Colorado v. Connelly*, 479 U.S. 157 (1986) ...................................................... 16

*J. D. B. v. North Carolina*, 131 S. Ct. 2394 (2011) ............................................8

*Johnson v. Zerbst*, 304 U.S. 458 (1938) ......................................................... 16

*Miranda v. Arizona*, 384 U.S. 436 (1966) ................................. 2, 6-7, 12, 16, 18

*Murray v. United States*, 487 U.S. 533 (1988) ................................................. 17

*Orozco v. Texas*, 394 U.S. 324 (1969) ......................................................... 8, 11

*Rhode Island v. Innis*, 446 U.S. 291 (1980) ......................................................7

*Thompson v. Keohane*, 516 U.S. 99 (1995) ......................................................8

*United States v. Atkins*, 2017 U.S. Dist. LEXIS 94206
       at *22-34 (N.D. Cal. June 19, 2017) ........................................................9

*United States v. Barnes*, 713 F.3d 1200 (9th Cir. 2013) ..................................15

*United States v. Beraun-Panez*, 812 F.2d 578 (9th Cir. 1987) ........................ 10

*United States v. Bernard S.*, 795 F.2d 749 (9th Cir. 1986) ..............................16

*United States v. Binder*, 769 F. 2d 595 (9th Cir. 1985) ................................... 16

*United States v. Carrion*, 463 F.2d 704 (9th Cir. 1972) ................................... 16

*United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008) ............. 8-11, 13, 16

*United States v. Gomez*, No. 1:18-cr-00002, 2021
       U.S. Dist. LEXIS 24771, at *12 (E.D. Cal. Feb. 8, 2021) ...................... 17

*United States v. Griffin*, 7 F.3d 1512 (10th Cir. 1993) ..................................... 16

*United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990) ................................... 12

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Memo Points & Authorities ISO Motion to Suppress Defendant's Statements; *Miranda v. Arizona*

# TABLE OF AUTHORITIES

**Cases**                                                                          Page(s)

*United States v. Heldt*, 745 F.2d 1275 (9th Cir. 1984) ................................... 16

*United States v. Howell*, 231 F.3d 615 (9th Cir. 2000)................................... 17

*United States v. Kim*, 292 F.3d 969 (9th Cir. 2002) ...........................................9

*United States v. Krstic*, 708 F. Supp. 2d 1134 (D. Or. April 20, 2010)............ 12

*Wong Sun v. United States*, 371 U.S. 471 (1963)...........................................17

**Misc.**

United States Constitution, Fifth Amendment ....................................................6

Memo Points & Authorities ISO Motion to Suppress Defendant's Statements; *Miranda v. Arizona*

1

## I.    INTRODUCTION

During the early afternoon on June 20, 2020, while Dr. Tang was preparing to move out of her student residential apartment and complete arrangements for her mother and young daughter to get to the airport for their return departure to China, two FBI agents knocked on her front door.  One of the agents talked to her mother through the window, referring to her mother as "aunt Li," asking whether her daughter was home.  When Dr. Tang opened the door, both the agents showed their FBI credentials and entered the apartment. The agents then closed the door and stood with their backs to the door.

The agents took immediate control of the approximately 800 square foot apartment, directing Dr. Tang's mother and young daughter to sit on a bed in the corner of the living room near the window, which had already been stripped of its linens.  As the case agent stayed with her mother and daughter, the other agent, who spoke native Mandarin Chinese, told Dr. Tang that he wanted to see her passport and followed her into one of the bedrooms, where her bag was located.  She removed her passport from the bag and gave it to the agent, who took the passport and followed Dr. Tang back to the living room.

The agents then sat in a position between Dr. Tang and the door, directed Dr. Tang to sit across from them and launched an extensive "interview" about her background and work in China, her visa application, and her role, if any, in the Chinese military, all without advising Dr. Tang of her constitutional rights.  This continued for approximately two hours, while the agents had control of her passport, and with Dr. Tang's mother and child told to remain seated on the bed in the corner, while waiting for the agents to conclude their questioning.  The agents were obviously prepared for this lengthy interrogation with an agent fluent in Mandarin Chinese, a picture of Dr. Tang in a uniform on a cell phone, and by even using a toy they brought along with them in order to keep Dr. Tang's young child occupied during the questioning.

-1-

The police-dominated atmosphere of this interrogation was custodial in nature and the agents' failure to afford Dr. Tang the warnings required by *Miranda v. Arizona* mandates that all of her statements during the questioning be suppressed.

## II.   FACTUAL BACKGROUND

### A.   The Filing of the Complaint.

Dr. Juan Tang is an oncology researcher with a PhD in Cellular Biology. A citizen of the Peoples Republic of China (China), she applied for and was granted a Non-Immigrant visa for entrance into the United States to work in a grant program focused on cancer research at the University of California, Davis. Dr. Tang, her husband, her mother, and her young daughter, arrived in the United States in December of 2019.  After initially touring the west coast, Dr. Tang's husband, a physician, returned to China and Dr. Tang rented a small student residential apartment in a housing complex in Davis, where she lived with her mother and young daughter.  Although she had not yet fully qualified to commence work in the UC research program, because she was still taking the prerequisite tests, Dr. Tang's work was derailed by the closure of the lab as a result of the COVID-19 pandemic.  By June 2020, Dr. Tang had decided to return home to China.  She did not make the trip.

Instead, she was interrogated, her residence and belongings were searched, and she was later arrested based on a Complaint filed in this District by one of the FBI agents who had interrogated her, which alleged that Dr. Tang, who is not fluent in English, made a false statement on her Non-Immigrant Visa application in answering a question in English as to whether the applicant had "ever served in the military."  Dkt. No. 1.

### B.   The Interrogation and Violation of *Miranda v. Arizona*.

On June 20, 2020, as Dr. Tang was packing and arranging for her mother and daughter to go to the airport to return home to China the next day, two FBI

-2-

1  agents knocked on her door and asked Dr. Tang's mother if she was home.

2  (While the case agent had earlier applied for and received a search warrant for

3  the premises and its contents, neither agent advised Dr. Tang of that fact and

4  instead began an interrogation, leaving a team of agents who were going to

5  conduct the search under the warrant in a concealed location.)

6      When Dr. Tang opened the door, both agents, who were dressed in

7  business attire, displayed their FBI credentials, and entered the apartment.  The

8  case agent Dilland and a Supervisory Special Agent Bill Baoerian then closed the

9  door and stood with their backs to it.  Declaration of Xiuying Li.

10      The agents took immediate control of the approximately 800 square foot

11  apartment.  SSA Baoerian, a native Mandarin speaker, directed Dr. Tang's

12  mother and her 8-year-old daughter to sit on a bed in the corner of the living room

13  near the window.  Declaration of Malcolm Segal ("Segal Decl.") Exhibit 1.  The

14  bed's linens had already been removed.  Segal Decl., Exhibit 2,

15  TANG_00000040.  SSA Baoerian asked for Dr. Tang's passport and followed her

16  into one of the bedrooms, where she had left her bag as she was packing to

17  move out of the apartment.  Segal Decl., Exhibit 3, TANG_00000116.  She

18  removed her passport from the bag and gave it to the agent, who took the

19  passport and followed Dr. Tang back to the living room.[1]  Photographs taken by

20  the FBI depict the barren apartment, the furniture, the bed on which Dr. Tang's

21  mother and daughter were told to remain, and the bags and luggage on the floor

22  of the bedroom.  Segal Decl., Exhibit 2.  Dr. Tang told agent Baoerian that she

23  was in the process of moving and that the new tenant was moving in that very

24  day.  In fact, she said that some of the things in the apartment belonged to the

25  new tenant.

26  _____

27  [1] As evidenced in the photographs taken during the search and in the Receipt for Property and
Evidence Collected Item Log, Dr. Tang's passport was first taken by SSA Baoerian and then formally

28  recorded as seized in the living room (identified by the agents as Room A) where he controlled it.
Segal Decl., Exhibits 3, 4, 5.

Memo Points & Authorities ISO Motion to Suppress Defendant's Statements; *Miranda v. Arizona*

1    The agents then sat down on chairs with their backs to the door, directed

2    Dr. Tang to sit in a chair across from them, with her back to the kitchen counter,

3    and launched into an interrogation about Dr. Tang's background in China, her

4    visa application, and her role, if any, in the Chinese military.  The interview

5    process included some questions from Agent Dilland, translated by SSA

6    Baoerian, and a substantial number of questions by SSA Baoerian in Mandarin

7    Chinese.  Dr. Tang was shown a photograph on Agent Dilland's cell phone and

8    asked whether that was her picture.  Although he was the supervisor, SSA

9    Baoerian took the only notes during the interview, which lasted approximately two

10   hours.  The half page of notes do not begin with or identify the date, time, the

11   participants in the questioning or the parties present, and obviously begin well

12   after the interview started.  Segal Decl., Exhibit 6.  The government has admitted

13   these basic facts in response to a discovery motion filed by the defense.[2]

14   The formal version of the interview, contained in a FD 302 report prepared

15   by the two agents, adds information not included in the notes.  Segal Decl.,

16   Exhibit 7.  Almost two months later, on the eve of the Grand Jury, the agents

17   prepared a supplemental FD 302 report, ostensibly to perfect their claim that,

18   before allegedly making a false statement to the agents, Dr. Tang was told that

19   lying to a federal agent was itself a crime.  Segal Decl., Exhibit 8.  That statement

20   was not only not in the initial report, neither does it appear in agent Baoerian's

21   handwritten notes.

22   One thing is clear from the absence of a statement to the contrary in the

23   notes, the initial report and the supplemental report, the agents did not advise Dr.

24

25   _____

     [2] Although presented in an anodyne fashion by the government, the discovery response states:
26   "On June 20, 2020, FBI agents interviewed Tang at her residence in Davis, California prior to the
     execution of a search warrant.  Tang appeared to be moving out of her residnece when the FBI
27   made contact.  Tang was not taken into custody during the interview nor was she restrained in
     any fashion.  Tang voluntarily provided her passport to the agents for identification purposes.
28   Although they had a search warrant and could have seized the passport at that time, the agents
     did not do so."  Dkt. No. 125 at 2:21-26.

Memo Points & Authorities ISO Motion to Suppress Defendant's Statements; *Miranda v. Arizona*

Tang of her Constitution right to decline the interview, decline to answer questions as the interrogation progressed, have an attorney present or appointed to assist her, or of her separate right to not admit the agents into the apartment without a warrant.  The reports do not reveal <u>when the agents decided that they would not advise Dr. Tang of her *Miranda* rights</u>, but no one can realistically deny that it was part of their plan to delay the execution of the search warrant while they interrogated their target.  And it is self-evident that the agents knew that it would be a long interview, during which Dr. Tang's mother and daughter would also be detained.  The agents conducted surveillance the day before, knew who would be present and brought along a toy with them to keep Dr. Tang's young child busy and quiet while they were interrogating her mother, knowing that she would be present in the small apartment during the interview.  There also can be no question that the agents believed the interview would take a substantial amount of time and would require live translation, as Dilland, the case agent, did not speak Mandarin Chinese.  Finally, no one can reasonably dispute that the agents, assigned to an intelligence mission, knew that Dr. Tang was a citizen of a foreign country and was to be approached for questioning about alleged criminal behavior in front of her mother and daughter, with their movement also intentionally restricted, and that Dr. Tang's passport would immediately be demanded from her, supposedly for "identification."

Yet it is pellucidly clear that the agents did not show Dr. Tang or ask her to read a waiver of her rights in English or Chinese or even discuss them.  They did not ask Dr. Tang if she wanted counsel or if she wanted to speak to the Chinese Consulate about obtaining counsel to assist her.  No one told her that she could object to the agent following her around in her own apartment.  They did not offer her a chance to decline or defer the interview or suggest that they could come back after she finished preparing for the move. Clearly that was never their intent because the search team was standing by in a concealed location so as not to

alarm Dr. Tang or cause her to resist questioning.  Instead, the agents sat on the search warrant while they conducted the interview.

When the interview was over, with Dr. Tang having answered all of their questions, and answered them even while expressing aloud some concern that she had done so, Agent Dilland stepped outside and made a call to the search team, approximately eight of whom dressed in street clothes entered the apartment and began photographing and searching the rooms.  Dr. Tang, her mother, and her daughter, still under control of the agents, were instructed to step outside and stay outside while the search was conducted.

During the search, the agents took Dr. Tang's laptop and cell phone, formally seized her passport (which had already been taken), and told her they were going to keep them.  Segal Decl., Exhibits 4 and 5.  They presented a document (obviously a consent) to Dr. Tang's mother for her signature and said they wanted to take her cell phone as well.  Since that was the family's only other cell phone, Dr. Tang told the agents that it was needed to communicate with the driver who was supposed to take her mother and daughter to the airport and said she preferred to keep it.[3]  The agents left that phone behind when they departed.

## III.  ARGUMENT

### A.  All Statements Made by Dr. Tang During The "Interview" Must Be Suppressed for Violation of *Miranda v. Arizona*.

The Fifth Amendment to the United States Constitution guarantees that no person shall be compelled in any criminal case to be a witness against herself. United States Constitution, Fifth Amendment.  In *Miranda*, as is by now well known to law enforcement for over fifty years, the Supreme Court held that "there

---

[3] It is clear that when offered the opportunity to accept or reject a form consent to search which mentioned she and her mother actually had rights – even after the interrogation - Dr. Tang availed herself of that knowledge to reject the search.  It does not require much effort to conclude that on receipt of verbal or written advise of Miranda rights, she would have declined the interview in favor of assisting her mother and daughter to go to the airport and also consult her country's consulate or an attorney.

Memo Points & Authorities ISO Motion to Suppress Defendant's Statements; *Miranda v. Arizona*

can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966).  As such, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. at 445.

The Court further held that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id*. at 467.  Therefore, a defendant "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id*. at 479.

Any *Miranda* analysis requires a showing that a custodial interrogation occurred.  No one can doubt that there was an interrogation in this case.  The Court has defined interrogation as "express questioning or its functional equivalent," meaning "any words or actions on the part of the police...that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).

Here, the interrogation was long and pointed with express questions about Dr. Tang's background in China, her visa application, and her alleged role in the Chinese military.  The agents even confronted Dr. Tang with a picture of her in a

-7-

uniform.  The agents had already formed the belief that Dr. Tang had lied on her

visa application and their pointed questions, statements, and tactics were clearly

intended to elicit an incriminating response.  That is evident from agent Dilland's

earlier recital of facts in the affidavit in support of the search warrant.  Segal Decl.,

Exhibit 9.

A suspect is in "custody" when placed under formal arrest or when a

reasonable person in the suspect's position would have understood the situation

to constitute a significant restraint on freedom of movement.  "Two discrete

inquiries are essential to the determination:  first, what were the circumstances

surrounding the interrogation; and second, given those circumstances, would a

reasonable person have felt he or she was at liberty to terminate the interrogation

and leave."  *J. D. B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011), quoting

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  The determination of whether a

person is "in custody" for *Miranda* purposes relies on the totality of the

circumstances.  *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

Dr. Tang was not arrested before or after the interrogation or the

subsequent search of her apartment.  Therefore, the analysis must turn on the

circumstances of the interrogation and whether a reasonable person would have

felt free to terminate the interrogation and leave.  Here, the interrogation occurred

within the place in which Dr. Tang resided until she left the country.  "The home

occupies a special place in the pantheon of constitutional rights."  *United States v.*

*Craighead*, 539 F.3d 1073, 1077 (9th Cir. 2008).

In *United States v. Craighead*, the Court noted that an "interrogation

conducted within the suspect's home is not per se custodial."  The Court noted

that "courts have generally been much less likely to find that an interrogation in

the suspect's home was custodial in nature."  *Id*. at 1083.  Nevertheless, in certain

circumstances, an interrogation in the suspect's home may be found to be

custodial.  *Id*., citing *Orozco v. Texas*, 394 U.S. 324, 326 (1969) (finding that the

-8-

suspect was "under arrest" and not free to leave when he was interrogated in his bedroom).  The Court focused on whether the deprivation of freedom of action is similar to those of a suspect taken into custody at a police station, like an "incommunicado interrogation of individuals in a police-dominated atmosphere." *Craighead*, 539 F.3d at 1083.

While the Court cautioned that determining whether an in-home interrogation was custodial is necessarily fact intensive, it provided relevant factors to assist in the analysis as to whether the circumstances effected a police-dominated atmosphere:  "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made."  *Id*. at 1084.  Other potential factors relevant to determining if the interrogation was custodial include the language used to summon the defendant; the extent to which the defendant was confronted with evidence of guilt (i.e., if the tone of question was aggressive, coercive, and deceptive or open and friendly in tone); the duration of the detention; and the degree of pressure imposed on the defendant.  See *United States v. Atkins*, 2017 U.S. Dist. LEXIS 94206 at *22-34 (N.D. Cal. June 19, 2017); see also *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002).  Thus, the analysis begins with what happened in the apartment.

### 1.    Dr. Tang's Apartment Was Police Dominated.

As part of their plan, two agents dressed in business clothes entered the apartment to interrogate Dr. Tang.  That was enough here to dominate the small apartment.  Ordinarily, a large number of law enforcement officers may fill a home such that there are no police-free rooms or spaces to retreat should the suspect wish to terminate the interrogation and a large number of officers "goes a long way towards making the suspect's home a police-dominated atmosphere."  See

-9-

*Craighead*, 394 U.S. at 1085.  However, the number of officers is not dispositive and even in a case which spoke of only two law enforcement officers, with no mention of their attire or any visible arms, the court found the defendant was in custody.  *See United States v. Beraun-Panez*, 812 F.2d 578 (9th Cir. 1987).

Here the two agents gained entrance into the apartment, showed FBI credentials and announced that they were with the FBI.  One of them, a supervisor, spoke fluent native Mandarin Chinese, a fact which any one in Dr. Tang's position would know was not merely a coincidence.  The agents immediately and completely dominated the entirety of Dr. Tang's small apartment and exerted complete control over Dr. Tang, her mother, and her daughter for hours.  They told the occupants of the apartment where to sit, directed Dr. Tang to retrieve her passport, and one agent followed her to the bedroom while she recovered it, leaving the other members of the family under the scrutiny of a non-Chinese speaking agent.  He followed her back to the small main room.  The agents manifestly ignored the information that she was in the process of moving out, and that another tenant was actively moving in, and continued on their planned course.  They were prepared with a photograph on a phone and specific information about Dr. Tang and her entry into the United States on a Non-Immigrant visa.  Dr. Tang, as would anyone else, was immediately aware that this was part of a previously devised plan, and not a casual visit since the agents knew she had a child with her and brought a toy with them to occupy the child during the process and was giving orders to everyone as to where to sit and what to do.  The agents were in charge from the moment they arrived, and neither she nor anyone else could doubt it.

### 2.    Dr. Tang Was Restrained.

"When law enforcement agents restrain the ability of the suspect to move – particularly through physical restraints, but also through threats or intimidation – a suspect may reasonably feel he is subject to police domination within his own

-10-

home and thus not free to leave or terminate the interrogation." *United States v. Craighead*, 539 F.3d 1073, 1085 (9th Cir. 2008), citing *Orozco v. Texas*, 394 U.S. at 325, 327 (1969).  There are other ways to restrain a person the agents want to interview.  Restraint amounting to custody can also be demonstrated where law enforcement officers permit the suspect to move around the home but insist on escorting or monitoring them at all times.  *Craighead*, 539 F.3d at 1085.

Here, as soon as the agents entered Dr. Tang's home, Dr. Tang, her mother, and her daughter were no longer allowed to freely move about the apartment without supervision.  The agents showed their FBI credentials and entered Dr. Tang's home when she opened the door.  The agents then closed the door and stood with their backs to it.  Dr. Tang's mother and daughter were instructed to sit on a bed in the corner of the living room, where Agent Dilland stayed with them while Dr. Tang was escorted to the bedroom by SSA Baoerian to retrieve her passport at his direction.  SSA Baoerian took her passport and escorted her back to the living room.  Since she was escorted through the apartment, to a room within a couple of dozen feet, Dr. Tang could not assume that the agents would have let her go anywhere in the apartment alone to contact the Chinese embassy or consulate.  Moreover, given the small size of the apartment, there was nowhere she could have gone to privately seek assistance, even if the agents would have let her do so.

The agents' explicit direction and control continued when they directed Dr. Tang to sit in a chair, with the agents seated in front of her, effectively blocking access to the exit.  Courts have found a custodial environment where law enforcement has blocked a suspect's exit path from the home.  *See Craighead*, 539 F.3d at 1085.  The agents clearly restricted Dr. Tang's movement, blocked her exit, and subjected her to complete law enforcement domination within her own apartment.  The agents also subjected her family to a high level of restraint – Dr. Tang's mother and child were confined to a corner of the living room for the

-11-

1   entire duration of the interrogation, with Dr. Tang's mother even unable to use the

2   rest room as she desired.  Declaration of Xiuying Li.  Given these circumstances,

3   there is no reasonable basis to believe Dr. Tang could have felt that she was free

4   to take her mother and young child and leave or to tell the agents to leave.  They

5   did not give her that opportunity.

6          Finally, the agents entered Dr. Tang's home during the surge of the Covid-

7   19 pandemic, further limiting her options even if she had been told she could

8   leave.  That fear itself had factored into her determination to go home to China.

9   In the final analysis, when an FBI agent takes your passport, for "identification" or

10  otherwise, and restrains your mother and small child, does not let your older

11  mother use the rest room, and then does not tell you, a foreign citizen that you

12  are free to go or decline to answer questions, you are restrained.  No one could

13  think otherwise.

14                 **3.      Dr. Tang Was Effectively Isolated.**

15         Isolation from the outside world has been highlighted as "perhaps the

16  crucial factor that would tend to lead a suspect to feel compelled to provide self-

17  incriminating statements."  *Id.* at 1086-87, citing *Miranda*, 384 U.S. at 445-46,

18  449-50.  The presence of friends of family lends moral support during questioning

19  and may deter a suspect from making inculpatory statements.  See *Miranda*, 384

20  U.S. at 450; *United States v. Griffin*, 922 F.2d 1343, 1352 (8th Cir. 1990).

21         While Dr. Tang was not physically isolated from her mother and daughter

22  during the interrogation, she was effectively isolated from them.  Unlike the

23  defendant in *United States v. Krstic*, who sat at a table with his family and the

24  interviewing agents and was able communicate privately with his family in their

25  native language throughout the interview, Dr. Tang was deprived of any such

26  support.  *See United States v. Krstic*, 708 F. Supp. 2d 1134, 1146-47. (D. Or.

27  April 20, 2010).  Here, the agents immediately directed Dr. Tang's mother and

28  young daughter to sit in the corner of the main room of the small apartment on a

-12-

bare mattress.  Even though they were technically in the same room, Dr. Tang's family could not speak to her or provide support given the circumstances.  Dr. Tang could not speak to her mother confidentially or seek her advice in Chinese because she knew that the FBI agent was fluent in that language.  Nor was anyone else available to provide her with assistance.

### 4.    Dr. Tang Was Never Informed That She Was Free to Leave or End the Interview.

"If a law enforcement officer informs the suspect that he is not under arrest, that statements are voluntary, and that he is free to leave at any time, this communication greatly reduces the chance that a suspect will reasonably believe he is in custody."  *United States v. Craighead*, 539 F.3d 1073, 1087 (9th Cir. 2008).  The record here, including the agent's reports, provides no indication that the agents advised Dr. Tang of her rights, presented her with a waiver of her rights to review, or indicated she could speak with counsel or the Chinese Consulate.  Similarly, the record provides no indication that the agents represented that this was a voluntary interview, that she could leave at any time, or that she could decline to answer the agents' questions.  Indeed, the absence of a record or notes to that effect speaks to the contrary.

If an advice of rights had been given it would have been recorded during one of the three attempts to document the interview.  Moreover, as the person who talked to the defendant in Chinese and took the notes, an agent with more than a dozen years of experience and the one who has a leadership and thus a training position with the FBI, his failure to document the advice of rights, if it was given, would indeed be shocking.  A reasonable person in Dr. Tang's position would not have felt that she was free to leave and therefore she submitted herself to the interrogation.

/ / /

/ / /

1    **5.     The Totality of the Circumstances Supports a Finding Dr.**
2            **Tang Was Subjected to a Custodial Interrogation.**

3         Finally, the Court must consider all of these factors in the full context of the

4    interrogation.  When Dr. Tang was escorted into one of the bedrooms to retrieve

5    her passport, she explained that she was in the process of moving out.  In fact,

6    she explained that another person was moving in that very day and some of the

7    things in the apartment at that time belonged to the new tenant.  This is consistent

8    with the photographs from the subsequent search, which depict a barren

9    apartment with bags and luggage on the floor.  The agents obviously ignored

10   what she told them because they launched into the interrogation.

11        The bed upon which Agent Baoerian made Dr. Tang's mother and daughter

12   sit for approximately two hours had already been stripped of its linens.  Dr. Tang

13   could readily observe that it was not comfortable to have to sit there for hours.

14   While one's home is ordinarily a comfortable and familiar space, the space was

15   barren and was certainly no longer comfortable during the process of moving out.

16   Facing a tight and now immovable deadline to vacate before the new tenant

17   completed her move made the situation all the more stressful.  Moreover, any

18   delay would cause Dr. Tang's mother and daughter to have a problem getting to

19   the airport.  These factors, coupled with the agents' domination and control,

20   negates any benefits a defendant would ordinarily derive from being in their home

21   during an interrogation.

22        As a foreign national in the United States on a visa, with limited fluency in

23   English, in the presence of her mother and young child who were also in the

24   United States on visas, who were all immediately subjected to law enforcement

25   control, direction, and observation, absent any advisement to the contrary, Dr.

26   Tang reasonably believed that she was not able to decline to answer the agents'

27   questions, ask them to leave her home, or otherwise end in the interrogation.

28   This is further supported by the fact that the agent almost immediately asked for

-14-

Dr. Tang's passport.  This demand for her identification was itself intimidating and unnecessary because the agents knew who she was.  A reasonable person would not feel they could decline to produce it or leave without their only significant piece of identification.

Moreover, the agents clearly knew and understood that Dr. Tang was a citizen of the Peoples Republic of China, a country where citizens customarily obey the orders of police and other authorities.  Dr. Tang had been in the United States for approximately six months and had no knowledge of or experience with the American justice system.  Given the agents clear knowledge of her cultural experience, with their extensive training in the intelligence community, coupled also with their belief that Dr. Tang was a member of the Chinese military, the agents expected, or should have expected, that Dr. Tang would not know that she had the right to refuse to answer their questions and that she would obey their commands.  Questioned thousands of miles from her home country, during a global pandemic, with FBI agents – one of whom was a native Mandarin Chinese speaker who took complete control of her home – Dr. Tang was under immense pressure to do whatever she thought the agents wanted her to do.

This was not a general street stop for suspicious activity or a like event, the agents here conducted a lengthy, pointed interrogation, focusing on Dr. Tang's background in China, her visa application, and her alleged role in the Chinese military.  The agents prepared for a full-fledged interrogation and tag teamed the questioning, confronting Dr. Tang with a picture of her in a uniform.  Confronting an interrogee with allegations and evidence of criminal conduct has often been found itself to render an interrogation custodial.  *See United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013).  This aggressive and long confrontation, with purported evidence of her alleged lie, clearly indicates the interrogation was custodial.

/ / /

Considering all relevant factors and the totality of the circumstances, the agents' interrogation of Dr. Tang was custodial and *Miranda* warnings were required.

**B.    An Evidentiary Hearing Is Necessary to Resolve any Factual Disputes Presented by This Motion, Unless the Government Concedes the Facts.**

"The determination of whether an in-home interrogation was custodial is necessarily fact intensive." *Craighead*, 539 F.3d at 1084, citing *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993). For statements made by a defendant during a custodial interrogation to be admissible in evidence, the Government must show the defendant waived her *Miranda* rights on a voluntary, intelligent, and knowing basis. *United States v. Binder*, 769 F. 2d 595, 599 (9th Cir. 1985), citing *Miranda*, 384 U.S. at 479. There is a presumption against waiver. *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986). "Whether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of defendant." *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986).

The prosecution bears the burden of proving by a preponderance of the evidence that a defendant waived her *Miranda* rights. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). The Government's burden to make such a showing is "great," and the court will "indulge every reasonable presumption against waiver of fundamental constitutional rights." *United States v. Heldt*, 745 F.2d 1275, 1277 (9th Cir. 1984), citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

To the extent there is any remaining dispute concerning the facts of the interrogation, an evidentiary hearing is required. *See United States v. Carrion*, 463 F.2d 704, 706 (9th Cir. 1972) (an evidentiary hearing must be held "when the moving papers allege facts with sufficient specificity to enable the trial court to conclude that relief must be granted if the alleged facts are proved."); *see also*

-16-

*United States v. Gomez*, No. 1:18-cr-00002, 2021 U.S. Dist. LEXIS 24771, at *12 (E.D. Cal. Feb. 8, 2021), citing *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000) ("An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist.").

### C.   All Evidence Derived from the Statements Made by the Defendant Must Also Be Determined and Suppressed.

Under the fruit of the poisonous tree doctrine, the exclusionary rule precludes admission of derivative evidence that is either a direct or indirect product of the illegally obtained primary evidence.  *Murray v. United States*, 487 U.S. 533, 536-37 (1988).  Once it is shown that evidence was the fruit of a violation of the constitutional proscription, it is the Government's burden to purge the evidence of its taint.  *Brown v. Illinois*, 422 U.S. 590 (1975).  As explained by the Supreme Court, the court must examine "whether, granting establishment of the primary illegality, the evidence to which…objection is made has come at by exploitation of that illegality or instead by means sufficiency distinguishable to be purged of the primary taint," or "so attenuated as to dissipate the taint."  *Wong Sun v. United States*, 371 U.S. 471, 487-488 (1963).  Since the statement elicited during the interrogation is the entire basis for Count Two of the Indictment, following its suppression, that Count must be dismissed but an appropriate inquiry must be conducted as to all of the evidence the government collected after the interrogation to determine if it was derived from the illegality of the questioning here.

### IV.  CONCLUSION

Restrained and controlled by two FBI agents, effectively separated from her family, in a foreign country, in the middle of a pandemic and associated lockdowns, not fluent in English, not offered an official interpreter, and confronted

with alleged evidence of a crime, Dr. Tang had no real choice but to stay and be questioned by the agents who had expressly designed this coercive, custodial environment.  Applying an objective test and considering all of the relevant factors, a reasonable person in Dr. Tang's position would not have felt free to leave and end the law enforcement questioning.  The circumstances and the conduct of the agents, including their failure to advise Dr. Tang of her Constitutional rights, support a reasonable and objective belief that she was not free to leave and therefore that the interrogation was custodial.  The agents failed to advise Dr. Tang of her rights as required by *Miranda v. Arizona* and the statements she made during the Government's pre-search custodial interrogation and any evidence derived from those statements must be suppressed.

Dated: April 9, 2021                **SEGAL & ASSOCIATES, PC**


By:     /s/ Malcolm Segal
          MALCOLM SEGAL
          EMILY E. DORINGER
          Counsel for Defendant

**LAW OFFICE of THOMAS A. JOHNSON**


By:     /s/ Thomas A. Johnson
          THOMAS A. JOHNSON
          Counsel for Defendant