Malcolm Segal, SBN 075481
Emily E. Doringer, SBN 208727
**SEGAL & ASSOCIATES, PC**
400 Capitol Mall, Suite 2550
Sacramento, CA  95814
Telephone:  (916) 441-0886
msegal@segal-pc.com

Thomas A. Johnson, SBN 119203
**Law Office of Thomas A. Johnson**
400 Capitol Mall, Suite 2560
Sacramento, CA 95814
Telephone: (916) 442-4022
taj@tomjohnsonlaw.com

Patrick Wong, SBN 241740
**Patrick Wong, Esq.**
145 El Camino Real
Menlo Park, CA 94025-5234
Telephone: (650) 391-5366
patrick@wong.law

Attorneys for Defendant
JUAN TANG

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          v.<br><br>TANG JUAN,<br>aka Juan Tang,<br><br>                    Defendant. | Case No:  2:20-CR-0134 JAM<br><br>**DECLARATION OF MALCOLM SEGAL IN SUPPORT OF MOTION TO SUPRESS DEFENDANT'S STATEMENTS; *MIRANDA V. ARIZONA***<br><br>Date:    TBD<br>Time:    TBD<br>Crtrm:   6, 14th Floor<br>Judge:   Hon. Judge John A. Mendez |

-1-

1.      I am an attorney licensed to practice law in the State of California. My firm, Segal & Associates, PC, maintains its offices at 400 Capitol Mall, Suite 2550, Sacramento, California.

2.      I am also admitted to practice in, among other courts, the United States District Court for the Eastern District of California, the Ninth Circuit Court of Appeals, and the United States Supreme Court.

3.      I am one of the attorneys of record for the defendant, Juan Tang.  I am familiar with the facts underling the case and I have personally reviewed the discovery produced to date in this matter.

4.      Attached as Exhibit 1 is a true and correct copy of the agent's drawing of the apartment, produced by the government as TANG_00000292.

5.      Attached as Exhibit 2 is a true and correct copy of selected photographs of the apartment taken during the subsequent search, produced by the government as TANG_00000034, 36, 40, 42, 44, 50, 108, and 110.

6.      Attached as Exhibit 3 is a true and copy of selected photographs of the bag where Dr. Tang's passport was located and the location where it was formally seized, produced by the government as TANG_00000116, 160, and 162.

7.      Attached as Exhibit 4 is a true and correct copy of the FD 597, Receipt for Property form, produced by the government as TANG_00000290.

8.      Attached as Exhibit 5 is a true and correct copy of the FD 886, Evidence Collected Item Log, produced by the government as TANG_00000291.

9.      Attached as Exhibit 6 is a true and correct copy of SSA Baoerian's handwritten notes, produced by the government as TANG_00000930.

10.     Attached as Exhibit 7 is a true and correct copy of the FD 302 summarizing Dr. Tang's interrogation prepared by the agents, produced by the government as TANG_00000926.

/ / /

/ / /

1
2
3

11.    Attached as Exhibit 8 is a true and correct copy of the supplemental FD 302 regarding Dr. Tang's interrogation, produced by the government as TANG_00001113.

4
5

12.    Attached as Exhibit 9 is a true and correct copy of the search warrant affidavit, produced by the government as TANG_00000268.

6
7
8
9
10
11
12

13.    Nothing in the discovery produced to date, including the three attempts to document the FBI agents' interview of Dr. Tang, evidences any *Miranda* advisement or informed waiver.  From the absence of any statement to the contrary, it is clear that the agents did not advise Dr. Tang of her constitutional rights to decline the interview, to decline to answer questions as the interrogation progressed, to have an attorney present or appointed to assist her, or to not admit the agents into the apartment without a warrant.

13
14
15

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed on April 9, 2021, in Sacramento County, California.

16
17
18

 /s/ Malcolm Segal_____
Malcolm Segal

19
20
21
22
23
24
25
26
27
28

-3-

# EXHIBIT 1



TANG_00000292

# EXHIBIT 2



TANG_00000034



TANG_00000036



TANG_00000040





TANG_00000044





TANG_00000108



TANG_00000110

# EXHIBIT 3



TANG_00000116



TANG_00000160



TANG_00000162

# EXHIBIT 4

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property

Case ID: ██████████████████

On (date) 06/20/2020   item (s) listed below were:
☒ Collected/Seized
☐ Received From
☐ Returned To
☐ Released To

(Name) TANG JUAN

(Street Address) 920 Cranbrook ct Apt 9 Davis, CA

(City) Davis, CA

Description of Item (s): 1. Chinese Passport TANG Juan #EH1308128
2. Huawei P30 Cellphone Model: ELE-ALOO
   S/N: GBG021991800 2884
3. Laptop - HP Model # 14-CD1055CL
   S/N: 8CG9163VN3
4. 1 Thumb drive Red
5. 1 Thumb drive Silver
6. 1 Portable Hard drive w/case Western Digital
   with case My Passport S/N WXVIA58FLI15
7. 1 Portable Hard drive Black Orico w/case
   S/N: S304NY05503458

Received By: _____ (Signature)

Printed Name/Title: STEVE STILSON

Received From: Juan Tang (Signature)

Printed Name/Title: Juan Tang

TANG_00000290

# EXHIBIT 5

FD-886 (Rev. 4-13-15)

**EVIDENCE COLLECTED ITEM LOG**

Print Legibly. More than one line may be used for each item, if necessary.

Page 1 of 1

Date: 6/30/20  Case ID: ___

Location: 920 Cranbrooke Ct.
Apt 9 Davis, CA

Preparer/Assistants:

Personnel (full names and initials):

| Item # | Description (e.g., One black Samsung flip phone; Serial #) | Location (e.g., Room) | Specific Location (e.g., Specific area w/in room) | Collected by/ Observed by (First Name and Last Name) | Packaging Method | Comments (if needed) |
|---|---|---|---|---|---|---|
| 1 | Chinese Passport Tang Juan ___ 3 | Room A | given to agents by Ms. Tang | | Small Bag | |
| 2 | Huawei P30 Cellphone Model: ELE-ALOO S/N: GBG0219918002854 | Room A | given to agents by Ms. Tang | | Small Bag | |
| 3 | Laptop - HP Model: 14-CD1055CL S/N: 8CG9163UN3 | Room D | on desk | | Paper Bag | |
| 4 | 1 thumb drive Red | Room D | small purse near closet | | Bag | |
| 5 | 1 Thumb drive Silver | Room D | small Buellpack in closet | | Bag | |
| 6 | 1 Portable Hard drive with Case, Western Digital My Passport S/N: WXVIA58FL115 | Room D | Red Bag in closet | | Bag | |
| 7 | 1 Black Oric co. portable hard drive with case S/N: S304NY0J503458 | Room D | Red Bag in closet | | Bag | |
| | | | | | | |
| | | | | | | |

TANG_00000291

# EXHIBIT 6

Basic medical Science,
medical military hospital. not so many ▢ other terms
so described the hospital          → direct sup
▮▮▮▮▮▮ 40s — work unit/ ▮▮▮▮▮▮
don't know/    → Sup in the hospital ▮▮▮▮▮▮
        20s ~~consult~~ some ←——————————→
    4 - 6 /the-group, said too much
    6 yrs, in school, master & PhD
    Air Force Uniform? Yes.                    Lab techs
      Filled out herself, Yes N/U
    Never served (          ).
       Six - year (paid
  CSC —$1900, hospital - $2000
  ▮▮ had research project She was interested in
  don't know ▮▮ background — not sure about school
  doesn't know anyone else — other than ▮▮▮▮
  knew ▮▮▮▮ wife very well, but doesn't know her name
  initially, then ——
  Everyone wears the same — insignia two/not PhD
  majority of students have it.
  6 - yrs, masters ▮▮▮▮ together all six years.
  asked about uniform, remained the same 6 yrs
  don't know ~~had~~ insignia meaning —
  ▮▮▮▮▮▮▮▮▮ ...ty/chem )
    daughter & husband live together

# EXHIBIT 7

OFFICIAL RECORD

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    06/26/2020

TANG Juan, date of birth (DOB)          1982, was interviewed at 920 Cranbrook Court, Apartment 9, Davis, California. After being advised of the identity of the interviewing Agents and the nature of the interview, TANG provided the following information:

[Agent's note: TANG primarily spoke in Mandarin Chinese, and interview interpretation, and the inclusion of Simplified Chinese characters listed herein, was provided by Federal Bureau of Investigation (FBI) ███████████████████████████████████.]

TANG described herself as a researcher working on basic medical science. TANG has been working at Xijing Hospital since graduating from university. When asked to describe the relationship between Xijing Hospital and the Chinese military, she stated that there was no relationship. When asked about the relationship between Xijing Hospital and Air Force Medical University, TANG stated there was no relationship, and she has never heard of Air Force Medical University. When asked if the Air Force Medical University is the same institution as the Fourth Military Medical University (FMMU), she indicated not many people in China described Fourth Military Medical University as the Air Force Medical University. When asked if Xijing Hospital is part of People's Liberation Army (PLA) Air Force, she said there was no relationship, however, she indicated that Xijing Hospital is an affiliate of the Fourth Military Medical University. When asked if PLA supported Xijing Hospital in any way, she stated she did not know.

Within Xijing Hospital, she worked at Molecular Medicine Center(分子医学中心). When asked to state the full name of the center, she indicated Molecular

Investigation on    06/20/2020    at   Davis, California, United States (In Person)

File #  ████████████████████                                     Date drafted    06/23/2020

by    DILLAND STEVEN G,██████████

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

TANG_00000926

Medicine Center was the full name. When asked who her supervisor was, TANG
first stated she did not have a supervisor. However, she later stated a
person named ▌▌▌▌▌▌) could be considered her supervisor. ▌▌ was a
male, in his 40's. When asked who her department head was, TANG did not
know who that person was. When asked who was the hospital dean, TANG did
not know who that person was either. TANG has been working at Xijing
Hospital for ten years. When asked who she routinely worked with, she
stated she worked alone and did not communicate with anyone. When asked how
many people worked in

her center or lab, she stated approximately four to six individuals. When
asked to provide the names of the individuals in her center or lab, she
could not recall anyone. She indicated the center rotated individuals in
and out frequently and that was why she could not remember any names. When
asked who she worked with just prior to her leaving for the United States,
she could not recall. However, she remembered two lab technicians that
worked with her, ▌▌▌▌▌▌) and ▌▌▌▌▌▌. She
believed ▌▌ attended Shanghai Normal University, and she could not recall
any other details regarding ▌▌▌▌▌. TANG then said, "I probably said
too much."

TANG attended FMMU for six years to obtain her masters and doctorate
degrees. TANG described that there were two types of students in FMMU. One
type of students was funded by the government and the others paid tuition
themselves. The ones funded by the government would have to serve in the
military upon graduation, the ones paid their own, did not.  TANG paid her
own tuition, therefore she did not have to serve in the military. TANG was
shown a photograph of herself in what appeared to be military uniform and
asked if she was ever in the military in any capacity. TANG admitted that
she was the individual in the photograph. TANG denied that she was ever
involved with the military, she stated wearing military uniform was part
of the requirements for attending FMMU because it was a military school.
When asked to describe service ribbons in the picture, she did not know
the meaning of the ribbons. When asked to describe the insignia on the
uniform,

she did not know the meaning. When asked how long she wore that uniform,
she stated she wore the uniform for six years. When asked if the insignia
or ribbons change during the six years, she believed they remained the same
and majority of the students in the school had the same insignia and
ribbons.

Continuation of FD-302 of ██████████   Interview of TANG Juan    , On   06/20/2020   , Page   3 of 3

TANG was told that the insignia represented civilian cadre of the PLA,
she adamantly denied she was ever a civilian cadre member.

TANG_00000928

TANG was asked if she knew a person named WANG Xin, TANG initially shook her head indicating no. When Agents mentioned WANG was recently arrested in Los Angeles, TANG then remembered that she knew of WANG and heard of his arrest. TANG was asked to describe her relationship with WANG, and TANG indicated she only knew of WANG, but she knew WANG's wife very well. When asked what WANG's wife's name was, TANG did not remember. TANG stated her daughter and WANG's child attended the same elementary school in China. She knew WANG's child had very good grades. TANG contacted WANG before and after coming to the U.S. to ask about living arrangements and child education, and WANG's wife was extremely helpful. TANG stated that she did not know WANG professionally. [Agent note: TANG and WANG attended the same college and
WANG worked at FMMU which was affiliated with Xijing Hospital.] Other than WANG, TANG did not know anyone else from FMMU that was studying in the U.S.

TANG prepared and submitted her visa application to the U.S. by herself. She was funded by the Chinese Scholarship Council and Xijing Hospital, and each organization provided approximately $2,000 USD for a total of $4,000 per month. TANG's sponsor for her study in the U.S. was Professor ▮▮▮▮▮ at UC Davis. TANG heard ▮▮s presentation in China and thought it applied to her area of research. TANG contacted ▮ and received permission to study at UC Davis. When asked if TANG knew professor ▮▮ education background, TANG was not sure, but thought ▮▮ attended a health school in China.

TANG was asked what her address was in China. TANG did not remember any street names where she lived. She lived in a community named Lan Di Si Cheng (兰蒂斯城) in Xi'an, China. When asked how someone would send her a letter, TANG described a letter or package just needed to be addressed to her with
her phone number and the community name. TANG was asked who she lived with in China, and TANG stated her husband and daughter.

# EXHIBIT 8



OFFICIAL RECORD

## FEDERAL BUREAU OF INVESTIGATION

Date of entry   08/05/2020

When reviewing the referenced FD-302 interview, Writers became aware that
a pertinent fact of the interview had not been included. This document
addresses the fact that Special Agent Steve Dilland advised TANG Juan,
date of birth ▮▮▮▮▮, 1982, during the interview with her at 920
Cranbrook Court, Apartment 9, Davis, California on June 20, 2020, that it
was a crime to lie to the FBI. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮ translated this advisory to TANG. During and at the conclusion of
the interview, Special Agents reviewed and confirmed TANG's statements
with her.

Investigation on   06/20/2020   at   Davis, California, United States (In Person)

File # ▮▮▮▮▮▮▮▮▮▮▮▮                                              Date drafted   08/03/2020

by   DILLAND STEVEN G, ▮▮▮ ▮▮ ▮▮▮

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

TANG_00001113

# EXHIBIT 9

1

## Affidavit in Support of an Application for a Search Warrant

2

I, Steven G. Dilland, having been duly sworn, do hereby state the following:

3

### Agent's Background and Experience

4

5   1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of
Criminal Procedure for a warrant to search the premises (920 Cranbrook Court, Apartment 9, Davis,
CA) hereinafter "SUBJECT PREMISES," further described in Attachment A, for the things described in
6   Attachment B, both of which are incorporated by reference herein.

7

8   2.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) assigned to the
Sacramento Field Office and have been so employed since July 2008.  I received training at the FBI
Academy in Quantico, Virginia from February 2008 to July 2008.  I am assigned to a counterintelligence
9   squad, with duties of investigating allegations relating to the national security of the United States
including theft of trade secrets, proprietary information, and intellectual property.

10

11  3.      I base this affidavit on (1) my investigation and research, (2) my training and experience,
(3) my communications with other law enforcement personnel who have engaged in investigation in this
12  matter, (4) records obtained, (5) documentary review and analysis, and/or (6) information related to me
by other individuals.  This affidavit is submitted for the limited purpose of obtaining a search warrant
13  and I have not included every fact known to me regarding this investigation.

14

### Summary and Applicable Law

15

16  4.      The Sacramento FBI counterintelligence squad is investigating an allegation that subject
TANG JUAN (TANG) violated Title 18, United States Code, Section 1546(a), when she possessed a
17  visa that was procured using statements that she knew were false and then entered the United States
using the visa.

18

19  5.      Based on the FBI's investigation, TANG is a researcher at U.C. Davis, and her residence,
according to DMV and a Student and Exchange Visitor Information System ("SEVIS") records, is at
920 Cranbrook Court, Apartment 9, Davis, CA, which is in the Eastern District of California. On June
20  19, 2020, FBI personnel conducting surveillance observed TANG interacting with unknown individuals
in the parking lot of the apartment complex where the SUBJECT PREMISES is located.

21

22  6.      The FBI is investigating alleged violations of Title 18, United States Code, 1546(a),
Fraud and Misuse of Visas, Permits and Other Documents, which states, in pertinent part:

23

24          Whoever knowingly forges, counterfeits, alters, or falsely makes any
            immigrant or nonimmigrant visa, permit, border crossing card, **alien**
25          **registration receipt card,** or other document prescribed by statute or
            regulation for entry into or as evidence of authorized stay or employment
26          in the United States, or utters, **uses, attempts to use, possesses, obtains,**
            accepts, or receives **any such visa,** permit, border crossing card, alien
27          registration receipt card, or other document prescribed by statute or
            regulation **for entry into or as evidence of authorized stay or**
28          **employment in the United States, knowing it to be forged,**

counterfeited, altered, or falsely made, or to **have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained;**

Shall be fined under this title or imprisoned not more than 25 years (if the offense was committed to facilitate an act of international terrorism (as defined in section 2331 of this title)), 20 years (if the offense was committed to facilitate a drug trafficking crime (as defined in section 929(a) of this title)), 10 years (in the case of the first or second such offense, if the offense was not committed to facilitate such an act of international terrorism or a drug trafficking crime), or 15 years (in the case of any other offense), or both.

7.     This affidavit is specifically in support of an application for a search warrant to search the residence, and person of TANG for evidence of violations of 18 U.S.C. § 1546(a).

## Statement of Probable Cause

8.     On June 7, 2020, FBI Los Angeles arrested WANG Xin (WANG) at the Los Angeles International Airport on charges related to visa fraud when WANG attempted to depart the United States for Tianjin, China. WANG was interviewed by Customs and Border Protection (CBP), and admitted that he had intentionally made fraudulent statements about his Chinese People's Liberation Army (PLA) military service in order to increase the likelihood of receiving a J1 visa to study at the University of California, San Francisco ("UCSF"). Specifically, WANG falsely claimed on his application for a J1 visa to enter the United States that he was not presently serving in the military. In actuality, WANG admitted that he holds the rank of major in the PLA. FBI San Francisco conducted further inquires and discovered TANG JUAN ("TANG") had a similar background and visa application as WANG. FBI San Francisco referred TANG to FBI Sacramento.

9.     TANG JUAN (TANG) applied for a United States Non-Immigrant Visa ("NIV") on or about October 28, 2019. TANG was issued a J-1 visa on or about November 5, 2019. According to Department of State records, TANG intended to conduct research at the University of California, Davis ("UCD"), studying cancer treatment methods  According to the Department of State website, J-1 visa is a non-immigrant documents "for individuals approved to participate in work-and study-based exchange visitor programs."

10.     On her NIV application, under the Additional Work/Education/Training section, she answered "NO" to the question of, "Have you ever served in the military?"

11.     FBI Sacramento's investigation revealed the following information indicating that there is probable cause to believe TANG'S statement regarding military service is false:

     a.   An open source search of TANG Juan revealed one article, found at http://www.qihuanghealthcare.com/live/detail/380, published on or about 04/14/2019, that described a forum hosted in the city of Xi'an, China. TANG was listed as one of four experts invited to the forum. TANG was further introduced in the article,

wearing what appeared to be a military uniform, and listing her employment as an associate researcher at Air Force Military Medical University, Molecular Medicine Translation Center, according to an online translation tool. A description of an insignia matching her uniform picture was found online. The insignia represents Civilian Cadres of the Chinese People's Liberation Army. Given my training and experience, I know that the People's Liberation Army is a general term describing the People's Republic of China military forces. To describe China's Air Force, one would say People's Liberation Army Air Force or PLAAF. According to the Ministry of National Defense of the People's Republic of China website, found at http://www.mod.gov.cn/policy/2009-07/14/content_3100988.htm, Civilian Cadres of the Chinese People's Liberation Army are active military personnel who have been appointed to junior professional technical positions or clerical ranks and above. Based upon my training and experience, this description is consistent with my understanding of the PLA's military structure. According to this description, TANG is considered an active military personnel.

b.  A photo of TANG in a military uniform from the article is attached below below. Based upon my training and experience, the uniform she is wearing is consistent with the PLAAF.



c.  The foregoing establishes probable cause to believe that TANG is currently serving in the PLAAF, which contradicts her claim on her visa application of never having served in the millitary.

d.  A California Department of Motor Vehicle ("DMV") records search revealed TANG currently resides at address 920 Cranbrook Ct, Apt 9, Davis CA 95616, and the DMV photo appears to be of the same person depicted in military uniform above.

AFFIDAVIT                                      3

TANG_00000270



12.     In addition to the foregoing, there are several notable similarities between the investigation of WANG, who was arrested by FBI Los Angeles on June 7, 2020, at the Los Angeles International Airport on charges related to visa fraud, and the investigation of TANG. (WANG was indicted on these charges by a grand jury in the Northern District of California on or about June 18, 2020.)

13.     As noted above, WANG was interviewed by Customs and Border Protection (CBP), and stated that he had intentionally made fraudulent statements about his Chinese People's Liberation Army (PLA) military service in order to increase the likelihood of receiving a J-1 visa to study at the University of California, San Francisco ("UCSF").

14.     A review of WANG's J-1 NIV issued on or about December 17, 2018, revealed that WANG stated in the application that he attended the Fourth Military Medical University, located at Changle West Road No. 169, Xi'an, Shaanxi, China. He stated in the visa application that he is employed by the same university at the same address.

15.     During CBP's interview of WANG, he admitted that he was paid 13,000 RMB (Chinese currency) per month. He also admitted that the Chinese Scholarship Council ("CSC") funded his study in the United States. WANG also stated that his supervisor at the Air Force Military Medical University, also known as Fourth Military Medical University (AFMMU/FMMU), had tasked him to replicate the UCSF lab in China.

16.     FBI San Francisco obtained email communications between WANG and a UCSF Associate Professor. On or about May 15, 2020, in an email communication, WANG stated he and 16 other AFMMU/FMMU colleagues are in the United States.

17.     Like WANG, TANG (according to her visa application) attended the Fourth Military Medical University, located at Changle West Road No. 169, Xi'an, Shaanxi, China. She claimed that her current employment was at the Xijing Hospital Institute of Basic Medical Science of Xi'an located at West Changle Road, Xi'an, Shaanxi, China. An online search of the hospital revealed it is an affiliate of the People's Liberation Army Air Force Medical University (AFMMU/FMMU).

18.     TANG also indicated in her application that her monthly income in Chinese currency was 13,000 RMB, which is the same amount that WANG stated he earned when interviewed by CBP.

19.     Just as WANG stated that the Chinese Scholarship Fund (CSC) funded his study in the United States, TANG stated in her application that CSC (and the hospital she works at) paid for her trip.

AFFIDAVIT                                             4

20.     Both TANG and WANG listed email addresses on their respective NIV applications that resolved to the same domain, i.e., fmmu.edu.cn. TANG's email address was listed as tangjuan1@fmmu.edu.cn and WANG's email address was listed as xinwang@fmmu.edu.cn. Internet searches resolved the domain fmmu.edu.cn to AFMMU/FMMU. In sum, review of both individuals' backgrounds yielded notable similarities in education, salary, employment, and funding agencies for their expenses in the United States.

21.     In addition to the foregoing, TANG listed her Chinese work telephone number as 02983293906 in her NIV application. According to FBI database records, the work number 02983293906 was also listed as the work number for CHEN Zhinan (zchen@fmmu.edu.cn), Director of National Translation Scientific Center of Molecule Medicine and Direcctor of Cell Engineering Research Center and Department of Cell Biology at the People's Liberation Army Air Force Medical University (AFMMU/FMMU).

22.     An open source search of "TANG Juan" revealed several articles. One article, found at https://www.medmeeting.org/home/program/8317?uid=645256, named 2019 Chinese Conference on Oncology, listed TANG as a speaker at the conference. The article further indicated that TANG's work unit was the Air Force Military Medical University. Another article, found at http://news.sciencenet.cn/htmlnes/2019/7/428011.shtm, published on or about 07/02/2019, listed TANG Juan, age 37, as a nominee; her profession was listed as Basic Medicine (Cell Biology), and her work unit was listed as China People's Liberation Air Force Military Medical University Molecular Medicine Translation Center. The search also revealed a pdf document with a Chinese government seal from the Shaanxi Province Science and Technology Office, which was dated from 2016 and listed TANG Juan and WANG Xin as among 100 Youth New Star selected for Shaanxi Province Advanced Talent Plan. TANG and WANG's work unit was listed as the Fourth Military Medical University. In summary, open source research showed TANG's continuous affiliation with AFMMU/FMMU, and revealed that TANG and WANG appear to be affiliated professionally.

## Locations of Potential Evidence

23.     In my training and experience, immigration and employment records, including visa records, travel records, employment history, bank records, records of financial transactions, contracts for payment, employment, and financial agreements, checks and balance sheets, and accounting records are commonly stored at a subject's home in documentary and/or electronic form, including on computers and other electronic devices such as tablets or smart phones. Accordingly, there is probable cause to believe that evidence, including the aforementioned types records, and the fruits and instrumentalities of the violations identified in this affidavit, can be found at the SUBJECT PREMISES in documentary or other form, including but not limited to electronic forms such as on a computer, digital device or electronic storage media that will be searched / seized for the items further described in Attachment B.

## Technical Terms

24.     Based on my training and experience, I use the following technical terms to convey the following meanings:

> *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between

AFFIDAVIT                                                 5

devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

*Storage medium*: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## Computers, Electronic Storage and Forensic Analysis

25.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Specifically, based upon my training and experience, I know that individuals keep important correspondence related to employment, immigration status, and salary at their homes in both documentary and electronic forms. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

26.     *Probable cause.* I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

AFFIDAVIT                                          6

TANG_00000273

27.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of, or the fruits or instrumentalities of, the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).

AFFIDAVIT

7

TANG_00000274

The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

    c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

28.   *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

TANG_00000275

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

29.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant. Because several people share the SUBJECT PREMISES as a residence, it is possible that the SUBJECT PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## Conclusion

30.    In summary, the FBI's investigation has revealed that TANG JUAN is employed by AFMMU/FMMU, which is part of the Chinese People's Liberation Army (PLA) Air Force. According to information obtained from the Chinese Ministry of Defense's website, and based on photos of her in uniform as well as other information cited above, it appears that TANG is part of a civilian cadre whose members are considered active duty military personnel. Based on this and the foregoing information, there is probable cause to believe TANG knowingly omitted her affiliation with the PLAAF on her visa application in order to obtain a U.S. visa and possessed that visa in the Eastern District of California, in violation of 18 U.S.C. § 1546(a). Accordingly, I request a warrant to search the persons and property listed in **Attachment A** for evidence of violation of 18 U.S.C. § 1546(a) as enumerated in **Attachment B**.

## Request for Sealing Order

31.    Because this investigation is continuing, disclosure of the Application for Search Warrant, the Search Warrant and this Affidavit could jeopardize the progress of the investigation. A disclosure would give the target an opportunity to destroy evidence, change patterns of behavior, or notify confederates. Accordingly, I request that the Court issue an order pursuant to which the Application for Search Warrant, the Search Warrant and this Affidavit be filed under seal until further order of this Court.

AFFIDAVIT                                      9

_____, Special Agent FBI
Special Agent Steven G. Dilland
Federal Bureau of Investigation

Approved as to form

__/s/ Heiko P. Coppola_____
Heiko Coppola
Assistant U.S. Attorney

Subscribed and Sworn
Before me telephonically this 20th of ___June___ 2020

___KENDALL J. NEWMAN___ (approved telephonically)
HON. KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

AFFIDAVIT                                    10

1
2  
3

**ATTACHMENT A**

**Property to be searched**

4
5
6
7
8
9
10
11

The property to be searched is known as 920 Cranbrook Court, Apt 9, Davis, CA 95616 and includes all locked and closed containers found therein. The property is further described as a two bedroom, one bathroom, 800 square foot apartment, located in a large apartment complex with multiple buildings. The apartment is located on the first floor of the building in which it is located. The building has apartment doors in clusters of four with two on the second floor immediately adjacent to each other and two on the first floor immediately adjacent to each other. The door to apartment 9 is located on the bottom right of the cluster of four doors in which it is located. The number "9" is located on the center of the door.

12
13
14
15
16
17
18
19
20
21
22

  

23
24
25
26
27
28

TANG_00000278

## ATTACHMENT B

### Property to be seized

1. The items to be seized from the Subject Premises include the following evidence, fruit, and instrumentalities of the violation of Title 18 U.S.C. § 1546(a), described as follows:

   a. All documentary evidence related to such violations, including but not limited to, visa and immigration records, identification documents, travel records, documents related to military service, bank records, records of financial transactions, contracts for payment, employment, and financial agreements, checks and balance sheets, and accounting records.

   b. All digital evidence, as that term is used herein, means the following:

      i. Any computer equipment or digital devices that are capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, including central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices including paging devices and cellular telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communication devices such as modems, routers, cables, and connections; storage media; and security devices;

      ii. Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes referenced above, or to create, access, process, or store evidence, contraband, fruits, or instrumentalities of such crimes;

      iii. Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes;

      iv. Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software;

      v. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

AFFIDAVIT

12

iv. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

v. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

vi. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

vii. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

viii. evidence of the times the COMPUTER was used;

ix. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

x. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

xi. records of or information about Internet Protocol addresses used by the COMPUTER;

xii. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

xiii. contextual information necessary to understand the evidence described in this attachment.

xiv. Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

AFFIDAVIT

14

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AFFIDAVIT

15



TANG_00000282