PHILLIP A. TALBERT
Acting United States Attorney
HEIKO P. COPPOLA
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

DAVID LIM
Trial Attorney
National Security Division
US Department of Justice
Washington, D.C.

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>         v.<br><br>TANG JUAN,<br>(aka Juan Tang)<br><br>                    Defendant. | CASE NO. 2:20-CR-00134 JAM<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS NON-CUSTODIAL STATEMENTS TO LAW ENFORCEMENT<br><br>COURT: Hon. John A. Mendez |

## I.   INTRODUCTION

On April 9, 2021, defendant Tang Juan ("Tang") moved to suppress the contents of her un-*Mirandized* statement to law enforcement. ECF 130. Because Tang was not in custody at the time she was interviewed by the FBI, the Court should deny her motion.

## II.   FACTUAL AND PROCEDURAL HISTORY

### A.   Factual History

1.   The FBI's initial investigation

Tang applied for a United States Non-Immigrant J-1Visa ("NIV") on or about October 28, 2019, which was issued on or about November 5, 2019. According to the Department of State website, a J-l

visa is a non-immigrant document "for individuals approved to participate in work-and study-based exchange visitor programs." Department of State records reflect that Tang intended to conduct cancer treatment-method research at the University of California, Davis ("UCD"). On or about December 27, 2019, Tang entered the United States through San Francisco International Airport.

On Tang's visa application, under the Additional Work/Education/Training section, Tang answered "no" when responding to the question: "have you ever served in the military?" Similarly, Tang also responded in the negative to questions related to communist party membership and whether she had any special chemical or biological experience. The FBI's investigation determined Tang's answers to these questions were false.

Specifically, with respect to Tang's military service, the FBI discovered through an internet search a photograph of Tang wearing a People's Liberation Army – Air Force ("PLAAF") uniform bearing the insignia of the Civilian Cadre, attached to a Chinese news article about a forum in Xi'an, China published on or about April 14, 2019. Tang was listed as one of four experts invited to the forum and was further introduced in the article, wearing what appeared to be a military uniform, and listing her employment as an associate researcher at Air Force Military Medical University, Molecular Medicine Translation Center. Members of the PLAAF Civilian Cadre are considered active duty military members. Additional open source internet searches revealed other articles about Tang and listed her affiliation with Air Force Military Medical University/Fourth Military Medical University and China People's Liberation Air Force Military Medical University, Molecular Medicine Translation Center.

    2.  Tang's interview and search warrant execution

On June 20, 2020, two FBI agents, SSA Bill Baoerjin and SA Steven Dilland interviewed Tang at her residence in Davis, California prior to the execution of a search warrant. *See* Exhibit One (Declaration of FBI SA Steven Dilland). SSA Baoerjin, a native Mandarin Chinese-speaker acted as the interpreter while SA Dilland interviewed Tang. The bulk of the interview was conducted in Mandarin Chinese but some portions of the interview took place in English. Even though the agents had obtained a search warrant prior to the interview, the search warrant team was not present or visible during the interview and did not enter the premises until after the interview was concluded.

The FBI agents were professionally attired in business suits. Although armed, the agents'

firearms were concealed and were not displayed at any point during the interview. The agents approached Tang's door and SA Dilland knocked on the door. Simultaneously, SSA Baoerjin observed Tang's mother, Li Xiuying, through an open window and greeted her in Mandarin Chinese. Li opened the door and spoke in Mandarin Chinese to Tang standing behind her. While standing outside of the apartment, the agents identified themselves using FBI-issued credentials and asked if they could come inside to talk. Li and Tang invited SSA Baoerjin and SA Dilland into the residence  Neither Tang nor her mother were taken into custody during the course of the interview. Neither was restrained in any physical or verbal fashion, the agents did not block their ability to leave the living/family room, and Tang was never isolated from her mother and child. Tang, her mother, and child had and exercised complete freedom of movement throughout the residence during the interview without interference from the agents. In fact, Tang even directed the agents where to sit during the interview. The front door to the apartment was not blocked by the agents. Because of the COVID19 pandemic, the agents wore masks and maximized social distancing between themselves and Tang. The agents did not perform a safety sweep of the apartment and remained in the living/family room throughout their interview with Tang. Moreover, the agents made no promises nor provided any inducements in order for Tang to speak with them.

      Tang voluntarily provided her passport to the agents for identification purposes. Tang retrieved her passport from another room in the apartment. SSA Baoerjin did not follow Tang when she retrieved her passport. Although the agents were in possession of a search warrant at the time of the interview and could have seized the passport at that time, the agents did not do so. The agents did not physically retain Tang's passport during the interview rather it was placed on a table within Tang's reach. Because Tang was not in custody at the time of the interview, she was not advised of her *Miranda* warnings nor was Tang advised that she was not compelled to speak with the agents or could end the interview at any time. The interview was not recorded.

      The interview lasted approximately 90 minutes, took place in the living/family room area of the residence and was conversational in nature. As further evidence that the FBI intended the interview to be non-confrontational, the agents even brought along a toy for Tang's daughter. Tang admitted to personally preparing and submitting the NIV application but denied serving in the Chinese military and

Case 2:20-cr-00134-JAM   Document 137   Filed 04/30/21   Page 4 of 11

adamantly denied being a member of the Civilian Cadre. Tang claimed that wearing a military uniform was required for attendance at FMMU because it was a military school. Tang further stated that she didn't know the meaning of the insignia on the PLAAF uniform and claimed that the majority of students at FMMU had the same insignia and ribbons. Although Tang was advised that it was a crime to lie to an FBI agent, at no point during the interview did she change or retract any of her denials about serving in the Chinese military. At the conclusion of the interview, the agents reviewed Tang's answers with her again and Tang did not change or retract her denials about serving in the Chinese military.

Upon completion of the interview, FBI agents executed the search warrant at Tang's residence, seizing electronic media and her Chinese passport. Agents found Tang's J-1 visa within her Chinese passport. During a later review of the electronic media evidence seized from Tang's residence, agents discovered a myriad of different photographs of Tang wearing military uniforms. Agents also found a video depicting a presentation conducted by Tang in which she is wearing what appears to be the PLAAF military uniform found in their open source search, and she begins the presentation with a salute. The video presentation was recorded within days of Tang's entrance into the United States on the J-1 visa.

Agents also found evidence of Tang's affiliation with the Chinese Communist Party. This consisted of an application to apply for government benefits in which Tang stated that she was a member of the Communist Party. Agents discovered Chinese military documents that detailed Tang's research related to antidotes for biological agents. Further review and analysis of Tang's electronic media revealed her initial military enlistment date and a letter dated in May 2020 to the China Scholarship Council and PRC Consulate General personnel indicating that her research in the United States was concluded and requesting to return to China to resume her military duties.

Following execution of the search warrant, FBI agents learned that Tang, along with her mother and daughter, had fled to the Chinese consulate in San Francisco. Tang remained in the Chinese consulate for approximately a month prior to her eventual arrest. In the evening hours of July 23, 2020, at approximately 9:45 p.m., FBI agents arrested Tang and later transported her to Sacramento pursuant to a criminal complaint for violation of 18 U.S.C. § 1546(a).

**B.**   **Procedural History**

GOVERNMENT'S OPPOSITION RE: STATEMENTS   4

1    This Court issued a sealed criminal complaint and arrest warrant in the above-entitled case on
2  June 26, 2020 alleging visa fraud in violation of 18 U.S.C. § 1546. ECF 1. Tang was arrested pursuant
3  to the complaint on July 23, 2020. Tang was ordered detained as a flight risk during her first appearance
4  before the Court on July 27, 2020. ECF 6. The Court heard and denied Tang's motion for bail review
5  on July 31, 2020. ECF 15. A grand jury returned a two-count indictment charging Tang with visa fraud
6  and making false statements to the FBI in violation of 18 U.S.C. §§ 1001 and 1546 on August 6, 2020.
7  ECF 18.

8    On August 24, 2020, Tang filed a second motion for bail review alleging a change in
9  circumstances and re-addressing factual explanations discussed in prior filings by the United States.
10 ECF 27. U.S. Magistrate Judge Newman heard Tang's second motion for bail review and ordered
11 Tang's release subject to certain conditions over the government's objection. ECF 34, 37. The District
12 Judge denied the United States' motion to stay release and its subsequent motion to revoke Judge
13 Newman's pretrial release order. ECF 51, 67.

14    On October 23, 2020, Tang filed another motion to modify the conditions of release, which the
15 United States opposed, and the magistrate judge denied. ECF 72, 83, 87, 90. The District Judge
16 subsequently affirmed the Magistrate Judge's denial of Tang's appeal. ECF 91, 99.

17    On December 8, 2020, because Tang demanded a speedy trial, the Court set a jury trial date for
18 February 8, 2021. ECF 100. The United States moved to exclude time, which was subsequently granted
19 in a written order by the Court on January 5, 2021. ECF 101, 109. In its order, the Court also set a
20 status conference for April 6, 2021 and a new jury trial date for July 12, 2021. ECF 109.

21    Tang has subsequently filed motions: (1) to compel discovery; (2) for a bill of particulars; (3) to
22 suppress evidence discovered as a result of the search warrant; (4) to suppress defendant's statements;
23 and (5) to dismiss pursuant to Fed.R.Crim.P. ECF 117, 118, 129 130, and 131, respectively. U.S.
24 Magistrate Judge Allison Claire heard argument for Tang's motions for a bill of particulars and to
25 compel discovery on April 19, 2021 and took those matters under submission. ECF 132.

26    **C.    Tang's Interview Suppression Motion**

27    On April 9, 2021, Tang filed a motion to suppress her statements to the FBI alleging, among
28 other things, that because of the "police dominated" atmosphere she was the subject of a custodial

interrogation requiring advisement of her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), prior to the execution of the search warrant. ECF 130. In support of her motion, Tang submitted declarations from her defense counsel and her mother, various photos and sketches of the apartment made by the FBI, and the search warrant affidavit. Noticeably absent from Tang's motion is any declaration from her that contests facts or details her state of mind during the interview. Based on the lack of *Miranda* warnings, Tang demands suppression of her statements and all evidence derived therefrom, as well as, requesting an evidentiary hearing to resolve any disputed facts. Tang has not demonstrated that she is entitled to a hearing. Because Tang was not in custody at the time of the FBI interview, Miranda warnings were not required, and the Court should deny her motion to suppress the interview statements.

### III. ARGUMENT

#### A. Applicable Law

Generally, law enforcement personnel are required to advise subjects of their rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) when two conditions are met: (1) the defendant is in custody and (2) is being interrogated. A defendant not formally under arrest may still be "in custody" if he/she is "deprived of his[/her] freedom of action in any significant way." *Miranda*, 384 U.S. at 444. To determine whether an individual is in custody, the Court examines the totality of the circumstances. *Thompson v Keohane*, 516 U.S. 99, 112 (1995). "Two discrete inquiries are essential to that determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *Id.*

Police interrogations within a defendant's home are not "per se custodial" and require a "necessarily fact-intensive" inquiry. *United States v. Craighead*, 539 F.3d 1073, 1083-84 (9th Cir. 2008) (internal citations omitted). To determine whether an in-home interrogation by law enforcement rises to the level of a "police-dominated atmosphere" and is therefore custodial under *Craighead*, the Court evaluates four factors: "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made." 539 F.3d

at 1084.

B. **Number of Law Enforcement Personnel**

Notwithstanding Tang's assertions to the contrary, the FBI's questioning in this case did not elevate Tang's interview to the level of a wholly police-dominated custodial interrogation. The facts in *Craighead* are instructive of what constitutes a "police dominated atmosphere" for the purposes of a custodial interrogation. In *Craighead*, "eight law enforcement officers, representing three different law enforcement agencies, entered Craighead's home. They were accompanied by two others, one of whom was Craighead's Air Force superior. All of the law enforcement personnel were armed, some wore protective gear, and some of them unholstered their firearms in Craighead's presence." 539 F.3d at 1085. Of particular note, the law enforcement personnel were in the process of executing a search warrant at Craighead's residence while he was being interrogated.

The facts in the present case are distinguishable and militate against any finding of a "police dominated atmosphere." Here, two FBI agents, dressed in business attire, knocked on Tang's apartment, identified themselves, and were admitted by her mother. Although both agents were armed, their weapons were concealed and were not displayed or drawn at any time during the interview. No other law enforcement personnel were present during the interview nor was Tang's superior from UC Davis. SA Dilland used a conversational tone throughout the interview and utilized SSA Baoerjin, who is a native Mandarin Chinese speaker to ensure that Tang understood his questions. There is simply nothing nefarious or "police dominating" about ensuring that a subject being interviewed has a full understanding of the questions being asked. SA Dilland estimated that at least 80% of the interview was conducted in Mandarin Chinese. At no time during the interview did either SA Dilland or SSA Baoerjin direct Tang, her mother, or her daughter where to sit. Similarly, SSA Baoerjin did not follow Tang to the bedroom, nor did either agent retain her passport once she had identified herself.

Notwithstanding the *Craighead* Court's statement that "when a large number of law enforcement personnel enter a suspect's home, they may fill the home such that there are no police-free rooms or spaces to which the suspect may retreat should [s]he wish to terminate the interrogation," Tang cites *United States v. Beraun-Panez*, 812 F.2d 578 (9th Cir. 1987), a case that predates *Craighead* by twenty-one years, for the proposition that the number of law enforcement officers is not dispositive of a police

GOVERNMENT'S OPPOSITION RE: STATEMENTS 7

dominated environment. The facts in *Beraun-Panez* are distinguishable from the present case. In *Beraun-Panez*, the Court's decision was premised upon the overly aggressive psychological tactics (i.e. "good cop/bad cop," constant accusations by the officers that the defendant was lying, preying upon the defendant's immigration status, separating the defendant from his co-workers, constant demands for the "truth" etc.) that were used by law enforcement officers during their interview of the defendant even though not arrested. *Id.* at 579-82.

Such was not the case here. While the agents presented Tang with a photograph that depicted her in PLAAF uniform and asked questions about her military service, research, and associates, they did not use any inherently coercive tactics. Their tone was conversational not confrontational. Moreover, the fact that they brought a toy to occupy Tang's daughter is strong evidence that the agents intended the interview to be non-confrontational.

### C. Tang Was Not Restrained

Tang claims, relying on her mother's declaration and similarly to the defendant in *Craighead*, that although not handcuffed, that she was restrained throughout the interview because the agents exerted complete control over seating, movement, her passport, and the front door. In *Craighead*, the defendant was led by agents into storage room at the rear of the residence where an agent interrogated him with the door closed while another agent, wearing raid gear with a weapon displayed stood with his back against the door facing the defendant. *Id.* at 1086. The Ninth Circuit concluded "when viewed in their totality, these facts demonstrated that Craighead's freedom of action was restrained in a way that increased the likelihood that Craighead would succumb to police pressure to incriminate himself." *Id.*

Here, Tang and FBI agents were seated in the living/family room area of the residence. As noted above, Tang directed the agents as to where to sit. Because of the COVID19 pandemic, the agents wore masks and socially distanced themselves to the extent possible. Tang sat on red metallic chair facing the door to the apartment while SA Dilland sat at a small table against the wall and SSA Baoerjin sat on a small chair with his back to the living/family room window. Neither agent was blocking the front door. Tang's mother and daughter initially sat on the bed in the living/family room, but freely moved about the apartment without escort during the interview, as did Tang. The agents did not perform a safety sweep of the residence prior to beginning the interview. Tang's passport was not physically

retained by either agent following confirmation of her identity, rather, it was placed on a counter within her reach. On these facts, it cannot be said that Tang was restrained either physically or psychologically.

### D. Tang Was Not Isolated

Citing *United States v. Krstic*, 708 F. Supp. 2d 1134, (D. Or. April 20, 2010), Tang further asserts that she was "effectively" isolated from her mother and daughter despite being in the same room with them throughout the FBI's interview. Unfortunately for Tang, *Krstic* is inapposite.

In *Krstic*, the defendant and other family members met the federal agents at the front door of his home. After being directed to the dining room by one of the defendant's family members, agents interviewed the defendant while seated at the dining room table. At least two of the defendant's family members remained at the kitchen table with him and the defendant's daughter eventually acted as a translator. The agents did not perform a safety sweep of the home, did not advise him of his *Miranda* warnings, did not inform him that he need not answer their questions, and attempted to conduct a low-key interview. The agents made no threats or promises of any kind. During the course of the interview, the defendant provided a number of incriminating statements, which the agents reduced to writing and allowed him to review before he signed the statement. Relying on the *Craighead* factors, the Court in *Krstic* ultimately concluded that the defendant's statements were admissible, even in the absence of being warned that he need not answer questions and was free to terminate the interview at any time. Id. at 1147.

Here, like in *Krystic*, Tang was never isolated from her mother or daughter. Had she wished to communicate privately with her mother, there is no evidence to suggest that the agents would have prevented her from doing so. That her mother may have felt intimidated by the agents being inside the apartment is not relevant to Tang's state of mind, thought process, or whether she believed she was in custody. It bears repeating that Tang has not provided a declaration attesting to her belief that she was in custody in support of this motion.

### E. Tang Was Not Informed That She Could Terminate the Interview and Totality of the Circumstances

The agents did not inform Tang that she was free to terminate the interview at any time. However, in the context of the other *Craighead* factors and under the totality of the circumstances, on

these facts, this omission is certainly not dispositive. The agents acted in a wholly non-threatening, non-aggressive, and non-coercive manner during Tang's interview. Although Tang was asked incriminating questions about her conduct, the agents took special care to do so in her own language. They did not restrict her movements and did not seize her passport until they executed the search warrant. Moreover, simply because Tang is not a citizen of the United States, that the interview lasted for approximately 90 minutes, and the FBI confronted her with a photograph of her in a PLAAF uniform, does not convert an otherwise non-custodial interview into a custodial one.

Furthermore, even in light of the factors enumerated in *United States v. Kim*, 292 F.3d 969 (9th Cir. 2002) another pre-*Craighead* opinion cited by Tang, the Court should deny this motion. Those factors include: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Id.* at 974 (internal citations omitted). The totality of the evidence simply does not support suppression of Tang's statements.

### F. There is No Need for An Evidentiary Hearing

There is no need for an evidentiary hearing because Tang has failed to articulate any contested facts. *See United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000) (holding that "An evidentiary hearing on a motion to suppress need be held only when the *moving* papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exists.") (emphasis added). "A hearing will not be held on a defendant's pre-trial motion to suppress merely because a defendant wants one. Rather, the defendant must demonstrate that a 'significant disputed factual issue' exists such that a hearing is required." *United States v. Kyle*, 565 Fed.Appx. 672, 673 (9th Cir. 2014) (quoting *United States v. Harris*, 914 F.2d 927, 933 (7th Cir. 1990). *See also United States v. Quoc Viet Hoang*, 486 F.3d 1156, 1162 (9th Cir. 2007) (holding that district court did not err in refusing to hold an evidentiary hearing on a motion to suppress because, *inter alia*, resolution of issue [how and whether an officer selected a package for inspection] would not alter the Court's Fourth Amendment analysis). Tang, as the moving party, fails to raise with "sufficient definiteness, clarity, and specificity" any contested facts. Neither Tang's mother's declaration nor her defense counsel's

renditions are sufficient in this case.  Instead, Tang devotes nearly the entirety of the relevant section in her motion to providing the Court with the legal standard for assessing an alleged *Miranda* violation. ECF 130 at 22-23.  Accordingly, the Court should reject Tang's request for an evidentiary hearing.

### IV.     CONCLUSION

Because Tang was not in custody at the time of the FBI interview, the agents were not required to provide *Miranda* warnings.  The Court should deny Tang's motion to suppress her statements to the FBI prior to the execution of the search warrant without holding an evidentiary hearing.

Dated:  April 30, 2021

PHILLIP A. TALBERT
Acting United States Attorney

By: /s/ HEIKO P. COPPOLA
HEIKO P. COPPOLA
Assistant United States Attorney