IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>  v.<br><br>TANG JUAN,<br>(aka Juan Tang)<br>      Defendant. | CASE NO. 2:20-CR-00134<br><br>DECLARATION OF FBI SPECIAL AGENT STEVEN G. DILLAND |

I. **DECLARATION OF STEVEN G. DILLAND**

1. I, Steven G. Dilland, am employed as a Special Agent with the Federal Bureau of Investigation and have been since 2008. I am currently assigned to the counterintelligence squad at the Sacramento Field Office. I have worked in counterintelligence for approximately 13 years.

2. I am the assigned case agent for the investigation that led to Tang Juan's indictment in the above- entitled case. I am familiar with the facts of this matter. I have reviewed defense counsel's motion and supporting exhibits that seek to suppress Tang's statements made during the interview that I conducted with Tang Juan prior to the execution of a search warrant on June 20, 2020.

3. FBI Supervisory Special Agent Bill Baoerjin, who I know to be a native Mandarin Chinese speaker, assisted me with Tang's interview. SSA Baoerjin interpreted my questions and Tang's responses during the interview. Based upon my interaction with Tang, I believe she is proficient in the English language. I estimate that approximately 80% of the interview was conducted in Mandarin Chinese and the remaining 20% was conducted in English. I estimate that Tang's interview lasted approximately 90 minutes. The interview was not recorded.

4. SSA Baoerjin and I arrived at Tang's apartment in Davis in the afternoon hours of June 20, 2020. We were professionally attired in business suits. We approached Tang's door and I knocked on the door, simultaneously SSA Baoerjin spotted Tang's mother, Li Xiuying, in the living/family room through an open window and greeted her in Mandarin Chinese. Li opened the door and spoke in Mandarin Chinese to Tang standing behind her. While standing outside of the apartment, we identified ourselves using our FBI-issued credentials and asked if we could come inside to talk. Li and Tang invited SSA Baoerjin and me into the residence.

5. Neither SSA Baoerjin nor I intended to conduct a custodial interview of Tang. Because Tang

was not in custody at any time during the interview, she was not read her *Miranda* warnings. I did not tell Tang that she was free to terminate the interview at any time. We obtained a search warrant in advance of our arrival but the search warrant team was not present or visible during the interview. Our firearms were concealed throughout the interview. We did not perform a safety sweep or any other search of the residence prior to the interview.

6. The tone throughout the interview was conversational and not aggressive or hostile. At no point were any threats or promises made to Tang, her mother or her child. We knew from our investigation that Tang's daughter was likely to be present during the interview so we brought along a toy to ease any tension that might arise because of our presence.

7. Tang, her mother, and her daughter had complete freedom of movement throughout the interview. They exercised that freedom of movement without interference from either SSA Baoerjin or me. No one was prevented from using the restroom. No one was physically or verbally restrained in any way.

8. Prior to the beginning of the interview, Tang identified herself with her People's Republic of China passport. Tang retrieved her passport from one of the bedrooms in the apartment. I did not follow Tang to the bedroom. Contrary to Li's declaration, SSA Baoerjin also did not follow Tang to the bedroom at this point. After Tang identified herself, the passport was placed on a table within reach of where Tang was seated during the interview. Neither SSA Baoerjin nor I physically retained Tang's passport during the interview. Tang had access to her passport throughout the interview.

9. The interview took place in the living/family room area of Tang's apartment. Tang directed SSA Baoerjin and me where to sit. Tang sat on a chair facing the front door. I sat in a small chair near a table against the wall of the living/family room. SSA Baoerjin sat in in another small chair with his back to the living/family room window. During the interview, SSA Baoerjin and I wore face masks in accordance with COVID-19 guidelines and maximized social distancing with Tang. Tang's access to the front door of the apartment was not blocked at any point during the interview.

10. Tang's mother and child initially sat on what appeared to be an unmade bed in the corner of the living/family room. We did not direct Tang's mother or child to sit in that location. Tang's mother and daughter did not sit on the bed for the entire interview. They freely moved around the apartment during the interview. In fact, Li and Tang's daughter moved freely throughout the apartment over the duration of the interview and left the living/family room multiple times. Neither were followed by SSA Baoerjin or me. In one instance, Li left the room and returned with what appeared to be hand sanitizer and sprayed the exterior of the box for the toy we provided Tang's daughter.

11. The substance of Tang's interview was captured in an FD 302 that I wrote and that is attached to her motion to suppress her statements to me. During the interview, I advised Tang that it was a crime to lie to an FBI agent. Despite this warning, at no point did she change, revise, correct, or retract any of her statements. At the conclusion of the interview, I reviewed her answers to my questions and she again made no changes, revisions, corrections, or retractions.

12. At the conclusion of the interview, we advised Tang that we had a Court authorized search warrant for Tang's residence. Prior to the search warrant's execution, Tang pointed out which items within the apartment were her property. Based on my observations inside the residence during the search, it appeared as though Tang, her mother, and daughter were in the process of moving out.

    I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

_____
STEVEN G. DILLAND