UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

TANG JUAN aka JUAN TANG,

        Defendant.

No.  2:20-cr-00134

**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

    On April 9, 2021, Defendant filed a Motion to Suppress statements she made to federal law enforcement agents during an interrogation that took place at the Defendant's apartment.  <u>See</u> Mot. to Dismiss ("Mot."), ECF No. 130.  The Government opposes the motion.  <u>See</u> Opp'n at ECF No. 137.  Defendant filed a reply. <u>See</u> Reply, ECF No. 141.

    As the Government concedes, Defendant was not provided <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966)(hereinafter "<u>Miranda</u>"), warnings by the FBI agents who interviewed her at her apartment on June 20, 2020.  Opp'n at 3.  The Government also concedes this interview was an interrogation for <u>Miranda</u> purposes.  <u>See</u> <u>generally</u> Opp'n.  The Government, however, disputes whether Defendant was "in custody", as caselaw defines that term, at the time of her interrogation.  Opp'n at 6-11.  Defendant insists this was a custodial interrogation.  Mot. at 6-16; Reply at 2-5.

1

For the reasons set forth below, the Court finds that Defendant was in custody and therefore entitled to Miranda warnings.  Accordingly, the Court GRANTS Defendant's Motion to Suppress.

## I.  FACTUAL BACKGROUND

On October 28, 2019, Defendant, a cancer researcher and Chinese national applied for and, on November 5, 2019, was granted, a non-immigrant visa to participate in a University of California, Davis cancer treatment-method research program.  Mot. at 2; Opp'n at 1-2.

On August 6, 2020, Defendant was charged with (1) visa fraud for answering "no" to the question "have you ever served in the military?" on her visa application and with (2) making false statements to the FBI during her June 20, 2020, interview in violation of 18 U.S.C. §§ 1001 and 1546.  See Indict., ECF No. 18.  On May 27, 2021, the Government filed a Superseding Indictment charging the same two counts.  See Sup. Indict., ECF No. 150.

This Motion concerns Defendant's interview with the FBI during which she made the allegedly false statements serving as the basis for Count Two of the Indictment.  See Indict. at 2. Specifically, in the early afternoon of June 20, 2020, two FBI agents - special agent Steven Dilland ("SA Dilland") and Supervisory Special Agent Bill Baoerjin ("SSA Baoerjin") - interviewed Defendant at her apartment in Davis, California, prior to executing a search warrant.  Mot. at 1; Opp'n at 2.  The apartment, located in a student-housing complex, is approximately

800-square-feet.  Mot. at 1-2.  Defendant lived there with her mother and eight-year-old daughter.  Id. at 3.  That day, Defendant was packing up the apartment and arranging for her mother and daughter to get to the airport for their return home to China.  Id. at 2.  A new tenant was moving in that same day. Id. at 3.

Both agents were dressed in business attire and had masks on due to the COVID-19 pandemic.  Mot. at 3; Opp'n at 2-3.  Both were also armed, though their weapons remained concealed and were not displayed during the interview.  Opp'n at 3.  The agents had already obtained a search warrant and a search team of six additional agents waited outside the apartment in a concealed location to execute the warrant.  Opp'n at 2; Reply at 1.  These agents were not present or visible during the interview.  Opp'n at 2.

As SA Dilland knocked on Defendant's door, SSA Baoerjin, a native Mandarin speaker, observed Defendant's mother through an open window and called out to her in Chinese.  Mot. at 3; Opp'n at 3.  SSA Baoerjin asked whether her daughter was home.  Mot. at 3.  The agents identified themselves, showing their FBI badges. Opp'n at 3.  Defendant opened the door and the agents entered the apartment.  Mot. at 3; Opp'n at 3.  Defendant retrieved her passport from the bedroom.[1]  Her passport was not formally seized at that point.  Mot. at 4, n.2.

_____

[1] The Government claims Defendant voluntarily provided her passport to the agents for identification purposes and that when she retrieved the passport from the bedroom, SSA Baoerjin did not follow her.  Opp'n at 3.  Defendant claims SSA Baoerjin asked for Defendant's passport then followed her into the bedroom where she removed her passport from a bag and followed her back into the

3

The interview then commenced in the living room.  Mot. at 4; Opp'n at 3.  The two agents sat in chairs, Defendant sat in a chair across from them, and Defendant's mother and daughter sat on a mattress stripped of linens in the corner of this room.[2] The agents provided Defendant's daughter with a toy.  Mot. at 5; Opp'n at 3.

For at least 90 minutes[3], the agents questioned Defendant about her background in China, her visa application, and her role, if any, in the Chinese military.  Mot. at 4; Opp'n at 3-4. SSA Baoerjin principally asked the questions in Mandarin Chinese, but some portions of the interview were in English.  Mot. at 4; Opp'n at 2.  At one point during the interview, the agents showed Defendant a photograph on SA Dilland's cell phone and asked whether that was her picture.  Mot. at 4; Opp'n at 8.

It is undisputed that the agents did not provide Defendant with Miranda warnings and did not advise Defendant that she was not compelled to speak with the agents or could end the interview at any time.  Opp'n at 3.  During the interview, Defendant admitted to personally preparing and submitting the visa

_____

living room.  Mot. at 3.

[2] The Government claims Defendant directed the agents where to sit during the interview and that Defendant sat on a chair facing the door to the apartment while SA Dilland sat at small table against the wall and SSA Baoerjin sat on a  chair with his back to the living room window; thus, the Government claims neither agent was in fact blocking the front door.  Opp'n at 3, 8. Defendant claims the agents directed her to sit in a chair across from them and directed her mother and daughter to sit on the mattress in the corner; she also claims the agents had their backs to the door effectively blocking access to the exit.  Mot. at 3-4, 11.

[3] The Government claims the interview lasted approximately 90 minutes.  Opp'n at 3.  Defendant claims it lasted for approximately 2 hours.  Mot. at 4.

4

application but denied serving in the Chinese military and being a member of the Civilian Cadre.  Opp'n at 3-4.

Defendant now seeks to suppress these statements.  She argues that because she was subject to a custodial interrogation yet was not advised of her rights as required by Miranda, all of her statements during the questioning must be suppressed.  See generally Mot.  In opposition, the Government contends Defendant was not in custody and therefore Miranda warnings were not required.  See generally Opp'n.

## II.   OPINION

### A.   Legal Standard

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  In Miranda, the Supreme Court adopted prophylactic procedural measures to guarantee that suspects are advised of their Fifth Amendment rights before custodial interrogations.  384 U.S. at 479 (holding a defendant "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.")  Thus, the "prosecution may not use statements. . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards" set forth in Miranda.  Id. at 444.

///

B. Analysis

In this case, Miranda warnings were not provided. Opp'n at 3 (conceding that "[Tang] was not advised of her Miranda warnings"). However, this failure to provide warnings violates Miranda only if a custodial interrogation occurred. 384 U.S. at 444.

1. Interrogation

In Rhode Island v. Innis, the Supreme Court defined interrogation as "express questioning or its functional equivalent." 446 U.S. 291, 300-301 (1980)(further explaining the "functional equivalent" of express questioning means "any words or actions on the part of the police" that the "police should know are reasonably likely to elicit an incriminating response from the suspect.")

Defendant argues there clearly was an interrogation. Mot. at 7-8. For well over an hour, two agents expressly questioned Defendant about her background in China, her visa application, and her role in the Chinese military. Id.; Opp'n at 3-4. Indeed, the Government does not dispute Defendant's characterization of the interview as an interrogation. See Opp'n.

As the parties agree there was an interrogation, the only contested issue is whether Defendant was in custody at the time of her interrogation.

2. Custody

In Miranda, the Supreme Court instructed that even where the suspect was not formally taken into police custody, the suspect may nevertheless be considered to be "in custody" if the suspect

was "deprived of his freedom of action in any significant way." 384 U.S. at 444. "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995).

In U.S. v. Craighead, the Ninth Circuit considered the application of the above standards to interrogations occurring within the defendant's home. 539 F.3d 1073, 1077 (9th Cir. 2008).[4] While first noting that "courts have generally been much less likely to find that an interrogation in the suspect's home was custodial in nature" as "the suspect is in familiar surroundings," the Ninth Circuit made clear that "nevertheless an interrogation in the suspect's home may be found to be custodial under certain circumstances." Id. at 1083 (internal citations omitted).

The determination of whether an in-home interrogation was custodial is "necessarily fact-intensive." Id. at 1084 (internal citations omitted). In Craighead, the Ninth Circuit identified the following factors as relevant to this determination: "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was

---

[4] In her Motion, Defendant cites to a number of pre-Craighead decisions. See Mot. at 9-13. The Court agrees with the Government that these decisions predating Craighead - the leading Ninth Circuit case on when interrogations at a suspect's home may be found to be custodial – are of limited utility. See Opp'n at 7,10.

isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made."  Id.  This list, however, is non-exhaustive and the ultimate question is "the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere.'"  Id. at 1083.

### a) Law Enforcement Personnel

The first Craighead factor is the number of law enforcement personnel and whether they were armed.  539 F.3d at 1084.  As the Ninth Circuit explained: "when a large number of law enforcement personnel enter a suspect's home, they may fill the home such that there are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation."  Id.  In Craighead, there were eight law enforcement officers representing three different agencies, all of whom were armed and some of whom had unholstered their firearms in Craighead's presence.  Id. at 1085.  The Ninth Circuit found that "a reasonable person in Craighead's position would feel that his home was dominated by law enforcement's agents and that they had come prepared for a confrontation."  Id.

Here, two FBI agents entered Defendant's 800-square-foot apartment on the day she was moving out and a new tenant was moving in.  Mot. at 1; Opp'n at 2.  Both agents were armed.  Opp'n at 2-3.  The Government argues these facts do not rise to a wholly police-dominated atmosphere, emphasizing the distinctions between the facts here and in Craighead.  Specifically, in Craighead there were eight agents from multiple agencies present

as opposed to just two from the same agency here.  Opp'n at 7-8.
However, Craighead did not set a floor for the number of agents
required to create a police-dominated atmosphere.  Rather, the
Craighead Court specifically stated that the relevant
determination is whether law enforcement personnel filled the
home such that there were no police-free rooms or spaces to which
the suspect could have retreated if she wanted to end the
interrogation.  539 F.3d at 1084.

Defendant claims SSA Baoerjin followed her into the bedroom
and back to the living room as she retrieved her passport, see
Mot. at 3, and that the agents directed her, her mother, and her
daughter where to sit in the living room, see id. at 3-4.  On
these facts, a reasonable person in Defendant's position would
feel that there were no spaces in the small apartment to retreat.

The Government counters that when Defendant retrieved her
passport from the bedroom, SSA Baoerjin did not follow her, see
Opp'n at 3, and that it was Defendant who directed the agents
where to sit during the interview not the other way around, see
id.  However, even under the Government's stated facts, a
reasonable person in Defendant's position may not have felt there
was anywhere in the home to retreat, given the small size of the
apartment and the impending arrival of the new tenant that day.
Additionally, as her mother and young daughter were seated on a
barren mattress in the corner of the living room, see Mot. at 3-
4, a reasonable person in Defendant's position would not have
felt free to retreat from the living room thereby leaving her
mother and daughter with the two agents.  Lastly, once Defendant,
a foreign national, retrieved her passport, which the agents

planned to seize and indeed had a warrant to do so, she was no longer free to leave.  As a foreign national, she could not go anywhere without it.

All of the above described circumstances indicate there were no places for Defendant to retreat had she wanted to terminate the interrogation, despite the presence of only two agents inside this very small apartment.  Thus, this factor weighs in favor of a custody finding.

b) Restraint

The second Craighead factor is whether the suspect was at any point restrained, either by physical force or by threats. 539 F.3d at 1085.  "When law enforcement agents restrain the ability of the suspect to move – particularly through physical restraints, but also through threats or intimidation – a suspect may reasonably feel he is subject to police domination within his own home and thus not free to leave or terminate the interrogation."  Id. (internal citations omitted).  In Craighead, the defendant was not handcuffed or physically restrained.  Id. at 1086.  Rather, the agents led him to a storage room at the back of his residence where one agent interrogated him with the door closed and another agent, wearing raid gear and visibly armed, stood with his back against the door facing the defendant. Id.  The Ninth Circuit found that "viewed in their totality" these facts "demonstrated Craighead's freedom of action was restrained in a way that increased the likelihood that Craighead would succumb to police pressure to incriminate himself."  Id. (internal citations omitted).

Here, Defendant does not claim that she was restrained by

physical force.  See generally Mot.  Nor does she claim the

agents explicitly threatened her.  Id.  Rather, analogizing to

Craighead, Defendant argues she was restrained because the agents

did not permit her to move around the home freely.  Id. at 10-12.

Specifically, Defendant claims that as soon as the agents entered

the apartment, they exerted complete control over her movements,

not allowing her to move around the apartment without

supervision.  Id. at 11.  According to Defendant, SSA Baoerjin

followed her to and from the bedroom to retrieve her passport and

then the agents directed her to sit in a chair with the agents

seated in front of her "effectively blocking access to the exit."

Id.  She points out the agents in Craighead too had blocked

Craighead's exit and this fact contributed to a finding of

custody.  Id. (citing to Craighead, 539 F.3d at 1085).

The Government disputes Defendant's characterization,

claiming that Defendant moved freely around without an agent

escorting her and that it was Defendant who told the agents where

to sit not the other way around.  Opp'n at 8-9.  Additionally,

according to the Government, neither agent was blocking the front

door.  Id. at 8.

However, even under Defendant's stated facts, the Court does

not find Defendant was restrained under Craighead.  The facts

here do not indicate intimidation or restraint on Defendant's

movement anywhere near the level of Craighead itself where agents

led Craighead to a rear storage room and one visibly armed agent

wearing raid gear stood with his back against the door facing the

defendant.  See 539 F.3d at 1086.  While armed, the two agents

here did not display their weapons as the agent in Craighead did.

Opp'n at 3.  Nor did the agents here take Defendant out to a backroom alone.  The interview took place in the living room with Defendant's mother and daughter present.  Mot. at 4; Opp'n at 3.

    For these reasons, the Court finds Defendant was not restrained.  This factor weighs against a finding of custody.

### c) Isolation

    The third Craighead factor is whether the suspect was isolated from others.  539 F.3d at 1086.  Isolation is "perhaps the crucial factor that would tend to lead a suspect to feel compelled to provide self-incriminating statements."  Id. at 1086-87 (internal citations omitted).  As such, the "removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements" is a "frequently recurring example of a police domination."  Id. (internal citations omitted).

    Here, Defendant was not physically isolated from her mother and her daughter.  Mot. at 12.  They remained seated on a bare mattress in the corner of the same room where Defendant was being questioned.  Id.  Rather, Defendant's argument is that while not physically isolated from her mother and daughter, she was effectively isolated from them.  Id. at 12-13.  In support of this contention, she cites to U.S. v. Krstic, 708 F. Supp. 2d 1134, 1146-47 (D. Or. April 20, 2010)(hereinafter "Krstic").  Id. at 12.

    In Krstic, federal agents met the defendant and some of his family members at the front door of his home.  708 F. Supp. 2d at 1139.  A family member directed the agents to the dining room,

where the agents interviewed the defendant; at least one of
defendant's family members remained at the kitchen table with him
throughout the interview.  Id.  The Krstic Court found that on
these facts, defendant was not isolated.  Id. at 1146-47.

Defendant attempts to distinguish Krstic by arguing that the
defendant there was able to communicate privately with his family
in their native language of Serbo-Croatian which the agents did
not speak, whereas here Defendant was not free to communicate
confidentially with or seek advice from her mother because SSA
Baoerjin was fluent in Mandarin Chinese.  Mot. at 12.  Defendant
also points out that whereas Krstic's family members remained at
the kitchen table, here the agents directed her mother and
daughter to remain seated on the mattress in the corner.  Id. at
12-13.

The Government counters that here, as in Krstic, Defendant
was never isolated from her mother or daughter, and had she
wished to, she was free to communicate with her mother.  Opp'n at
9.  Further, the Government emphasizes that Defendant has not
provided a declaration attesting to her state of mind and that
Defendant's mother's feeling of intimidation is irrelevant.  Id.

The Court agrees with the Government.  Krstic does not
further Defendant's contention that she was "effectively
isolated" from family members.  By her own account of events, her
mother and child remained in the same room the entire time, just
as Krstic's family members remained in the room with him.  Mot.
at 13.

Defendant therefore was not isolated.  This factor weighs
against a finding of custody.

### d) Informed about ability to leave or end the interview

The fourth Craighead factor is whether the suspect was informed that the questioning was voluntary and that she was free to leave or terminate the interview. 539 F.3d at 1087. "If a law enforcement officer informs the suspect that he is not under arrest, that statements are voluntary, and that he is free to leave at any time, this communication greatly reduces the chance that a suspect will reasonably believe [s]he is in custody." Id. (internal citation omitted). In Craighead, the agent told Craighead that: "he was not under arrest and that he would not be arrested that day regardless of what information he provided," "his statements were voluntary," and that "he was free to leave." Id.

Here, the agents did not provide any of the advisements that the Craighead agent did. As the Government concedes, the agents did not inform Defendant that she was free to leave or terminate the interview at any time. Opp'n at 9. Nor does the Government provide any explanation as to why such information was not provided to the Defendant at the outset of the interview. Id. Thus, this factor weighs in favor of finding Defendant was in custody.

### e) Final Analysis

To summarize, the Court finds that the first and fourth Craighead factors weigh in favor of a finding of custody while the second and third weigh against. As the Craighead Court emphasized, however, these four factors are non-exhaustive; rather, the custody determination is a totality of the

circumstances inquiry with the ultimate question being "the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere.'" 539 F.3d at 1084.

Here two additional circumstances of the interrogation lead the Court to conclude that Defendant was in custody. First, Defendant is not a U.S. citizen. Mot. at 15. Rather, she is citizen of the Peoples Republic of China "a country where citizens customarily obey the orders of police and other authorities." Id. At the time of the interview, she had no experience with the American justice system. Id. A reasonable person in her position would not have felt free to terminate the interrogation or to ask the agents to leave.

Second, at the time of the interrogation, Defendant was nearly moved out of her apartment undercutting the idea that this was a "comfortable and familiar space" for her. Mot. at 14. Indeed, a new tenant was moving in that day and some of the things in the apartment belonged to the new tenant. Id. Photographs from the subsequent search, which depict a barren apartment with bags and luggage on the floor and the beds stripped of linens, corroborate this. Id. Thus, in addition to the factors contributing to a police-dominated atmosphere discussed above, the fact of the move out also diminishes the extent to which this apartment was a comfortable and familiar setting.

Finally, a comparison of the totality of the circumstances in Craighead and those here tilts the balance decisively in favor of a custody finding. It bears repeating that in Craighead, the

Ninth Circuit found that the defendant was in custody <u>despite</u> the fact the agent told him he was not under arrest, his statements were voluntary, and he was free to terminate the interview. 539 F.3d at 1087. Further, Craighead was an electronic warfare technician in the U.S. Air Force and, by all indications, a U.S. Citizen and a native English speaker. 539 F.3d at 1078. In short, Craighead was a sophisticated actor who was told he could terminate the interview. Yet, the Ninth Circuit still found that he was in custody. 539 F.3d at 1089. Here, Defendant is neither a U.S. citizen nor a native English speaker. Mot. at 14-15. She was not informed by SA Dilland or SSA Baoerjin that she was free to leave or that her statements were voluntary. Opp'n at 3. Defendant, unlike Craighead, also had her young daughter and mother with her, whom she would not have reasonably felt free to leave with the agents particularly in the middle of a pandemic on the day the family was moving out of the apartment. In all of these ways, the circumstances here were arguably at least as coercive as those in <u>Craighead</u>.

Given the inherently coercive totality of the circumstances, the Court finds Defendant was in custody. She was entitled to but not given <u>Miranda</u> warnings. Accordingly, her statements must be suppressed for violation of <u>Miranda</u>.[5]

---

[5] Defendant further argues all evidence derived from the illegally obtained statements must be determined and suppressed under the fruit of the poisonous tree doctrine. Mot. at 17 (citing to <u>Murray v. United States</u>, 487 U.S. 533 (1988)). Defendant, however, fails to specifically identify any other evidence derived from these statements. As Defendant has not identified any such derivative evidence, this order is limited to suppression of her statements.

1           III.  ORDER

2        For the reasons set forth above, the Court GRANTS

3   Defendant's Motion to Suppress her statements.  As these

4   statements are the entire basis for Count Two of the Superseding

5   Indictment, see Sup. Indict. at 2, Count Two is DISMISSED.

6        IT IS SO ORDERED.

7   Dated:  June 1, 2021

8                                    _____
                                     JOHN A. MENDEZ,
9                                    UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28