# Exhibit 1

FD-302 (Rev. 5-8-10)


OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    07/02/2021

JESSE FIELD (FIELD), Federal Bureau of Investigation (FBI) Intelligence Analyst (IA), was interviewed at FBI Headquarters (FBIHQ), 935 Pennsylvania Avenue Northwest, Washington, DC on June 23, 2021 by Supervisory Special Agents Colleen Christie and Sean Buckley.  Also present for the interview were Assistant United States Attorney Christopher D. Grigg and Counterintelligence and Export Control Section Trial Attorney David Aaron. After being advised of the identities of the interviewers and the purpose of the interview, FIELD voluntarily provided the following information:

FIELD attended the UNIVERSITY OF PORTLAND, Oregon where he earned a bachelor's degree in Physics.  FIELD worked odd jobs for a few years before attending EMBRY-RIDDLE UNIVERSITY, where he completed the course work for dual master's degrees in Operations and Management of Aero Sciences.  While attending EMBRY-RIDDLE, FIELD tutored athletes in physics, chemistry, and mathematics.  FIELD was hired by the FBI before completing his thesis; he did not earn the degrees.

FIELD's first day working for the FBI was October 25, 2009.  Following IA training, FIELD was assigned to the Directorate of Intelligence at FBIHQ, working at the China Technology Transfer Analysis Unit (CTTAU) of the Counterintelligence Division (CD).  His position was transferred to CD but he remained working in CTTAU.  FIELD worked in CTTAU his whole career, aside from five months at the Legal Attaché's (Legat) office at the US Embassy in London.  While working in the Legat, FIELD covered a variety of threats, but focused primarily on threats stemming from the People's Republic of China (PRC).  CTTAU was not always called CTTAU, but its purpose has been the same since FIELD began working in it.

FIELD's first line supervisor was Supervisory Intelligence Analyst (SIA) PRISCILLA YEON-VOGELHEIM.

---

Investigation on    06/23/2021    at Washington, District Of Columbia, United States (In Person)

File # ███████████  ████████  ██████  ████     Date drafted    06/24/2021

by Sean Buckley, Colleen M. Christie

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

The US had adversaries who sought to steal US technology to gain military and economic advantages. Some technology transfer was legal, some was illicit. Other government agencies and departments such as the Department of Defense identified specific technologies that were important to protect from adversaries. FIELD studied dual-use technologies that fit into the PRC's Military-Civil Fusion program (MCF). Dual-use technologies had both military and commercial applications.

FIELD had little training on China's People's Liberation Army (PLA). FIELD knew its goals, functional groups, general posture, its military leaders, its policies, goals, and intentions. FIELD knew more about PLA strategy than its tactical goals. FIELD used this general information to shape how he interacted with the FBI's partners.

FIELD received some legal instruction about the US Constitution during IA training. FIELD did not have formal instruction in criminal statutes. FIELD had never been a sworn law enforcement officer or agent. FIELD had no training or experience in visa fraud, false statements, destruction of evidence, obstruction of justice, or the corresponding criminal statutes.

FIELD recognized the redacted draft graphic entitled "Defining the Extent of Obfuscation of Visiting Chinese Scholars' Ties to the PLA" dated April 20, 2021 as the first standalone graphic FIELD ever attempted to prepare [Agent note: see attached 1A]. The intent of this draft graphic was to concisely capture the information about the individuals into labelled buckets.

A graphic was an intelligence product designed to quickly explain information to executives without a full, lengthy explanation of the topic. Graphics were primarily for an internal FBI audience, possibly up to the Assistant Director level though it was possible for graphics to be distributed outside the FBI. The source materials used for a graphic depended on the topic and the audience. There were no common set of sources for graphics generally. FIELD was an all-source IA, which meant FIELD could use all available sources of information to write intelligence products.

A background note (BN) supported intelligence products. A BN was never published on its own. The intent of a BN was to assist a briefer when presenting an intelligence product.

Continuation of FD-302 of ████  Interview of JESSE FIELD _____ , On 06/23/2021 , Page 3 of 7

FIELD was out of the office due to COVID-19 until October 2020. FIELD began working on the draft graphic/BN remotely in September 2020. IA JESSICA BOLIN added the photographs of the subjects to the draft graphic. FIELD did not know what other content BOLIN contributed to the draft graphic or draft BN. Most of the language in the draft BN was FIELD's.

IAs had discretion to generate intelligence products for the benefit of the FBI and US Intelligence Community (USIC). However, SIA PETER TAHAN tasked FIELD to produce the draft graphic/BN. TAHAN, Acting Unit Chief (A/UC) BRIAN INGRAM, and Acting SIA (A/SIA) ALLYS FINICAL had a consensus that other members of management used the counterintelligence term "undercover" inaccurately; part of the reason for the draft graphic/BN was to correct this.

The draft graphic/BN were not intended to assess the merits of, or comment on, the cited investigations. The purpose was to categorize the subjects of the investigations to facilitate more precise conversations. The subjects did not fit into traditional categorical terms used by the FBI or USIC. FIELD hoped the FBI and USIC would adopt the terms in the draft graphic/BN, setting up a new framework to define the types of actors described in the products. The draft graphic/BN cited those six specific subjects because some were connected to an FBI operation concerning PLA scholars that occurred around the summer of 2020. YE YANQING left the US prior to the 2020 operation but FIELD included her in the draft graphic because of her connections to a PLA-affiliated university in China, the Fourth Military Medical University (4MMU). FIELD would have included other people interviewed as part of this operation but those interviews did not yield charges or generate investigations.

The normal drafting process for intelligence products began with a drafting/workshopping stage that produced a first draft. FIELD would sometimes circulate the first draft to a supervisor to ensure the product was headed in the right direction. At this point, FIELD would begin confirming the citations and facts he used in his intelligence products prior to formal review by successive supervisors: SIA, UC, then usually to Assistant Section Chief (ASC), then Section Chief (SC). Each level of supervisor could make changes that the drafter would incorporate. Supervisors involved in this review and vetting process checked to ensure the product was consistent with unit strategy, messaging, and that the type

of product was the appropriate vehicle for the message.

Some intelligence products went to the IDDBU for it to determine if the products were appropriate for passage to the FBI Director or Deputy Director.  IDDBU could ask a product's author for changes as well.  Some finished intelligence products go to PSU for grammar, formatting, and other final clarifications or changes before distribution outside the FBI. To be disseminated outside the FBI, a product had to have gone through PSU and an FBI Deputy Assistant Director had to have approved the dissemination. [Agent note: based on the context of the conversation, interviewers understood FIELD to have been referring to the Director's Daily Briefing Unit (DDBU) and the Production Services Unit (PSU).]

There was a lot of back and forth on the draft graphic/BN regarding formatting.At the point at which FIELD left these documents, the documents were still in the drafting/workshopping stage and FIELD was beginning to check the citations.  FIELD's leadership was still trying to agree on verbiage.  The draft graphic/BN had not reached the final review and vetting steps.  FIELD was not sure if the dates on the draft graphic/BN were the last dates he worked on them.  To the best of his recollection, FIELD believed the last time he worked on the draft graphic/BN was April 2021 while the documents were in the drafting/workshopping stage.

Depending on the intelligence product, FIELD would coordinate with other government agencies prior to publishing.  For the draft graphic/BN, FIELD would have had to coordinate with other CD units.  FIELD knew the draft graphic/BN contained information about subjects of prosecutions, so he did not want to continue working on them until he had coordinated with the respective field offices.  FIELD wanted to check with OGC on the best way to coordinate with those field offices.  The draft graphic/BN were still within CTTAU, so FIELD had not coordinated the products with anyone outside CTTAU before the documents went to OGC. [Agent note: based on the context of the conversation, interviewers understood FIELD to have been referring to the FBI's Office of the General Counsel (OGC).]

The statements in the draft graphic/BN had not been adopted by CTTAU or the FBI.  IAs were taught to loosely hold their assessments because the review and coordination processes can reveal more information than the IA had available during the drafting/workshopping stage.  For this reason,

Continuation of FD-302 of ▇▇▇ Interview of JESSE FIELD _____ , On 06/23/2021 , Page 5 of 7

FIELD had written the draft graphic/BN so as to be able to revise his assessments.

FIELD wanted the draft graphic/BN to be based on information found in case files.  FIELD only documented what he found in case files.  FIELD did not review all the FD-302s, electronic communications, surveillance logs, digital and physical evidence, and other types of files in the cases before drafting these products.  FIELD did not review all the information available to the investigators for the respective cases.  FIELD was looking at the bigger picture; he did not know all the evidence in each case.  FIELD just needed information that characterized the "buckets" in the draft graphic to more precisely describe them.

The bucket labels had been proposed before FIELD had been assigned the task of writing the draft graphic.  FIELD wanted the labels to be descriptive, simple, and easily understood at a glance.  The only label that had been easy to define was "Obfuscated."  The other three buckets required definition during the workshopping stage.  FIELD did not intend to imply wrongdoing on anyone's part or to clear anyone of wrongdoing with the draft graphic/BN.  Part of the reason FIELD wanted to deconflict the draft graphic/BN with OGC and the field offices was to inform how the buckets were defined.  The field offices could have offered data to inform the correct categorization of the subjects.

The "Obfuscated" bucket had been defined to include subjects who had not declared their PLA affiliation on their US visa applications, but whose PLA affiliation had been determined through investigation. In addition, the declared PRC institutions were either dummy institutions, that is, the institution did not exist, or the true institution had assumed the name of an actual institution with no derogatory information associated with it.

The "Declared" bucket had been defined to include subjects who had correctly affiliated with the PLA on their US visa applications.  GUAN LEI had been charged with obstruction of justice and destroying evidence at the time FIELD wrote the draft graphic/BN.  FIELD did not know about GUAN's visa fraud charge at the time FIELD drafted these products.  FIELD would have changed his assessment in the draft graphic/BN to reflect the visa fraud charge if FIELD had continued working on the products.  During the drafting/workshopping stage, FIELD did not know if GUAN's destruction of

Continuation of FD-302 of ▆▆▆ Interview of JESSE FIELD _____, On 06/23/2021 , Page 6 of 7

evidence was related to a national security matter.  Such knowledge would
have informed FIELD's assessment.  FIELD knew case agents did not always
serialize indictments to their case files.  The draft graphic was out of
sync with GUAN's indictment for failing to disclose his PLA affiliation on
his visa application.

The "Undeclared" bucket had been defined to include subjects who had not
declared their PLA affiliation on their US visa applications and did not
declare their PRC military research affiliations but did declare a civilian
research affiliation.

The "Partially declared" bucket had been defined to include subjects who
had not declared affiliation with the PLA but the investigation had revealed
the subjects were members of the PLA.  These subjects had declared
affiliation with a PLA research institution.

Approximately 1000 Chinese scholars left the US after the enforcement
activity in the summer of 2020.  Of these, some may have been involved in
obfuscation of their activities or affiliations.  The charged cases had more
facts available to FIELD, so he used the charged cases as the subject matter
for his draft graphic/BN.

FIELD had not looked at the draft graphic/BN since OGC reviewed them.
They may have contained information that needed updating.

Subjects ZHAO KAIKAI and GUAN LEI were members of China's National
University of Defense Technology (NUDT), not 4MMU.  This did not make a
difference for the purpose of assigning them buckets on the draft graphic.

The yellow highlighted portions in the draft BN were reminders of
important unfinished work FIELD had to complete in the document.

The statement "The vast majority of 4MMU-affiliated individuals in the US
. . ." in item 5 of the draft BN was a quotation from a source FIELD could
not recall.  The statement was not FIELD's assessment.

INGRAM wrote the comment bubble regarding anecdotal evidence in item six
of the draft BN.  FIELD kept this comment as a reminder to himself to
identify and cite information that may have contradicted that part of item
six.

Continuation of FD-302 of ████ Interview of JESSE FIELD                    , On  06/23/2021  , Page  7 of 7

FIELD could not recall who the UCLA representative cited in item nine of the draft BN was.  FIELD believed that citation came from a document in a case file.

After he stopped working on these products, FIELD became aware that some of the PLA experts he cited in item nine disagreed with one another. Coordination with field offices would have informed FIELD of these differences and that would have informed his assessment.  FIELD would have noted flaws in those experts' analyses if he had known of them during the drafting process.  The PLA experts said the DS-160 visa application form lacks clarity.  This summarized files FIELD had reviewed and was not FIELD's assessment of visa application forms.

Footnote one was based on an interview of WANG XIN.  The numbers WANG provided interviewers were inaccurate.  FIELD would have identified these inaccuracies during his citation review and would have corrected them in the documents.  The "xxxx" in the footnote was a reminder to FIELD to fact-check the citation.

FIELD had not been aware while drafting the draft graphic/BN that visiting PRC scholars had been coached by PRC officials on how to answer questions when interacting with US officials.  FIELD would have included that information in the products to provide a better picture for decision makers about the topic.  FIELD wanted to provide as complete a picture as possible.

Civilian cadre of the PLA were viewed as active duty military but tended to be administrative personnel, scientists, and researchers, not personnel on the battlefield.  Civilian cadre tended to wear PLA uniforms.

Non-traditional collectors (NTC) collected sensitive technology and expertise from the US and other countries to benefit the PRC.  NTCs were not trained intelligence officers of PRC intelligence services or their co-optees.

[Agent note: the interview began at approximately 1:48 pm Eastern and ended at approximately 5:24 pm.  At approximately 3:48 pm, the interview paused for a break of approximately 10 minutes.]