# Exhibit 2

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry  07/02/2021

    PRISCILLA YEON-VOGELHEIM (YEON-VOGELHEIM), Federal Bureau of Investigation (FBI) Supervisory Intelligence Analyst (SIA), was interviewed at FBI Headquarters, 935 Pennsylvania Avenue Northwest, Washington, DC on June 23, 2021 by Supervisory Special Agents Colleen Christie and Sean Buckley.  Also present for the interview were Assistant United States Attorney Christopher D. Grigg and Counterintelligence and Export Control Section (CES) Trial Attorney David Aaron.  Upon being advised of the purpose of the interview, YEON-VOGELHEIM voluntarily provided the following information:

    YEON-VOGELHEIM attended BOSTON UNIVERSITY and received her undergraduate degree in Print Journalism with a minor in French and a specialty in Spanish.  YEON-VOGELHEIM lived abroad and spoke several languages.  After her graduation, YEON-VOGELHEIM lived in Massachusetts and worked as a political reporter, but sometimes covered other topics as well.  She then attended GEORGE WASHINGTON UNIVERSITY (GWU) and received a master's degree in International Affairs.  While at GWU, she interned at the WOODROW WILSON INTERNATIONAL CENTER FOR SCHOLARS.  After graduation, YEON-VOGELHEIM worked for SCIENCE APPLICATIONS INTERNATIONAL CORPORATION (SAIC) and was assigned to the Office of Nuclear Matters at the Pentagon.

    In September 2010, YEON-VOGELHEIM became an intelligence analyst (IA) for the FBI.  YEON-VOGELHEIM first worked at FBI Washington Field Office (WFO) as a Reports Officer in the Russia Counterintelligence Program.  YEON-VOGELHEIM then transferred to FBI Headquarters in January 2011 and worked as an IA on Russia technology (tech) transfer matters.  From 2017 to 2020, YEON-VOGELHEIM was assigned to the Office of the Director of National Intelligence (ODNI) as a joint duty assignment (JDA) and continued to work on Russia tech transfer matters.  After completing her JDA in April 2020, YEON-VOGELHEIM transferred to the Cyber Division with a focus on Russia but

---

Investigation on  06/23/2021  at Washington, District Of Columbia, United States (In Person)

File # ███████████████████████████████████████████████████     Date drafted  06/24/2021

by Colleen M. Christie, Sean Buckley

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

faced a reduced work schedule due to COVID-19.

On January 3, 2021, YEON-VOGELHEIM was promoted to SIA of the China Tech Transfer Analysis Unit (CTTAU). CTTAU focused on tech transfer issues related to China. YEON-VOGELHEIM described tech transfer as the "know-how" and expertise. The unit originally focused on tech transfer that could potentially have military connections. Due to changes in May 2021, the unit added economic espionage, export control, and commercial technologies to its mission. YEON-VOGELHEIM's work was not specific to the People's Liberation Army (PLA) but it was sometimes related due to the military technology portfolio.

As an SIA, YEON-VOGELHEIM first supervised eight people, including IA JESSE FIELD (FIELD). After May 2021, YEON-VOGELHEIM's unit increased to ten people. YEON-VOGELHEIM remained FIELD's immediate supervisor.

Prior to January 2021, YEON-VOGELHEIM received no formal training on the People's Republic of China (PRC). When she became an SIA, YEON-VOGELHEIM read information related to her new portfolio regarding the PRC.

YEON-VOGELHEIM had no training or experience regarding criminal law. YEON-VOGELHEIM had never been a sworn law enforcement officer or agent. YEON-VOGELHEIM had no training or experience in Title 18 United States Code (USC) 1546(a) (Visa Fraud); no training or experience in Title 18 USC 1001 (False Statements); and no training or experience in Title 18 USC 1519 (Destruction of Evidence). YEON-VOGELHEIM had no training or experience in immigration law or visa applications.

YEON-VOGELHEIM was not required to write a certain number of white papers but there was an expectation to produce approximately one white paper per year. Official FBI intelligence products had specific formats and templates that analysts were required to follow when composing their products. Official FBI intelligence products faced a strict review and approval process before they were published. White papers were less formal products and had less of an editorial process before they were finalized. Authors of white papers were free to choose their topics. White papers were not disseminated to the Intelligence Community; they were FBI-internal products only. Intelligence analysts were required to use citations in their intelligence products and avoid personal opinions. Unlike finished

intelligence products, white papers were less strict with citations and included a "Key Assumptions" section. Intelligence analysts used the Key Assumptions section to identify assumptions they made in the white paper, what could change those assumptions, and to assist in recognizing biases. If a bias was identified, the author was required to list its potential effects on the assessment in the white paper.

The audience for the white paper depended upon the topic of the paper. White papers were typically tasked by the author's unit chief and intended for a specific person in the author's management chain or section. A white paper could be sent to the FBI Director but YEON-VOGELHEIM had never written a white paper that was passed to that level.

There was a review process for white papers but the review process was not as strict compared to FBI intelligence products. White papers faced internal review up the management chain of the author's unit, section, or whomever requested the white paper.

Intelligence analysts were not required to read all the serials in the case file when composing a white paper because a white paper is less formal. Authors of white papers were able to choose their sources and had the freedom to be selective with their sources. White paper authors were able to cite finished intelligence products whereas official intelligence products required primary sources as citations.

White papers were not required to be deconflicted with field offices but it was a good practice to consult with field offices. There was no difference when writing a white paper on an open case versus a closed case; the process remained the same. If there was pending litigation, YEON-VOGELHEIM would coordinate the white paper with the case agent and treat it more sensitively.

Because white papers were more informal, there were no "quality control" measures an author was required to follow. Authors were free to offer their assessments in white papers. There was no formal process to verify the language used in the white paper draft.

Opinions were not included in white papers but assessments were included. Opinions were first person, unsupported comments that did not have to be proved. Assessments were source-based facts made on behalf of

the unit.  Assessments became the position of the FBI or division once finalized.

YEON-VOGELHEIM was the author of the white paper draft titled "Fourth Military Medical University Interviews and Arrests Likely Had Minimal Impact in Mitigating Technology Transfer Threats from PRC Students" [Agent note: A copy of the draft white paper is included in the 1A].  YEON-VOGELHEIM was the only author; no one else wrote any portions of the white paper draft.  To the best of YEON-VOGELHEIM's recollection, she started writing the white paper draft sometime in early March 2021 and finished sometime later in March 2021, exact dates not recalled.  YEON-VOGELHEIM stressed the white paper was in draft form and was subject to change.  The word "DRAFT" was contained in the watermark of the paper.

YEON-VOGELHEIM wrote the white paper draft in March 2021 as a response to a February 2021 award nomination. YEON-VOGELHEIM was originally included as part of the award nomination but disagreed about the "high impact" the award's nomination claimed to have made.  YEON-VOGELHEIM did not think the arrests of the PLA students met the threshold for high impact at that time, as YEON-VOGELHEIM assessed at an early stage the impact was minimal.  The white paper draft was a way for YEON-VOGELHEIM to dispute the information contained in the awards packet.  YEON-VOGELHEIM removed herself from the award nomination.  YEON-VOGELHEIM's unit chief recommended YEON-VOGELHEIM write a white paper to send to the Deputy Assistant Director (DAD) of Operations in order to explain why YEON-VOGELHEIM was no longer included in the awards packet.  YEON-VOGELHEIM could not recall if her unit chief specifically tasked her to write a white paper or to put something in writing.  YEON-VOGELHEIM wanted to document her assessment and how it differed from what was stated in the award's nomination.  YEON-VOGELHEIM recognized there were other ways to express her views such as through an email or an in-person meeting.  YEON-VOGELHEIM admitted there was no difference between writing a white paper or an email; either would have accomplished the same goal.

The white paper had reached initial draft form when YEON-VOGELHEIM submitted it to her unit chief for review.  YEON-VOGELHEIM's unit chief returned the white paper draft for edits.  After those edits were made, YEON-VOGELHEIM's unit chief submitted the white paper draft to their assistant section chief for review.  The white paper draft was returned for

edits and was then passed to YEON-VOGELHEIM's section chief. YEON-VOGELHEIM never received feedback from her section chief about the white paper draft. The white paper draft was still in draft form and was going through the editing and review process. It was never ready for the final customer. YEON-VOGELHEIM circulated the white paper draft up her management chain for edits and review. The white paper was not a finalized product and was subject to change.

YEON-VOGELHEIM did not coordinate her white paper draft with any of the special agents in any of the field offices. YEON-VOGELHEIM consulted with some of the program managers (PM) involved but did not talk to the PM who wrote the awards nomination [Agent note: PMs are supervisory special agents at FBI Headquarters].

YEON-VOGELHEIM's assessments were included in the white paper draft. The content and assessments included in the white paper draft were based upon YEON-VOGELHEIM's work experience and training she received as an intelligence analyst. YEON-VOGELHEIM was not given any specific language to include in her white paper draft.

In composing the white paper draft, YEON-VOGELHEIM relied on language used in an indictment, some interviews, previous information on how PLA officers operate, and a comparison of previous high-impact operations. YEON-VOGELHEIM did not review all 302s, electronic communications (ECs), or letterhead memorandums (LHMS) contained in all of the case files. YEON-VOGELHEIM read the indictment for WANG XIN but did not read any other indictments. YEON-VOGELHEIM did not review any search warrants or affidavits related to any of the cases. YEON-VOGELHEIM reviewed one criminal complaint but could not recall which specific one. YEON-VOGELHEIM did not review any physical or digital evidence from any of the cases nor did she review any of the online accounts. YEON-VOGELHEIM did not review any physical surveillance logs, recordings, or any jail calls. YEON-VOGELHEIM did not review any visa applications. YEON-VOGELHEIM did not review all of the information contained in the case files.

YEON-VOGELHEIM reviewed a draft of FIELD's PLA graphic, exact date not recalled. [Agent note: The PLA graphic refers to the draft graphic titled "Defining the Extent of Obfuscation of Visiting Chinese Scholars' Ties to the PLA and its corresponding draft background note. A copy is included in

the 1A.]  FIELD started his graphic in September 2020 but was delayed due to COVID-19.  FIELD was tasked to write the graphic but YEON-VOGELHEIM did not know by whom; YEON-VOGELHEIM became FIELD's supervisor in January 2021.  YEON-VOGELHEIM reviewed FIELD's graphic in the early stages of his draft.  YEON-VOGELHEIM knew it was going to change after review by the various field offices and others in his chain of command.  The graphic was never sent to the field offices for review because it was stopped when the graphic was sent to the Office of the General Counsel (OGC).

YEON-VOGELHEIM's assessment in the white paper draft spoke on behalf of her unit as the unit declined to be listed in the award's nomination packet.  Other people in the unit agreed with YEON-VOGELHEIM's assessment and agreed the arrests had minimal impact on the PRC tech transfer threat at that time.  YEON-VOGELHEIM did not dispute the visa fraud charges and the arrests of the subjects.  The purpose of the white paper was to dispute the claim of the "high impact" listed in the award's nomination.  The title of the white paper draft is the main message she was trying to convey.  It was not a comment on the pending criminal cases and the evidence.  It was possible the impact of the cases could grow over time.  Assessments and impacts could evolve over time.  In looking at it through a tech transfer lens, YEON-VOGELHEIM's assessment as of March 2021 was that the arrests had minimal impact on the PRC tech transfer threat.

The white paper draft cited "low confidence" because of the low amount of sources and the lack of corroboration from multiple sources.  The information was based on arrests and interviews of people associated with Fourth Military Medical University (4MMU).  There was not enough corroboration to give it a higher confidence level.

The FBI did not adopt YEON-VOGELHEIM's assessment listed in the white paper draft as its official position since the white paper was still in the draft process.  YEON-VOGELHEIM's unit did not adopt this as its official position either.

At the time she wrote the draft of the white paper, YEON-VOGELHEIM was unaware of other relevant information.  YEON-VOGELHEIM had recently become aware of the existence of this relevant information.  Awareness of this information during the drafting process would have increased YEON-VOGELHEIM's assessment of the impact the operation.

YEON-VOGELHEIM disagreed with the use of the terms "undercovers" and "spies" in the award's nomination. YEON-VOGELHEIM defined "undercover" as someone who uses a title as a cover. YEON-VOGELHEIM defined "spies" as intelligence officers working under a different title. The act of spying meant committing espionage against the United States. YEON-VOGELHEIM did not believe these were accurate and appropriate terms used in the nomination packet as the people referenced in the white paper draft were researchers and not paid by the PRC. The purpose of Footnote D in the white paper draft was to highlight this and distinguish peoples' relationships with the PLA. Footnote D also reflected what the interviewees said in their interviews. Footnote D was not YEON-VOGELHEIM's assessment; it was a point of clarification. YEON-VOGELHEIM's unit was still trying to characterize the various relationships to the PLA.

YEON-VOGELHEIM was aware some of the interviewees were coached and the interviewees were told by the PRC what to say during their interviews with US officials. The white paper draft did not say the interviewees were truthful. It identified a trend YEON-VOGELHEIM found in the interviews: the interviewees said they were confused and harassed.

The use of the terms "harassment" and "confusion" were not an expression of YEON-VOGELHEIM or her unit. The terms were taken from the interviews. YEON-VOGELHEIM did not state the interviewees may have been untruthful because such a statement was not required in a white paper. That type of statement would be included in an alternate analysis and a white paper was not required to have an alternate analysis; only formal intelligence products were required to cite alternate analyses.

YEON-VOGELHEIM reiterated the white paper draft was written through the tech transfer lens. Tech transfer is only one aspect of national security. YEON-VOGELHEIM's assessment was based on the arrests of six people out of approximately 10,000 PRC-national students in the United States. From a PRC tech transfer threat perspective, YEON-VOGELHEIM considered that to be an overall low impact at the time she drafted her white paper. Addressing additional national security issues, including the exploitation of the United States visa process, was outside the scope of the white paper draft. YEON-VOGELHEIM agreed that people who came to the United States as students could exploit the visa system and it was a national security concern.

WANG XIN met the unit's referenced criteria as a person of concern. YEON-VOGELHEIM knew a second person also met the criteria but could not recall the name of the specific person; it was possibly ZHAO KAIKAI. The other people arrested did not meet the unit's referenced criteria [Agent note: The white paper draft listed four indicators for CTTAU to consider a student, scholar, or researcher a concern]. WANG and the second person both admitted to being tasked to transfer their expertise to the PRC.

YEON-VOGELHEIM did not know GUAN LEI and ZHAO KAIKAI were affiliated with the National University of Defense Technology (NUDT). YEON-VOGELHEIM thought all people referenced in the paper were 4MMU. She would have learned that information if she had spoken to the case agents.

YEON-VOGELHEIM opined if a person affiliated with NUDT met the additional criteria listed in the white paper draft, then that person would be worthy of an investigation.

YEON-VOGELHEIM did not know evidence was destroyed at the time she wrote her white paper draft; she learned about it after. If YEON-VOGELHEIM knew this information at the time, she would have included it in her white paper draft.

YEON-VOGELHEIM would like for the Intelligence Community to make a determination regarding the relationship between the PLA and its students, specifically in regards to their military members, contractors, and civilians. If this happened and additional information was learned, YEON-VOGELHEIM could adjust her assessment.

YEON-VOGELHEIM did not consider herself to be an expert in PLA matters yet but is interested in learning new information.

YEON-VOGELHEIM had not changed her assessment reflected in the white paper draft as she believed the impact of the arrests at that time was minimal based on the PRC tech transfer threat.

If the arrests had not been nominated for an award, YEON-VOGELHEIM probably would have not written her white paper draft. The reasons for the white paper draft were to highlight that only two of the seven people arrested were assessed by YEON-VOGELHEIM to be involved in tech transfer; caution people against using terms such as "undercover" and "spies;" and to

allocate resources appropriately to high priority threats. The white paper draft was not intended to dispute any other national security threats.

[Agent note: The interview began at approximately 11:08 am Eastern and ended at approximately 1:27 pm. YEON-VOGELHEIM was offered a break at approximately 12:24 pm but declined.]